## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>         Plaintiff,<br><br>         v.<br><br>NDG Financial Corp., Northway Financial Corp., Ltd., Northway Broker, Ltd., E-Care Contact Centers, Ltd., Blizzard Interactive Corp., Sagewood Holdings, Ltd., New World Consolidated Lending Corp., New World Lenders Corp., Payroll Loans First Lenders Corp., and New World RRSP Lenders Corp.,<br><br>         Defendants. | Case No. _____<br><br>__COMPLAINT__ |

The Consumer Financial Protection Bureau (Bureau) brings this action against Defendants NDG Financial Corp., Northway Financial Corp., Ltd., Northway Broker, Ltd., E-Care Contact Centers, Ltd., Blizzard Interactive Corp., Sagewood Holdings, Ltd., New World Consolidated Lending Corp., New World Lenders Corp., Payroll Loans First Lenders Corp., and New World RRSP Lenders Corp. (Defendants or the NDG Enterprise).

## INTRODUCTION

1.      Defendants, operating through a maze of interrelated companies, originate, service, and collect payday loans that are void in whole or in part under state law in seventeen states including New York. Defendants deceive consumers into believing that federal and state laws do not apply to the Defendants or the loans. Defendants also use various unfair and deceptive tactics in securing repayment of the payday loans.

2.     The Bureau brings this action under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a); and the Credit Practices Rule, 16 C.F.R. §444.1(a), §444.2(a)(3)(i)-(iii). This action seeks permanent injunctive relief; restitution; the refund of monies paid; disgorgement of ill-gotten monies; and other equitable relief for Defendants' violations of the CFPA and the Credit Practices Rule.

## JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5564(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C § 1345.

4.     Venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here and Defendants do business here. 28 U.S.C. § 1391(b); 12 U.S.C. § 5564(f).

## PLAINTIFF

5.     The Bureau is an independent agency of the United States Government created by the CFPA. 12 U.S.C. § 5491(A). The Bureau is charged with enforcing Federal consumer financial laws. 12 U.S.C. §§ 5563, 5564.

6.     The CFPB is authorized to initiate federal district court proceedings in its own name and through its own attorneys to address violations of Federal consumer financial law, including the CFPA. 12 U.S.C. § 5564(a)-(b). Sections 1031 and 1036(a) of the CFPA, 12 U.S.C. §§ 5531 and 5536(a), prohibit unfair, deceptive, or abusive acts or practices, or other violations of Federal consumer financial law, by any covered person or service provider.

## DEFENDANTS

7.     NDG Financial Corp. (NDG Financial) is a Canadian corporation with its principal place of business at Suite 200, 15225 104th Avenue, Surrey, British Columbia.

8.     NDG Financial lists its registered office mailing address at Suite 3334, Four Bentall Centre, P.O. Box 49116, 1055 Dunsmuir Street, Vancouver, British Columbia.

9.     NDG Financial is a privately held global e-commerce company focused on providing payday loans in the United States over the Internet through its wholly owned subsidiary companies.

10.     NDG Financial and its subsidiaries are under common ownership.

11.     At all times material to this complaint, NDG Financial, acting through its wholly owned subsidiary companies, advertised, marketed, originated, serviced, and collected on the extension of credit in the form of payday loans to consumers residing in this district and throughout the United States.

12.     Those activities are "consumer financial services" under the CFPA. 12 U.S.C. § 5481(5)(A), (A)(i), (A)(x).

13.     NDG Financial provided "material services" to its subsidiaries in order to facilitate the NDG Enterprise's payday lending activities. NDG Financial personnel established and managed banking and payment processing relationships with US-based service providers on behalf of NDG Financial's wholly owned subsidiaries. NDG Financial is therefore an "affiliate," "service provider," and "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6)(B), (26)(A)(i).

14.     Northway Financial Corp., Ltd. (Northway), registered as a private limited liability company under the Malta Companies Act of 1995 and licensed by the Malta

Financial Services Authority (MFSA), is a wholly owned subsidiary of NDG Financial with its principal place of business located at Level 8, Plaza Commercial Centre, Bisazza Street, Sliema, Malta.

15.     Northway, as the lending arm of the NDG Enterprise payday loan operation, extends credit to US consumers in the form of payday loans using a series of Internet "doing business as" websites, including CashTransferCenters.com; PRLDirect.com; 247Greenstreet.com; GreenPicket.com; PaydayAvenue.com; CashTaxi.com; PixyCash.com; SonicPayday.com; and Zip19.com (the DBA websites).

16.     Northway provides a "consumer financial product or service," and is therefore a "covered person" under the CFPA.  12 U.S.C. § 5481(6)(A), (15)(A)(i). It is also a "lender" under the Credit Practices Rule. 12 C.F.R. § 444.1(a).

17.     Northway Broker, Ltd. (Northway Broker), registered as a private limited liability company under the Malta Companies Act of 1995 and licensed by the MFSA, is a wholly owned subsidiary of NDG Financial that shares its principal place of business with Northway in Sliema, Malta.

18.     Northway Broker provides money brokering services to US consumers applying for payday loans from Northway via the DBA websites.

19.     Northway Broker generates revenue by charging broker fees for Northway's loan transactions as well as Non-Sufficient Funds (NSF) fees to consumers that default on payment.

20.     Northway Broker provides a "consumer financial product or service" and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6)(A), (15)(A)(i). It is also a "lender" under the Credit Practices Rule. 12 C.F.R. § 444.1(a).

4

21.     Northway Broker also provides "material services" to Northway by contracting with credit reporting agencies that provide background information on potential Northway loan applicants. It is therefore also an "affiliate" and "service provider" under the CFPA. 12 U.S.C. § 5481(1), (26)(A).

22.     E-Care Contact Centers, Ltd.  (E-Care), incorporated in Canada, is a wholly owned subsidiary of NDG Financial.

23.     E-Care shares both its principal place of business and registered office address with NDG Financial.

24.     E-Care has an additional location at Suite 300, 433 Main Street, Winnipeg, Manitoba.

25.     E-Care collects payday loans extended by Northway, which constitutes a "consumer financial service" under the CFPA and makes E-Care a "covered person" under the CFPA. 12 U.S.C. § 5481(5)(A), (15)(A)(x), (6).

26.     Blizzard Interactive Corp. (Blizzard) is a Canadian incorporated, wholly owned subsidiary of NDG Financial with its principal place of business at Suite 500, 433 Main Street, Winnipeg, Manitoba.

27.     Blizzard also shares an address with NDG Financial and E-Care.

28.     Blizzard identifies potential payday loan customers for Northway by generating a demographic profile of its target customers, including their state of residence.

29.     Blizzard then sends this profile to third-party lead generators and pays a fee for any leads referred.

30.     Blizzard is therefore an "affiliate," "service provider," and "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6), (26).

31.     Defendant Sagewood Holdings, Ltd. (Sagewood) is a Canadian corporation that shares its registered office mailing address with NDG Financial and E-Care.

32.     Sagewood also lists an address at Suite 400, 15225 104th Avenue, Surrey, British Columbia.

33.     Sagewood controls a 50.1% share of NDG Financial, which in turn owns Northway in its entirety.

34.     Sagewood is therefore a "related person" and "covered person" under the CFPA. 12 U.S.C. § 5481(6), (25).

35.     New World Consolidated Lending Corp. (NWCL), New World Lenders Corp.(NWL), Payroll Loans First Lenders Corp. (PLFL), and New World RRSP Lenders Corp. (NWRL) (collectively, the Funding Entities) are NDG Financial wholly owned subsidiaries located in Canada that issue private bonds to individual and corporate investors.

36.     The NDG Enterprise then uses these investment funds to extend loan principal to US consumers via Northway.

37.     By raising money that is then extended to US consumers in the form of loan principal, the Funding Entities participate in the operation and maintaining of the NDG Enterprise's payday lending service and are therefore NDG Financial and Northway "affiliates," "service providers," and "covered persons" under the CFPA. 12 U.S.C. § 5481(1), (6), (26).

## COMMON ENTERPRISE

38.     Defendants NDG Financial, Northway, Northway Broker, E-Care, Blizzard, Sagewood, NWCL, NWL, PLFL, and NWRL have operated as a common enterprise

while engaging in the unfair, deceptive, and abusive acts and practices and other violations of law described below.

39.     The NDG Enterprise has conducted its business practices through an interrelated network of companies that have common ownership, management, business functions, addresses, office space, and employees.

40.     The Chief Executive Officer and Chief Strategy Officer for NDG Financial also hold leadership positions in NDG Financial's subsidiaries: Northway, Northway Broker, E-Care, and Blizzard.

41.     Ownership of NDG Financial and its subsidiaries is shared by three Canadian citizens.

42.     In addition, the NDG Enterprise has distributed funds collected from US consumers amongst its various entities using shared bank accounts located in the US and Canada.

43.     Because these entities have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

### DEFENDANTS' BUSINESS PRACTICES

44.     Since at least July 21, 2011, NDG Financial, through its wholly owned subsidiaries, has extended high-cost, short-term installment loans, also known as payday loans, exclusively over the Internet to consumers in all fifty of the United States.

45.     Blizzard identifies customers for Northway's loans by purchasing leads from lead generation companies.

46.     Consumers apply for loans via DBA websites managed by Northway Broker.

47.    The Funding Entities generate the capital to fund the loans that Northway makes to US consumers.

48.    Northway originates the loans.

49.    E-Care collects the debts.

50.    NDG Financial and E-Care establish and manage the service provider relationships required for continued funding and operation of the lending enterprise.

### Blizzard identifies potential consumers for Northway's Loans

51.    Blizzard establishes required demographic criteria for the consumers to whom it seeks to market the NDG Enterprise's loans.

52.    Blizzard then sends its required criteria to the lead generators.

53.     One of the criteria that Blizzard uses to identify customers is the consumer's state of residency. For example, in June 2013, Blizzard targeted consumers residing in the United States, with the exception of Georgia, Pennsylvania, Puerto Rico, West Virginia, American Samoa, Guam, Mariana Islands, and North Dakota.

54.    In June 2013, Blizzard worked with a lead generator to target consumers residing in New York and New Jersey.

55.    Blizzard maintains software that redirects its purchased leads to the DBA websites.

### Consumers Access Northway's Loans Through the DBA Websites

56.    Each DBA website server has been physically housed (aka "hosted") with Canadian and US-based telecommunications companies using the following domain name servers associated with E-Care: dns1.ecarecenters.net, dns2.ecarecenters.net, and dns3.ecarecenters.net.

8

57.    A publicly available domain name search indicates that the DBA websites use servers physically located in the United States or Canada.

58.    In order to apply for a loan via the websites, the consumer must first establish a personal website account by creating a user name and password.

59.    Once the account is created, the website prompts the consumer to enter the amount for which he or she is applying.

60.    Consumers are required to enter their checking account number, social security number, date of birth, and home address.

61.    The websites further indicate that the loan funds will be disbursed directly into the consumer's checking account through an ACH credit.

### The NDG Enterprise disburses and receives funds via ACH transfer

62.    The NDG Enterprise uses US-based banks, payment processors, and money transmitters to transfer funds to and from US consumers, typically through Automated Clearing House (ACH) credit and debit entries.

63.    In order to disburse funds to and collect funds from US consumers through the ACH network, NDG Financial and E-Care employees established and maintained accounts with several US-based Originating Depository Financial Institutions, Third Party Payment Processors, and money services transmitters in Northway's name.

64.    Originating Depository Financial Institutions ("ODFIs") are financial institutions that initiate credit and debit entries via the ACH system.

65.    Third Party Payment Processors ("TPPPs") are nonbank companies that process ACH and other types of payments on behalf of their merchant clients using accounts they establish with ODFIs.

9

66.     NDG Financial employees communicate with its ODFIs and TPPPs using e-mail accounts belonging to NDG Financial, Northway, and E-Care.

67.     For example, Northway's Treasury Manager sent e-mails using @ndgfinancial.com and @ecarecenters.com addresses.

68.     NDG Enterprise personnel have also established twelve affiliated accounts at a Canadian financial institution on behalf of NDG Enterprise entities, including NDG Financial, Northway, E-Care, Blizzard, NWCL, NWL, PLFL, and NWRL.

69.     Northway loan repayments are deposited into Northway's accounts with a US-based ODFI.

70.     NDG Enterprise personnel then wire funds from Northway's US-based ODFI accounts to its Canadian-based accounts which are then funneled to the affiliated subsidiary accounts identified above.

## NDG Enterprise Loan Characteristics

71.     The NDG Enterprise originates, services, and collects payday loans in all fifty states, including states such as New York in which those loans have no legal effect because they violate state usury caps and licensing requirements.

72.     The loans are generally short term (14 days), ranging from $100-$1500 with finance charges between $19.98 and $26.98 per $100 borrowed.

73.     In addition, some loan agreements include a wage assignment clause that, by its terms and conditions, is not revocable and does not contain an opt-out provision.

74.     According to the wage assignment clause, if the consumer defaults on the loan for more than seven days from the date that payment is due, the consumer authorizes the NDG Enterprise to instruct the consumer's employer to pay the outstanding loan amount directly to the NDG Enterprise from the consumer's wages.

75.     In numerous instances, Defendants, pursuant to wage assignment clauses signed by consumers, received money directly from the consumers' employers' payroll accounts via ACH debit entries.

76.     Records from one of Defendants' ODFI's shows ACH debit entries from various business entity accounts that Defendants admit, in correspondence with that ODFI, represent loan repayments pursuant to consumer wage assignment clause authorizations.

77.     Below is a sample chart on the CashTaxi.com website from May 2013 disclosing the cost of the loan in terms of both a flat fee and annual percentage rate:

| Loan Term (days) | Loan Amount | Total Fees | Days in a Year | APR |
|---|---|---|---|---|
| 14 | $100.00 | $22.98 | 365 | 599.12% |
| 14 | $100.00 | $25.98 | 365 | 677.34% |
| 14 | $100.00 | $26.98 | 365 | 703.41% |
| 14 | $500.00 | $114.90 | 365 | 599.12% |
| 14 | $500.00 | $129.90 | 365 | 677.34% |
| 14 | $500.00 | $134.90 | 365 | 703.41% |
| 14 | $1000.00 | $229.80 | 365 | 599.12% |
| 14 | $1000.00 | $259.80 | 365 | 677.34% |
| 14 | $1000.00 | $269.80 | 365 | 703.41% |
| 14 | $1500.00 | $344.70 | 365 | 599.12% |
| 14 | $1500.00 | $374.70 | 365 | 677.34% |
| 14 | $1500.00 | $404.70 | 365 | 703.41% |

## Defendants' Collection Practices

78.     Once the loan is disbursed to the consumer, E-Care collects delinquent payments on behalf of the NDG Enterprise.

79.     E-Care, using the name of the DBA website through which the consumer selected the loan, contacts delinquent consumers by phone, e-mail, and letter, restating the consumer's obligation to repay the principal and interest in full, along with a $39.00 NSF fee, and a $20.00 late payment fee.

11

80.     In numerous instances, the NDG Enterprise, through E-Care, falsely represented to consumers that non-payment of debt would result in lawsuit, arrest, imprisonment, or wage garnishment, despite lacking the intention or legal authority to take such actions.

81.     In fact, the NDG Enterprise had no intention of suing individuals in the United States.

82.     In correspondence with an ODFI, Defendants admitted that they do not sue individuals in the United States.

83.     The NDG Enterprise also has no intention of employing wage garnishment as a collections technique.

84.     In correspondence with an ODFI, Defendants admitted that they do not employ wage garnishment in the United States.

85.     Between July 21, 2011, and 2014, the NDG Enterprise furnished information to credit reporting agencies on trade lines belonging to consumers residing in all fifty states, including approximately at least 15,000 trade lines belonging to New York residents.

### Defendants' Assertions of Federal and State Law Immunity

86.     Some of the loan agreements, issued by Northway and Northway Broker on behalf of the NDG Enterprise, expressly claimed that Northway and Northway Broker were not subject to any laws of the US federal government or any state.

87.     The loan agreements also asserted that US federal and state laws did not apply to Northway and Northway Broker, the consumer's account, or to the terms of the loan agreement.

88.     In response to consumers that contacted Defendants to report a complaint, dispute a charge, or request reimbursement, Defendants asserted that the consumers' state laws did not apply.

89.     For example, Defendants frequently sent a form letter to complaining consumers, which stated:

> If you take a moment to review the attached loan agreement, you will see that Northway Financial Corporation Ltd. is a Financial Institution licensed and regulated in accordance with the European Union (EU) Directives. As such, the laws of the Republic of Malta (member State of the European Union), not the state of [consumer's state of residence] applies to its terms. We provided you with this notice so that you would understand the terms of your loan.

90.     In response to hundreds of complaints against Northway for alleged violations of consumer protection laws, several states have issued Cease and Desist orders to Northway, directing it to stop extending unlicensed loans that do not comply with various state consumer lending law protections.

91.     Those states include: Michigan (2014), California (2012, 2013, and 2014), Virginia (2013), New Hampshire (2011), Maine (2011), Oregon (2011), and Pennsylvania (2010).

92.     In some instances, after receiving the Cease and Desist orders, the NDG Enterprise continued to originate, service, or collect loans in those states.

93.     In some instances, the NDG Enterprise responded to state regulators through a Malta-based law firm, which claimed that because Northway is physically located in Malta it does not transact business in any US state, and is therefore not subject to state law.

13

94.     In further contrast to what it tells consumers, the NDG Enterprise, in an application filed with a US bank in order to process ACH transactions, acknowledged that it was subject to US federal law:

> US Operations are governed under federal law. As detailed by NDG [Financial]'s management, US companies can operate either under the Federal law or State law, and are subject to the regulations and taxes according to the choice of law. As NDG [Financial] is an Internet company with no physical location in any state, NDG [Financial] opted to be regulated under Federal law, which provides it the freedom to operate across differing states. Challenge with opting for Federal law is the company is occasionally subject to cease and desist orders from States who are unaware they are operating under Federal law.

95.     The NDG Enterprise underwent annual external audits of its financial statements by an independent accounting firm.

96.     These external audits placed the NDG Enterprise on notice that its payday lending operations were subject to US federal and state law.

97.     The 2010 audit report stated that (1) the NDG Enterprise was subject to extensive regulation in the jurisdictions in which it operated; (2) there was a risk that regulatory authorities in those jurisdictions would apply specific lending legislation on loans issued to borrowers residing in those jurisdictions; (3) there was a risk that the NDG Enterprise was violating specific loan legislation in the borrowers' jurisdictions; and (4) that the interest rates on NDG Enterprise loans would exceed the maximum permissible rate of interest in some borrowers' jurisdictions, thus making the borrowers' obligations legally unenforceable.

98.     According to the audit, the NDG Enterprise informed the auditor that it conducted business in accordance with the applicable laws of the respective jurisdictions.

99.     The NDG Enterprise told a service provider that its practices were consistent with the requirements of US consumer protection statutes and that all laws related to the collection of debt in the jurisdiction in which the customer resides were adhered to at all times.

100.    Further, records show that an ODFI service provider met with NDG Enterprise personnel to express concerns about the Enterprise's compliance with federal and state laws.

101.    The NDG Enterprise responded by claiming it did not need to comply with state licensing requirements because its US operations were governed by federal law and that it was "federally registered."

## STATE LAWS PROTECTING CONSUMERS
## WHO TAKE OUT SMALL DOLLAR LOANS

102.    In addition to extending payday loans in states that have affirmatively tried to stop Defendants from selling unlicensed and illegal payday loans to their citizens, Defendants have originated, serviced, and collected on loans that consumers are not obligated to pay, in whole or in part, based on state licensing regulations or usury caps that render non-compliant loans, such as those offered by Defendants, void.

103.    Many states protect consumers from harmful practices associated with the origination, servicing, and collection of payday loans.

104.    Such legal protections include restrictions upon the types of entities which may engage in these types of transactions, licensing requirements, and civil and criminal usury limits.

105.    Loans that violate these laws are declared void, meaning that the lender has no legal right to collect, and the borrower is not obligated to pay, some or all of the principal or interest on the loan.

### Interest-Rate Caps

106.    The following states have enacted laws that render payday loans void if they exceed the usury limit:

   a. Arkansas, whose state constitution provides that all contracts with interest in excess of 17% "shall be void as to principal and interest. . . ." Ark. Const. amend. 89, §§ 3, 6(b);

   b. Minnesota, which caps interest rates for (a) written loan contracts at 8% absent applicability of another statute, Minn. Stat. § 334.01, subdiv. 1; and (b) consumer short-term loans at 21.75% APR, or the total of 33% a year on the part of the unpaid balance up to $1,125 and 19% a year on the part of the unpaid balance above $1,125. Minn. Stat. §47.59, subdiv. 3(a). Loans that exceed these rates are void and the borrower has no obligation to pay any amounts owing on them. Minn. Stat. §§ 334.03, 47.601, subdiv. 6(b);

   c. New Hampshire, which prohibits annual interest rates above 36% for loans of $10,000 or less. N.H. Rev. Stat. § 399-A:12(I). Loans that do not comply with those restrictions are void, and the lender has no right to collect any principal, charges, or recompense. N.H. Rev. Stat. § 399-A:11(V);

   d. New York, which prohibits any person or corporation not licensed by the state of New York from "directly or indirectly charg[ing], tak[ing]

16

or receiv[ing] any interest . . . at a rate exceeding" annual interest of 16% on covered loans. N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a(1). Loans that exceed the rate are void. N.Y. Gen. Oblig. Law § 5-511; *see also Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986) ("[A] usurious transaction is void *ab initio* . . . ."); and

e.  North Carolina, which imposes a tiered set of interest-rates limits with a maximum of 30% on loans below $15,000 and repayable between 12 and 96 months. N.C. Gen. Stat. § 53-176(a). Loans that violate this provision are void, and the lender has no right to collect, receive, or retain any principal or charges. N.C. Gen. Stat. § 53-166(d).

107.  Colorado prohibits annual interest above 12% on unpaid balances for loans other than supervised loans. Colo. Rev. Stat. § 5-2-201(1). For supervised loans, Colorado prohibits a supervised lender from receiving a finance charge exceeding the equivalent of the greater of either of the following: (a) the total of 36% on unpaid balances of $1,000 or less, 21% on unpaid balances between $1000.01 and $3,000, and 15% on unpaid balances greater than $3,000, or (b) 21% per year on unpaid balances. Colo. Rev. Stat. § 5-2-201(2). Consumers are relieved of the obligation to pay any charge that exceeds these limits and are entitled to a refund from the lender or assignee for any excess amount that they paid. Colo. Rev. Stat. § 5-5-201(2).

108.  Defendants made loans to consumers in Arkansas, Minnesota, New Hampshire, New York, and North Carolina that charged interest at rates exceeding those allowed by the laws of the respective states, and therefore, those loans are void.

109.    Defendants made loans to consumers in Colorado that charged interest at rates exceeding those allowed by Colorado law, and therefore, consumers were relieved of the obligation to pay charges in excess of the legal limits.

### Licensing Requirements

110.    The following states have implemented licensing regimes that include measures aimed at preventing and penalizing harmful consumer lending practices: Alabama, Arizona, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and Utah. The licensing regimes in these states reflect substantive consumer-protection concerns by, for instance:

    a.  ensuring that licensees possess the requisite character, integrity, and experience (Ariz. Rev. Stat. § 6-603(F)(2); Colo. Rev. Stat. § 5-2-302(2); Ind. Code § 24-4.5-3-503(2); 209 Mass. Code Regs. 20.03; N.C. Gen. Stat. § 53-168(a)(2); N.H. Rev. Stat. § 399-A:4(I); N.Y. Banking Law § 342); and

    b.  ensuring compliance with loan-term and disclosure regulations by requiring compliance examinations and investigations by state regulators as well as recordkeeping and annual reports (Ariz. Rev. Stat. §§ 6-607, 6-608(A), 6-609(A)-(D); Colo. Rev. Stat. §§ 5-2-304, 5-2-305; Ind. Code § 24-4.5-3-505; Mass. Gen. Laws ch. 140 §§ 97-99; N.H. Rev. Stat. §§ 399-A:6, 399-A:10; N.Y. Banking Law §§ 348, 349; N.C. Gen. Stat. §§ 53-184).

111.     These state licensing statutes reflect the strong public policy interest in ensuring that entities seeking to engage in the consumer-lending business are vetted and supervised by regulators for compliance with consumer protections and other laws.

112.     The following state laws render payday loans void if they are made without a license. If a covered loan is made without a license in the following states, the entity has no right to collect from consumers, or the consumers have no obligation to repay certain loan amounts:

a.   Alabama, which voids covered loans of $1,000 or less that are made without a license, and the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans, Ala. Code § 5-18-4(a), (d);

b.   Arizona, which voids covered loans of $10,000 or less that are made or procured without a license, and the lender has no right to collect any principal, finance charges, or other fees in repayment of such loans, Ariz. Rev. Stat. §§ 6-601(5)-(7), 6-602(B), 6-603(A), 6-613(b);

c.   Illinois, which voids consumer-installment loans for principal amounts not exceeding $40,000 made after January 1, 2013, without a license, and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan, 205 Ill. Comp. Stat. §§ 670/1 (2012), 670/20(d) (2013);

d.   Indiana, which voids covered loans made without a license in which the finance charge exceeds 25% a year, and the debtor has no obligation to pay either the principal or finance charges on such loans, Ind. Code §§ 24-4.5-5-202(2), 24-4.5-3-502(3);

e.  Kentucky, which voids covered loans of $15,000 or less if the interest rate exceeds 8% and the loan is made without a license, and the lender has no right to collect any principal, charges, or recompense whatsoever on such loans, Ky. Rev. Stat. Ann. §§ 286.4-991(1), 286.4-420, 360.010(1);

f.  Massachusetts, which voids covered loans of $6,000 or less if interest and expenses on the loan exceed 12% a year and the loan is made or purchased without a license, and the lender or purchaser has no right to collect money in repayment of such loans, Mass. Gen. Law. Ch. 140, §§ 96, 110;

g.  Minnesota, which voids covered loans of $1,000 or less that are made without a license, and the borrower is not obligated to pay any amounts owing on such loans, Minn. Stat. § 47.601, subdiv. 1(d), subdiv. 6(b)(1);

h.  Montana, which voids covered loans in any amount that are made, or for which any compensation is contracted for, charged, or received directly or indirectly, by a person without a license, and the person does not have the right to collect, receive, or retain any principal, interest, fees, or other charges on such loans, Mont. Code Ann. § 32-5-103(1), (4);

i.  New Hampshire, which voids covered loans of $10,000 or less that are made without a license, and the lender has no right to collect such loans, N.H. Rev. Stat. §§ 399-A:1(XIV), 399-A:2(I), (IV);

j.  New Jersey, which voids consumer loans of $50,000 or less that are made without a license, and the lender has no right to collect or receive

any principal, interest, or charges on such loans, unless the act was the result of good faith error, N.J. Rev. Stat. §§ 17:11C-2, 17-11C-3, 17-11C-33(b);

k. New Mexico, which voids loans of $2,500 or less made by a person with no license, and the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans, N.M. Stat. § 58-15-3;

l. New York, which voids personal loans of $25,000 or less that are made without a license and where the interest or other charge exceeds that permitted to a licensee, and the lender has no right to collect such loans, N.Y. Banking Law §§ 340, 355;

m. North Carolina, which voids covered loans of $15,000 or less that are made or secured for repayment without a license, and any party in violation shall not collect, receive, or retain any principal or charges with respect to such loans, N.C. Gen. Stat. § 53-166(a), (d);

n. Ohio, which voids loans of $5,000 or less that are made without a license, and the lender has no right to collect, receive, or retain any principal, interest, or charges on such loans, Ohio Rev. Code Ann. § 1321.02; and

o. Utah, which voids deferred deposit loans made by persons who have not registered with the Department of Financial Institutions, and the lender has no right to collect, receive, or retain any principal or other interest or fees in connection with the loan, Utah Code Ann. § 7-23-201(1)(a), (7).

113.    Colorado relieves the consumer's obligation to pay finance charges to the lender or assignee where the lender or assignee has failed to obtain the requisite license. Colo. Rev. Stat. §§ 5-5-201(1), 5-2-301(1)(a), (b), 5-1-301(17).

114.    Defendants were not licensed to make loans in any US state.

115.    Defendants made loans to consumers residing in Alabama, Arizona, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Utah, and Colorado, and those loans are void because of Defendants' failure to acquire the required licenses.

116.    Defendants made loans to consumers residing in Colorado, and those consumers were relieved of the obligation to repay finance charges because of Defendants' failure to acquire the required licenses.

### Summary of States in Which Defendants' Loans Are Void in Whole or in Part

117.    Defendants' loans were void in the following states based on state licensing law, state usury law, or both: Alabama, Arizona, Arkansas,  Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and Utah.

118.    Colorado relieves consumers of the obligation to repay excess fees and finance charges for loans that exceed interest rates limits or are issued without a license.

119.    These states are hereinafter referred to as the "Subject States."

## VIOLATIONS OF THE CONSUMER
## FINANCIAL PROTECTION ACT

### Unfair, Deceptive, or Abusive Acts or Practices

120.     Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1), prohibit a "covered person" or "service provider" from engaging in "any unfair, deceptive or abusive act or practice." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

121.     An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

122.     An act or practice is abusive if it materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service. 12 U.S.C. § 5531(d)(1).

### Count I

*Deception Relating to the Collection of Loan Payments which Consumers Did Not Owe*

123.     The Bureau realleges and incorporates by reference paragraphs 1-122 of this Complaint.

124.     Through the actions set forth above, Defendants represented expressly or by implication that consumers residing in the Subject States were obligated to repay loan amounts, an obligation that in fact did not exist because the loans violated state licensing and/or usury laws that declared such amounts void *ab initio*.

125.     Through the following actions, Defendants reinforced the misrepresentations that consumers were obligated to pay debts that were void in the Subject States:

       a.   Sending executed loan agreements;

    b.   Sending demand letters for payment;

    c.   Originating ACH debit entries from consumer bank accounts;

    d.   Offering and accepting repayment through money service transmitters; and

    e.   Contacting consumers by telephone to demand repayment.

126.    Defendants falsely represented that they had the legal right to collect certain loan payments for loans that were void under state law.

127.    Defendants falsely represented that consumers had the legal obligation to pay the loan amounts for loans which were void under state law.

128.    In numerous instances, consumers residing in Subject States were not under a legal obligation to repay the void amounts.

129.    Defendants' misrepresentations were likely to mislead reasonable consumers.

130.    Defendants' misrepresentations were material.

131.    Defendants' misrepresentations, actions, and materially incomplete statements constitute deceptive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

### Count II

*Unfairness Relating to the Collection of Loan Payments that Consumers Did Not Owe*

132.    The Bureau realleges and incorporates by reference paragraphs 1-131 of this Complaint.

133.    Defendants caused substantial injury by forcing consumers residing in the Subject States to pay illegal amounts that they did not owe.

134.    Consumers were unlikely to know that Subject States' usury laws and licensing requirements rendered Defendants' loans void, and thus consumers were unable to avoid paying illegal amounts to which Defendants were not entitled.

135.    Consumers could not reasonably avoid paying illegal amounts because Defendants repeatedly asserted that state law did not apply to the loan agreements.

136.    The injuries sustained by consumers residing in the Subject States were not outweighed by countervailing benefits to consumers or to competition.

137.    Defendants' actions constitute unfair acts in violation of 12 U.S.C. § 5536(a)(1)(B).

### Count III

*Abusiveness Relating to the Collection of Loan Payments that Consumers Did Not Owe*

138.    The Bureau realleges and incorporates by reference paragraphs 1-137 of this Complaint.

139.    The consumer's legal obligation to repay is a material term, cost, and condition of the loan.

140.    As set forth above, Defendants materially interfered with consumers' ability to understand that they were not under legal obligation to repay the loan amounts that were void under state law.

141.    Consumers residing in the Subject States likely were unaware that Defendants lacked the legal authority to collect the loans because the loans violated usury and licensing laws in those states.

142.    Defendants took unreasonable advantage of consumers' lack of understanding regarding the enforceability of the loans by collecting debts to which

Defendants were not legally entitled by repeatedly asserting that state law did not apply to the loan agreements.

143.    Defendants' actions constitute abusive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count IV

*Deception Relating to Applicability of US Federal and State Law*

144.    The Bureau realleges and incorporates by reference paragraphs 1-143 of this Complaint.

145.    In loan agreements and communications with consumers, Defendants represented that they and the loan agreements were not subject to US federal or state law.

146.    By contrast, Defendants told their service providers that they are, in fact, subject to US federal law.

147.    In fact, Defendants are subject to US federal and applicable state law.

148.    Defendants' external auditor placed Defendants on notice that they are subject to the laws of the borrowers' jurisdictions.

149.    Defendants told service providers that their practices complied with US consumer protection statutes and laws related to the collection of debt in the jurisdiction in which the customer resides.

150.    Defendants' representations that they were not subject to US federal or applicable state law were likely to mislead reasonable consumers.

151.    The governing law applicable to the parties and their respective rights and responsibilities relating to the loans was a material condition of the product.

152.   Defendants' representations that they were not subject to US federal or applicable state law were material.

153.   Defendants' representations constitute deceptive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count V

### *Abusiveness Relating to Applicability of US Federal and State Law*

154.   The Bureau realleges and incorporates by reference paragraphs 1-153 of this Complaint.

155.   Defendants' loan agreements and its communications with consumers materially interfered with consumers' abilities to understand that US federal and applicable state laws applied to Defendants and governed disputes arising from the use of Defendants' loans.

156.   The governing law applicable to the parties and their respective rights and responsibilities relating to the loans was a material condition of the product.

157.   Defendants' actions constitute abusive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count VI

### *Deception Relating to Consequences of Non-Payment*

158.   The Bureau realleges and incorporates by reference paragraphs 1-157 of this Complaint.

159.   Defendants, in numerous instances, represented to consumers that non-payment of debt would result in lawsuits, arrest, imprisonment, or wage garnishment.

160.   When Defendants made these representations, they did not intend to take the threatened actions.

161.    Defendants did not have the legal authority to take some of the actions they threatened.

162.    Defendants' representations were designed to increase the likelihood that consumers would repay the debt.

163.    Defendants admitted to their ODFI service provider that, "in order to garnish wages Northway would have to get a judgement [sic] first. Since Northway does not sue individuals in the United States, wage garnishment is not available to Northway as a method to collect form US customers. In addition, Northway has no intention in employing garnishment as a collection technique."

164.    Defendants' representations to US consumers regarding the actions Defendants would take were false and misleading and constitute deceptive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## VIOLATION OF THE CREDIT PRACTICES RULE

165.    The Credit Practices Rule (CPR) is a rule promulgated by the Federal Trade Commission (FTC) under Section 18 of the FTC Act, 15 U.S.C. § 57a.

166.    The Bureau is authorized to enforce a rule prescribed under the FTC Act by the FTC with respect to an unfair or deceptive act or practice to the extent that such rule applies to a covered person or service provider with respect to the offering or provision of a consumer financial product or service as if it were a rule prescribed under section 1031, 12 U.S.C. § 5531, of the CFPA. The Bureau therefore may enforce the CPR. 12 U.S.C. § 5581(b)(5)(B)(ii).

167.    The CPR defines a "lender" as "a person who engages in the business of lending money to consumers within the jurisdiction of the Federal Trade Commission." 16 C.F.R. § 444.1(a).

168.    Northway and Northway Broker are "lenders" as defined under the CPR and are "covered persons" under the CFPA.

169.    The Credit Practices Rule prohibits lenders, in connection with the extension of credit to consumers, from taking or receiving from a consumer an obligation that constitutes or contains an assignment of wages or other earnings unless: (i) the assignment by its terms is revocable at the will of the debtor, (ii) the assignment is a payroll deduction plan or preauthorized payment plan, commencing at the time of the transaction, in which the consumer authorizes a series of wage deductions as a method of making each payment, or (iii) the assignment applies only to wages or other earnings already earned at the time of the assignment. 16 C.F.R. § 444.2(a)(3).

170.    The Bureau is authorized to bring a civil action against any person that violates the CPR. 12 U.S.C. §§ 5564(a), 5581(b)(5)(B)(ii).

### Count VII

*Conditioning the Extension of Credit on an Irrevocable Wage Assignment Clause*

171.    The Bureau realleges and incorporates by reference paragraphs 1-170 of this Complaint.

172.    In numerous instances, in connection with the extension of credit to consumers, Defendants have taken or received from consumers an obligation that constitutes or contains an assignment of wages or other earnings where the assignment: (i) by its terms is not revocable at the will of the consumer, (ii) is not a payroll deduction plan or preauthorized payment plan, commencing at the time of the transaction, in which the consumer authorizes a series of wage deductions as a method of making each payment, and (iii) does not apply only to wages or other earnings already earned at the

time of the assignment, in violation of Section 444.2(a)(3) of the Credit Practices Rule, 16 C.F.R. § 444.2(a)(3).

## Count VIII

*Unfairness Relating to Conditioning the Extension of Credit on an Irrevocable Wage Assignment Clause*

173.   The Bureau realleges and incorporates by reference paragraphs 1-172 of this Complaint.

174.   Defendants' practice of conditioning some loan agreements upon irrevocable wage assignment clauses caused or was likely to cause substantial injury to consumers.

175.   Wage assignments occur without the procedural safeguards of a hearing and opportunity to assert defenses or counter claims.

176.   The use of irrevocable wage assignments causes serious and detrimental interference with employment relationships, negatively affects promotions, pay raises, and job assignments, and can result in job loss.

177.   Further, the use of irrevocable wage assignments disrupts consumers' finances and can make it difficult for a consumer to purchase necessities or discharge other obligations in a timely fashion.

178.   Consumers cannot reasonably avoid these injuries because some loans are conditioned upon the wage assignment clause and are irrevocable.

179.   Finally, these injuries are not outweighed by countervailing benefits to consumers or to competition.

180.   Defendants' actions constitute unfair acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## THIS COURT'S POWER TO GRANT RELIEF

181.    Under Section 1055 of the CFPA, 12 U.S.C. § 5565, this Court has "jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law . . ." including the CFPA. 12 U.S.C. § 5565(a)(1). This relief includes rescission, refund of monies, restitution, disgorgement or compensation for unjust enrichment, payment of damages or other monetary relief, public notification regarding the violation, limits on the activities or functions of the person, and civil money penalties. 12 U.S.C. § 5565(a)(2). In addition, the CFPB may recover its costs in connection with the action, if it is the prevailing party. 12 U.S.C. § 5565(b).

## PRAYER FOR RELIEF

182.    Wherefore, the CFPB, pursuant to Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, request that the Court:

a.    Permanently enjoin the Defendants from committing future violations of the CFPA, the CPR, or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b.    Award damages and other monetary relief as the Court finds necessary to redress injury to consumers resulting from the Defendants' violations of the CFPA and CPR including but not limited to restitution and the refund of monies paid;

c.    Order disgorgement against Defendants of ill-gotten gains;

d.    Award the costs of bringing this action;

e.    Award other injunctive relief as appropriate, including but not limited to the cessation of collection activities and the correction of information furnished to any credit reporting agencies; and

    f.   Award additional relief as the Court may determine to be just and proper.

Dated: July 2, 2015                  Respectfully submitted,

Anthony Alexis
*Enforcement Director*

Deborah Morris
*Deputy Enforcement Director*

Craig Cowie
*Assistant Litigation Deputy*

Natalie R. Williams
Charles R. Gayle
Edward J. Reilly
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Gayle): 202-435-9555
Telephone (Reilly): 202-435-9426
Fax: 202-435-7722
E-mail: charlie.gayle@cfpb.gov
E-mail: edward.reilly@cfpb.gov
*Attorneys for Consumer Financial Protection Bureau*