**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>              Plaintiff,<br><br>              v.<br><br>NDG Financial Corp., Northway Financial Corp., Ltd., Northway Broker, Ltd., E-Care Contact Centers, Ltd., Blizzard Interactive Corp., New World Consolidated Lending Corp., New World Lenders Corp., Payroll Loans First Lenders Corp., New World RRSP Lenders Corp., Peter Ash, Sagewood Holdings, Ltd., Kimberly DeThomas, Jeremy Sabourin, William Wrixon,<br><br>              Defendants,<br><br>Peter Ash, Sagewood Holdings, Ltd., Paul Ash, Knightsbridge Holdings Ltd., Paul Grehan, 0562752 B.C. Ltd., Kimberly DeThomas, Emerald Willow Holdings, Ltd.,  Jeremy Sabourin, Red River Holdings Company Ltd., William Wrixon, Twillingate Holdings Ltd.<br><br>              Relief Defendants. | Case No. 15cv5211 (CM)<br><br>**FIRST AMENDED COMPLAINT** |

The Consumer Financial Protection Bureau (Bureau) brings this action against

NDG Financial Corp., Northway Financial Corp., Ltd., Northway Broker, Ltd., E-Care

Contact Centers, Ltd., Blizzard Interactive Corp., New World Consolidated Lending

Corp., New World Lenders Corp., Payroll Loans First Lenders Corp., New World RRSP

Lenders Corp., Peter Ash, Sagewood Holdings Ltd., Kimberly DeThomas, Jeremy

Sabourin, and William Wrixon (Defendants). The Bureau also names Peter Ash,

Sagewood Holdings, Ltd., Paul Ash, Knightsbridge Holdings, Ltd., Paul Grehan,

0562752, B.C. Ltd., Kimberly DeThomas, Emerald Willow Holdings, Ltd., Jeremy

Sabourin, Red River Holdings Company, Ltd., William Wrixon, and Twillingate

Holdings Ltd., as Relief Defendants (collectively with Defendants, the NDG Enterprise).

## INTRODUCTION

1.     Defendants, operating through a maze of interrelated companies,

originate, service, and collect payday loans that are void in whole or in part under state

law in sixteen states including New York. Defendants deceive consumers into believing

that federal and state laws do not apply to the Defendants or the loans. Defendants also

use various unfair and deceptive tactics in securing repayment of the payday loans.

2.     The Bureau brings this action under the Consumer Financial Protection

Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a); and the Credit Practices

Rule, 16 C.F.R. §444.1(a), §444.2(a)(3)(i)-(iii). This action seeks permanent injunctive

relief; restitution; the refund of monies paid; disgorgement of ill-gotten monies; and

other equitable relief for Defendants' violations of the CFPA and the Credit Practices

Rule.

## JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction over this action because it is

brought under "Federal consumer financial law," 12 U.S.C. § 5564(a)(1), presents a

federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28

U.S.C § 1345.

4.     Venue is proper in this district because a substantial part of the events or

omissions giving rise to the claims occurred here and Defendants do business here. 28

U.S.C. § 1391(b); 12 U.S.C. § 5564(f).

## <u>PLAINTIFF</u>

5.      The Bureau is an independent agency of the United States Government created by the CFPA. 12 U.S.C. § 5491(A). The Bureau is charged with enforcing federal consumer financial laws. 12 U.S.C. §§ 5563, 5564.

6.      The CFPB is authorized to initiate federal district court proceedings in its own name and through its own attorneys to address violations of federal consumer financial law, including the CFPA. 12 U.S.C. § 5564(a)-(b). Sections 1031 and 1036(a) of the CFPA, 12 U.S.C. §§ 5531 and 5536(a), prohibit unfair, deceptive, or abusive acts or practices, or other violations of federal consumer financial law, by any covered person or service provider.

## <u>DEFENDANTS AND RELIEF DEFENDANTS</u>

7.      The NDG Enterprise includes a collection of commonly controlled companies located in Canada and Europe that function as a seamless unit to offer unlicensed and usurious payday loans over the Internet to US consumers.

8.      The NDG Enterprise, which includes Sagewood Holdings Ltd., (Sagewood), Peter Ash, Knightsbridge Holdings Ltd. (Knightsbridge), Paul Ash, 0562752 B.C. Ltd. (0562752), Paul Grehan, Emerald Willow Holdings, Ltd., (Emerald Willow), Kimberly DeThomas, Red River Holdings Company, Ltd. (Red River), Jeremy Sabourin, Twillingate Holdings Ltd., (Twillingate), William Wrixon,  NDG Financial Corp., (NDG Financial), Northway Financial Corp. Ltd. (Northway), Northway Broker Ltd., (Northway Broker), E-Care Contact Centers Ltd. (E-Care), Blizzard Interactive Corp. (Blizzard), New World Lenders Corp. (NWL), New World Consolidated Lenders

Corp. (NWCL), Payroll Loans First Lenders Corp. (PLFL), and New World RRSP

Lenders (NWRRSP), have collectively operated the payday lending scheme under

common control and ownership.

9.     From approximately 2005 until 2013, Sagewood owned 50.1% of NDG

Financial shares, Knightsbridge owned 39.8%, and 0562752 owned 10.1%.

10.    During this period, NDG Financial owned, directly or indirectly, the other

NDG Enterprise corporations.

11.    In approximately 2009, the NDG Enterprise reorganized resulting in all of

the Canadian corporations (E-Care, Blizzard, NWL, NWCL, PLFL, NWRRSP) being

owned, directly or indirectly, by NDG Financial and all of the European corporations,

including Defendants Northway and Northway Broker, being owned by New Northway

S.A. (New Northway).

12.    After the reorganization, Sagewood owned 50.1% of NDG Financial and

New Northway; Knightsbridge owned 39.8% of each and 0562752 owned 10.1%.

13.    On or about September 1, 2013, Sagewood transferred its majority interest

in NDG Financial and New Northway to Emerald Willow, while the remaining interests

were transferred from Knightsbridge and 05662752 to Red River and Twillingate

14.    Prior to the transfer, Defendant and Relief Defendant Peter Ash held

50.1% of NDG Financial and New Northway shares through his 100% interest in

Sagewood.

15.    Prior to the transfer, Relief Defendant Paul Ash held 39.8% of NDG

Financial and New Northway shares through his 100% interest in Knightsbridge.

16.    Prior to the transfer, Relief Defendant Paul Grehan held 10.1% of NDG

Financial and New Northway shares through his 100% interest in 0562752.

17. Defendant NDG Financial is a Canadian corporation with its principal place of business at Suite 200, 15225 104th Avenue, Surrey, British Columbia.

18. NDG Financial has also listed Suite 400, 15225 104th Avenue, Surrey, British Columbia as its address.

19. NDG Financial lists its registered office mailing address at Suite 3334, Four Bentall Centre, P.O. Box 49116, 1055 Dunsmuir Street, Vancouver, British Columbia.

20. NDG Financial is a privately held global e-commerce company focused on providing payday loans in the United States over the Internet through its subsidiaries and affiliate companies.

21. From approximately 2005 to 2013, NDG Financial was owned by Sagewood, Knightsbridge and 0562752.

22. NDG Financial is currently owned by Emerald Willow, Red River, and Twillingate.

23. At all times material to this Complaint, NDG Financial, acting through its affiliates (Northway and Northway Broker) and subsidiaries (E-Care and Blizzard), advertised, marketed, originated, serviced, and collected on the extension of credit in the form of payday loans to consumers residing in this district and throughout the United States.

24. Those activities are "consumer financial services" under the CFPA. 12 U.S.C.    § 5481(5)(A), (A)(i), (A)(x).

25.  NDG Financial provided "material services" to its affiliates and subsidiaries in order to facilitate the NDG Enterprise's payday lending activities. NDG Financial personnel established and managed banking and payment processing

relationships with US-based service providers on behalf of its subsidiaries and entities with which it is under common control. NDG Financial is therefore an "affiliate," "service provider," and "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6)(B), (26)(A)(i).

26.     Defendant Northway, registered as a private limited liability company under the Malta Companies Act of 1995 and licensed by the Malta Financial Services Authority (MFSA), has its principal place of business located at Level 8, Plaza Commercial Centre, Bisazza Street, Sliema, Malta.

27.     Northway, as the lending arm of the NDG Enterprise payday loan operation, extends credit to US consumers in the form of payday loans using a series of Internet "doing business as" websites, including CashTransferCenters.com; PRLDirect.com; 247Greenstreet.com; GreenPicket.com; PaydayAvenue.com; CashTaxi.com; PixyCash.com; SonicPayday.com; and Zip19.com (the DBA websites).

28.     Northway is directly or indirectly owned and operated by NDG Financial or its affiliates or related parties.

29.     Northway provides a "consumer financial product or service," and is therefore a "covered person" under the CFPA.  12 U.S.C. § 5481(6)(A), (15)(A)(i). It is also a "lender" under the Credit Practices Rule. 12 C.F.R. § 444.1(a).

30.     Defendant Northway Broker, Ltd. (Northway Broker), registered as a private limited liability company under the Malta Companies Act of 1995 and licensed by the MFSA, shares its principal place of business with Northway in Sliema, Malta.

31.     Northway Broker provides money brokering services to US consumers applying for payday loans from Northway via the DBA websites.

32.     Northway Broker generates revenue by charging broker fees for Northway's loan transactions as well as Non-Sufficient Funds (NSF) fees to consumers that default on payment.

33.     Northway Broker is directly or indirectly owned and operated by NDG Financial or its related parties or affiliates.

34.     Northway Broker provides a "consumer financial product or service" and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6)(A), (15)(A)(i). It is also a "lender" under the Credit Practices Rule. 12 C.F.R. § 444.1(a).

35.     Northway Broker also provides "material services" to Northway by contracting with credit reporting agencies that provide background information on potential Northway loan applicants. It is therefore also an "affiliate" and "service provider" under the CFPA. 12 U.S.C. § 5481(1), (26)(A).

36.     Defendant E-Care, incorporated in Canada, was formerly known as Payroll Loans, Ltd. and is a wholly owned subsidiary of NDG Financial.

37.     E-Care shares both its principal place of business and registered office address with NDG Financial.

38.     E-Care has also used Suite 400, 15225 104th Ave, Surrey BC as its address.

39.     E-Care has an additional location at Suite 300, 433 Main Street, Winnipeg, Manitoba.

40.     E-Care collects payday loans extended by Northway, which constitutes a "consumer financial service" under the CFPA and makes E-Care a "covered person" under the CFPA. 12 U.S.C. § 5481(5)(A), (15)(A)(x), (6).

41.     E-Care also provides "material services" to Northway by managing Northway's relationships with banks, Third Party Payment Processors (TPPP), and

credit reporting agencies, which makes it an "affiliate" and "service provider" under the CFPA. 12 U.S.C. § 5481(1), (26)(A).

42.    Defendant Blizzard is a Canadian incorporated, wholly owned subsidiary of NDG Financial with its principal place of business at Suite 500, 433 Main Street, Winnipeg, Manitoba.

43.    Blizzard also shares an address with NDG Financial and E-Care.

44.    Blizzard identifies potential payday loan customers for Northway by generating a demographic profile of its target customers, including their state of residence.

45.    Blizzard then sends this profile to third-party lead generators and pays a fee for any leads referred.

46.    Blizzard is therefore an "affiliate," "service provider," and "covered person" under the CFPA. 12 U.S.C. § 5481(1), (6), (26).

47.    Defendants NWL, NWCL, PLFL and NWRRSP (the Funding Entities) are NDG Financial wholly owned subsidiaries or affiliates located in Canada that assist in raising funds for the payday lending operation.

48.    Northway uses the funds raised by these entities to extend loan principal to US consumers.

49.    NWL is a private company incorporated under the laws of British Columbia in 2005 and is a wholly owned subsidiary of NWCL.

50.    NWL lists its address at Suite 200, 15225 104th Ave., Surrey, BC V3R 6Y8.

51.    NWCL is a private company incorporated under the laws of British Columbia and is a wholly owned subsidiary of NDG Financial.

8

52.     PLFL was a private company incorporated under the laws of British Columbia and in 2013, listed its address at Suite 200, 15225 104th Ave, Surrey BC, Canada.

53.     PLFL was dissolved on July 22, 2014.

54.     NWRRSP was a private company incorporated under the laws of British Columbia and in 2012, listed its address at Suite 200, 15225 104th Ave., Surrey, BC V3R 6Y8.

55.     NWRRSP was dissolved on November 29, 2013.

56.     NWL, PLFL, and NWRRSP were established primarily as vehicles to provide funding to NWCL which in turn provides funds to Northway.

57.     By raising money on behalf of Northway, which Northway then lends to US consumers in the form of loan principal, the Funding Entities participate in the operation and maintaining of the NDG Enterprise's payday lending service and are therefore NDG Financial and Northway "affiliates," "service providers," and "covered persons" under the CFPA. 12 U.S.C. § 5481(1), (6), (26).

58.     Defendant Sagewood is a Canadian corporation that has its registered office mailing address at Suite 200 8837 – 201 Street, Langley, BC V2Y 0C8.

59.     Individual Defendant Peter Ash is 100% owner of Sagewood as well as its sole director and officer.

60.     During time periods relevant to this Complaint, Peter Ash listed a business address at Suite 400 15225 104th Avenue, Surrey, British Columbia.

61.     Until September 1, 2013, Sagewood controlled a 50.1% share of NDG Financial.

62.     During time periods relevant to this Complaint, Sagewood controlled a 50.1% share of New Northway, which was formerly known as Northway S.a.r.l.

63.     New Northway owns 100% of the shares in Cumberland Holdings Ltd. (Cumberland).

64.     Cumberland owns 99.9% of the shares in Northway and Northway Broker.

65.     Sagewood and Peter Ash, its 100% owner, are therefore "related persons" and "covered persons" under the CFPA. 12 U.S.C. § 5481(6), (25).

66.     Internal NDG Enterprise documents refer to Peter Ash as a shareholder of the "NDG Group of companies," which included, NDG Financial, E-Care, Blizzard, NWL, NWCL, NWRRSP, PLFL, New Northway, Cumberland, Northway and Northway Broker.

67.     Peter Ash was an officer and director of NDG Financial, Northway, Northway Broker, Blizzard, E-Care, NWL, NWCL, and New Northway, and was charged with managerial responsibility over those entities during time periods relevant to this Complaint.

68.     Sagewood and Peter Ash materially participated in the affairs of NDG Financial, New Northway, and the NDG Enterprise and are therefore "related persons" and "covered persons" under the CFPA. 12 U.S.C. §5481(6), (25).

69.     Relief Defendant Emerald Willow lists its address at Suite 200, 15225 104th Ave, V3R 6Y8.

70.     Emerald Willow currently controls a majority of shares in NDG Financial.

71.     Emerald Willow is therefore a "related person" and "covered person" under the CFPA. 12 U.S.C. § 5481(6), (25).

72.     Individual Defendant and Relief Defendant Kimberly DeThomas (DeThomas) is the Chief Executive Officer of NDG Financial and E-Care and is charged with managerial responsibility over those entities.

73.     DeThomas is Chief Executive Officer (CEO), President, and Director of NWL.

74.     DeThomas is a Director of NWCL.

75.     DeThomas was CEO and President of NWRRSP at the time of its dissolution in 2013.

76.     DeThomas was a Director of PLFL at the time of its dissolution  in 2014.

77.     DeThomas is a Director of Northway.

78.     DeThomas is a Director of Northway Broker.

79.     DeThomas is a Director of Blizzard.

80.     DeThomas is therefore a "related person" and "covered person" under the CFPA. 12 U.S.C. §5481(6),(25).

81.     Individual Defendant and Relief Defendant Jeremy Sabourin (Sabourin) is the Chief Operating Officer of NDG Financial.

82.     Sabourin is President of Blizzard.

83.     Sabourin is an officer or director of E-Care, NWL, NWCL, PLFL, NWRRSP, and Red River Holdings Co., Ltd. (Red River).

84.     Sabourin is charged with managerial responsibility over NDG, E-Care, Blizzard, NWL, and NWCL.

85.     Sabourin is therefore a "related person" and "covered person" under the CFPA. 12 U.S.C. §5481(6),(25).

86.     Individual Defendant and Relief Defendant William Wrixon (Wrixon) is the Chief Financial Officer of NDG Financial, Blizzard, and NWL.

87.     Wrixon is also an officer or director for E-Care, Blizzard, NWRRSP, PLFL, NWCL, and Twillingate.

88.     Wrixon is charged with managerial responsibility of NDG, E-Care, Blizzard, NWL, and NWCL.

89.     Wrixon is therefore a "related person" and "covered person" under the CFPA. 12 U.S.C. §5481(6),(25).

90.     Relief Defendant Knightsbridge was incorporated on November 9, 2004 in British Columbia.

91.     Knightsbridge has listed its registered office at Suite 3334, Four Bentall Centre, P.O. Box 49116, 1055 Dunsmuir Street, Vancouver B.C., V7X 1G4 during time periods relevant to this Complaint.

92.     Knightsbridge owned 39.8% of shares in NDG Financial and New Northway during time periods relevant to this Complaint.

93.     Relief Defendant Paul Ash was the sole director, officer, and shareholder for Knightsbridge during time periods relevant to this Complaint.

94.     Knightsbridge and Paul Ash materially participated in the affairs of NDG Financial, and the NDG Enterprise and are therefore "related persons" and "covered persons" under the CFPA. 12 U.S.C. §5481(6), (25).

95.     Relief Defendant 0562752 (formerly Blackrock Capital Corp.) was incorporated on April 9, 1998 in British Columbia.

96.     0562752 has listed its registered office at Suite 3334 Four Bentall Centre, P.O. Box 49116, 1055 Dunsmuir Street, Vancouver, B.C., V7X 1G4 during time periods relevant to this Complaint.

97.     0562752 owned 10.1% of shares in NDG Financial and New Northway during time periods relevant to this Complaint.

98.     Relief Defendant Grehan was a director and shareholder of 0562752 during time periods relevant to this Complaint.

99.     0562752 and Grehan materially participated in the affairs of NDG Financial and the NDG Enterprise and are therefore "related persons" and "covered persons" under the CFPA. 12 U.S.C. §5481(6), (25).

100.    Relief Defendant Red River holds shares in NDG Financial and has materially participated in its affairs.

101.    Red River is therefore a "related person" and "covered person" under the CFPA. 12 U.S.C. §5481(6), (25).

102.    Relief Defendant Twillingate holds shares in NDG Financial and has materially participated in its affairs.

103.    Twillingate is therefore a "related person" and "covered person" under the CFPA. 12 U.S.C. §5481(6),(25).

## COMMON ENTERPRISE

104.    Sagewood, Peter Ash, Knightsbridge, Paul Ash, 0562752, Grehan, Emerald Willow, Kimberly DeThomas, Red River, Sabourin, Twillingate, Wrixon, NDG Financial, Northway, Northway Broker, E-Care, Blizzard, NWCL, NWL, PLFL, and NWRRSP have operated as a common enterprise (the NDG Enterprise) while engaging in the unfair, deceptive, and abusive acts and practices and other violations of law described below.

13

105.    The NDG Enterprise has conducted its business practices through an interrelated network of companies that have common ownership, management, business functions, addresses, office space, and employees.

106.    In addition, the NDG Enterprise has distributed funds collected from US consumers amongst its various entities using shared bank accounts located in the US and Canada.

107.    Because these entities have operated as a common enterprise, each of the named Corporate and Individual Defendants is jointly and severally liable for the acts and practices alleged below.

### STRUCTURE OF THE NDG ENTERPRISE

108.    The NDG Enterprise is split into two groups: (1) the European Group and (2) the Canadian Group.

109.    Below are NDG Group organizational charts for the European Group and the Canadian Group in 2009:





110.    From 2005 until September 1, 2013, both the European and Canadian Groups of NDG Enterprise entities were owned and controlled by Sagewood (50.1% control), Knightsbridge (39.8% control), and 0562752 (10.1% control).

111.    After September 1, 2013, control over both the European and Canadian Groups was transferred to Emerald Willow, Red River, and Twillingate.

112.    The NDG Enterprise routinely combined the financial statements of its European and Canadian groups, and in those financial statements referred to the enterprise as the "NDG Group" or "NDG Financial Group."

113.    From at least as early as 2009 to 2012, a big four accounting firm performed an external audit of the combined financial statements of the European and Canadian Groups of NDG Enterprise entities. The audit was sent to the shareholders: Sagewood, Knightsbridge, and 0562752.

114.    The 2010 audit included Defendants NDG Financial, E-Care, Blizzard, NWCL and NWL in the Canadian Group. It included New Northway, Cumberland, along with Defendants Northway and Northway Broker in the European Group.

115.    The 2010 audit stated that "the entities included in the combined financial statements are all under common control. These combined financial statements have been prepared to represent the results of the Companies' payday lending operations."

116.    The 2010 audit also described the nature of NDG Enterprise operations:

"The Companies operate an Internet-based payday lending business. The Companies specialize in providing unsecured short-term loans over the Internet to US, European and Australian consumers with immediate cash needs. All of the Companies' marketing takes place over the Internet. Over 66% of the Companies' business is conducted with US consumers."

### HISTORY OF THE NDG ENTERPRISE

117.    The NDG Enterprise created a "Corporate Fact Sheet" for service providers that described the history of the enterprise.

118.    A version of the  "NDG Corporate Fact Sheet," created in approximately 2010, included the following statements:

a.    "Company Profile: NDG Financial Group is a privately-held global e-commerce company focused on providing short-term unsecured consumer loans in the United States, Australia and the United Kingdom. The products and services provided in stated regions are through Northway Financial Corporation Ltd. and Northway Broker

Ltd. which are licensed and regulated financial institutions under the Malta Financial Services Authority (MSFA)."

b. "Corporate Headquarters: NDG Financial Corp., Suite 400-15225, 104th Avenue, Surrey, BC, Canada V3R 6Y8,  Tel. 1-604-587-6500."

c. "European Operations: Northway Financial Corp. Ltd., Northway Broker, Ltd., Level 8, Plaza Commercial Centre, Bisazza Street, Sliema, Malta SLM 1640, Tel: 356-22606890."

d. "Management: Kimberly DeThomas, Chief Executive Officer; Jeremy Sabourin, Chief Strategy Officer; William Wrixon, Chief Financial Officer."

e. "Shareholders: Peter Ash, 50.1%; Paul Ash, 39.899%, Paul Grehan, 10.001%."

f. "Websites: www.ecarecenters.com- E Care Contact Centers (Contact Center); www.blizzardi.com- Blizzard Interactive (Internet Marketing); www.cashtransfercenters.com- CashTrasnferCenters.com (US); www.paydayAvenue.com- PaydayAvenue.com (US); www.prldirect.com- PRLDirect.com (US); www.sonicpayday.com- SonicPayday.com(US); www.zip19.com-- Zip19.com (US); www.greenpicket.com- GreenPicket.com (US)."

g. "November 1995: Payroll Loans Ltd. was born with its first retail outlay in Surrey, British Columbia, Canada. Peter Ash, with Master degree and an entrepreneur joined the operation."

h. "May 1998: Winnipeg call centre opened and Kim DeThomas was the first employee hired by Peter Ash."

18

i.   "November 1999: Peter Ash commenced on-line business under Payroll Loans Direct."

j.   "March 2000: Paul Ash joined the company as Chief Information Technology Officer."

k.   "2002: Jeremy Sabourin, an entrepreneur with his own internet business, joined the operation in charge of marketing and strategic growth; total number of collectors reached 27."

l.   "December 2004: Peter Ash, Paul Ash and Paul Grehan acquired the group of companies; monthly sales surpassed USD $25M."

m.  "May 2005: Northway Financial Corporation Ltd. and Northway Broker, Ltd. were incorporated, both Malta Financial Services Authority licensed financial institutions within European Union."

n.   "August 2005: E-Care Contact Centers Ltd. and Blizzard Interactive Corporation were created, Kim DeThomas and Jeremy Sabourin were appointed as Presidents with respective operations."

o.   "October 2005: NDG Group begins to own and operate Northway Financial Corporation Ltd. and Northway Broker Ltd."

p.   "February 2006: New proprietary loan processing system called 'Whitebox' goes live."

q.   "April 2007: Peter & Paul Ash met with Maltese Prime Minister Lawrence Gonzi at Northway offices in Sliema, Malta."

119.   A version of the NDG Corporate Fact sheet circulated in 2011 identified the shareholders as Sagewood Holdings, Ltd. (50.1%), Knightsbridge Holdings, Ltd. (39.899%), and Blackrock Capital, Ltd. (10.001%).

## DEFENDANTS' BUSINESS PRACTICES

120.    Since 2005, the NDG Enterprise, through its commonly controlled entities, has extended high-cost, short-term loans, also known as payday loans, exclusively over the Internet to consumers in all fifty of the United States.

121.    The NDG Enterprise entities work together as a seamless unit, all in support of the overall payday lending operation (as described in the 2010 external audit).

122.    Blizzard identifies customers for Northway's loans by purchasing leads from lead generation companies.

123.    Consumers apply for loans via DBA websites managed by Northway Broker.

124.    The Funding Entities generate the capital to fund the loans that Northway makes to US consumers.

125.    Northway originates the loans.

126.    E-Care collects the debts.

127.    NDG Financial, Blizzard, and E-Care personnel establish and manage Northway's US-based service provider relationships required for continued funding and operation of the lending enterprise.

### Blizzard Identifies Potential Consumers for Northway's Loans

128.    Blizzard establishes required demographic criteria for the consumers to whom it seeks to market the NDG Enterprise's loans.

129.    Blizzard then sends its required criteria to the lead generators.

130.     One of the criteria that Blizzard uses to identify customers is the consumer's state of residency. For example, in June 2013, Blizzard targeted consumers

residing in the United States, with the exception of Georgia, Pennsylvania, Puerto Rico, West Virginia, American Samoa, Guam, Mariana Islands, and North Dakota.

131.    In June 2013, Blizzard worked with a lead generator to target consumers residing in New York and New Jersey.

132.    Blizzard maintains software that redirects its purchased leads to the DBA websites.

### Consumers Access Northway's Loans Through the DBA Websites

133.    Each DBA website server has been physically housed (aka "hosted") with Canadian and US-based telecommunications companies using the following domain name servers associated with E-Care: dns1.ecarecenters.net, dns2.ecarecenters.net, and dns3.ecarecenters.net.

134.    A publicly available domain name search indicates that the DBA websites use servers physically located in the United States or Canada.

135.    In order to apply for a loan via the websites, the consumer must first establish a personal website account by creating a user name and password.

136.    Once the account is created, the website prompts the consumer to enter the amount for which he or she is applying.

137.    Consumers are required to enter their checking account number, social security number, date of birth, and home address.

138.    The websites further indicate that the loan funds will be disbursed directly into the consumer's checking account through an ACH credit.

### The NDG Enterprise Disburses and Receives Funds via ACH transfer

139.    The NDG Enterprise uses US-based banks, payment processors, and money transmitters to transfer funds to and from US consumers, typically through Automated Clearing House (ACH) credit and debit entries.

140.    In order to disburse funds to and collect funds from US consumers through the ACH network, NDG Financial and E-Care employees established and maintained accounts with several US-based Originating Depository Financial Institutions, Third Party Payment Processors, and money services transmitters in the name of several NDG Enterprise entities, including Northway, Northway Broker, New Northway, Cumberland, and Blizzard.

141.    Originating Depository Financial Institutions ("ODFIs") are financial institutions that initiate credit and debit entries via the ACH system.

142.    Third Party Payment Processors ("TPPPs") are nonbank companies that process ACH and other types of payments on behalf of their merchant clients using accounts they establish with ODFIs.

143.    NDG Financial employees communicate with its ODFIs and TPPPs using e-mail accounts belonging to NDG Financial, Northway, and E-Care.

144.    For example, Northway's Treasury Manager, working out of NDG Financial headquarters in Surrey, BC, sent e-mails using @ndgfinancial.com and @ecarecenters.com addresses.

145.    NDG Enterprise personnel have also established affiliated accounts at a Canadian financial institution on behalf of NDG Enterprise entities.

146.    Northway loan repayments are deposited into Northway's accounts with a US-based ODFI.

22

147.    NDG Enterprise personnel then wire loan repayments from Northway's US-based ODFI accounts through correspondent accounts located in New York to its Canadian-based accounts which are then funneled to and between affiliated entity accounts, including Sagewood, Knightsbridge, Blackrock (now 0562752), NDG Financial, E-Care, Blizzard, NWL, NWCL, NWRRSP, PLFL, and Northway.

148.    The NDG Enterprise, using one New York correspondent banking institution for northbound wires and a second New York correspondent banking institution for southbound wires, conducted hundreds of wire transactions between its depository accounts located in the United States and Canada.

149.    Consumers also repaid Northway loans via wire payments through money transmitter services.

150.    E-Care set up relationships with US-based money transmitter service providers in order to collect Northway loans that US consumers took out through NDG's DBA websites.

151.    Bank records indicate that since July 21, 2011, the NDG Enterprise has collected, at least, an estimated $500 million in Northway loan repayments from US consumers via ACH and money transmitter service repayments.

### NDG Enterprise Loan Characteristics

152.    The NDG Enterprise originates, services, and collects payday loans in all fifty states, including states such as New York, in which those loans have no legal effect because they violate state usury caps and licensing requirements.

153.    The loans are generally short term (14 days), ranging from $100-$1500 with finance charges between $19.98 and $26.98 per $100 borrowed.

154. In addition, some loan agreements include a wage assignment clause that, by its terms and conditions, is not revocable and does not contain an opt-out provision.

155. According to the wage assignment clause, if the consumer defaults on the loan for more than seven days from the date that payment is due, the consumer authorizes the NDG Enterprise to instruct the consumer's employer to pay the outstanding loan amount directly to the NDG Enterprise from the consumer's wages.

156. In numerous instances, Defendants, pursuant to wage assignment clauses signed by consumers, received money directly from the consumers' employers' payroll accounts via ACH debit entries.

157. Records from one of Defendants' ODFI's shows ACH debit entries from various business entity accounts that Defendants admit, in correspondence with that ODFI, represent loan repayments pursuant to consumer wage assignment clause authorizations.

158. Below is a sample chart on the CashTaxi.com website from May 2013 disclosing the cost of the loan in terms of both a flat fee and annual percentage rate:

| Loan Term (days) | Loan Amount | Total Fees | Days in a Year | APR |
|---|---|---|---|---|
| 14 | $100.00 | $22.98 | 365 | 599.12% |
| 14 | $100.00 | $25.98 | 365 | 677.34% |
| 14 | $100.00 | $26.98 | 365 | 703.41% |
| 14 | $500.00 | $114.90 | 365 | 599.12% |
| 14 | $500.00 | $129.90 | 365 | 677.34% |
| 14 | $500.00 | $134.90 | 365 | 703.41% |
| 14 | $1000.00 | $229.80 | 365 | 599.12% |
| 14 | $1000.00 | $259.80 | 365 | 677.34% |
| 14 | $1000.00 | $269.80 | 365 | 703.41% |
| 14 | $1500.00 | $344.70 | 365 | 599.12% |
| 14 | $1500.00 | $374.70 | 365 | 677.34% |
| 14 | $1500.00 | $404.70 | 365 | 703.41% |

## Defendants' Collection Practices

159.    Once the loan is disbursed to the consumer, E-Care collects delinquent payments on behalf of the NDG Enterprise.

160.    E-Care, using the name of the DBA website through which the consumer selected the loan, contacts delinquent consumers by phone, e-mail, and letter, restating the consumer's obligation to repay the principal and interest in full, along with a $39.00 NSF fee, and a $20.00 late payment fee.

161.    In numerous instances, the NDG Enterprise, through E-Care, falsely represented to consumers that non-payment of debt would result in lawsuit, arrest, imprisonment, or wage garnishment, despite lacking the intention or legal authority to take such actions.

162.    In fact, the NDG Enterprise had no intention of suing individuals in the United States.

163.    In correspondence with an ODFI, Defendants admitted that they do not sue individuals in the United States.

164.    The NDG Enterprise also has no intention of employing wage garnishment as a collections technique.

165.    In correspondence with an ODFI, Defendants admitted that they do not employ wage garnishment in the United States.

166.    Between July 2011 and 2014, the NDG Enterprise furnished information to credit reporting agencies on trade lines belonging to consumers residing in all fifty states, including approximately at least 15,000 trade lines belonging to New York residents.

**Defendants' Assertions of Federal and State Law Immunity**

167.    Some of the loan agreements issued by Northway and Northway Broker on behalf of the NDG Enterprise expressly claimed that Northway and Northway Broker were not subject to any laws of the US federal government or any state.

168.    The loan agreements also asserted that US federal and state laws did not apply to Northway and Northway Broker, the consumer's account, or to the terms of the loan agreement.

169.    In response to consumers that contacted Defendants to report a complaint, dispute a charge, or request reimbursement, Defendants asserted that the consumers' state laws did not apply.

170.    For example, Defendants frequently sent a form letter to complaining consumers, which stated:

> "If you take a moment to review the attached loan agreement, you will see that Northway Financial Corporation Ltd. is a Financial Institution licensed and regulated in accordance with the European Union (EU) Directives. As such, the laws of the Republic of Malta (member State of the European Union), not the state of [consumer's state of residence] applies to its terms. We provided you with this notice so that you would understand the terms of your loan."

171.    In response to hundreds of complaints against Northway for alleged violations of consumer protection laws, several states have issued cease and desist orders to Northway, directing it to stop extending unlicensed loans that do not comply with various state consumer lending law protections.

172.    Those states include: Michigan (2014), California (2008, 2012, 2013, and 2014), Virginia (2013), New Hampshire (2011), Maine (2011), Oregon (2011), and Pennsylvania (2010).

173.     In some instances, after receiving the cease and desist orders, the NDG Enterprise continued to originate, service, or collect loans in those states.

174.     Since at least 2008, the NDG Enterprise responded to state regulators in many instances through a Malta-based law firm, which sent a form letter stating:

> We act for Northway Financial Corporation Limited (NF) and Northway Broker (NB) Limited...[o]ur clients carry on their business exclusively in Malta. They do not carry on business, they do not have facilities, or employ any staff anywhere in the State, or anywhere else in the United States of America. Our client has no subsidiary or related company carrying on any business in the State or any other State of the United States of America...

175.     The letters generally concluded with the following statements: "Accordingly, we cannot agree with the Desist and Refrain order which states that clients are in breach of [state law]," or "[a]ccordingly, we cannot agree that either of NF or NB have transacted business in the state and/or are subject to the provisions of state law."

176.     In 2005, E-Care set up an account with a money transmitter service to collect Northway loan repayments from US consumers.

177.     In doing so, it provided a false address to the money transmitter service.

178.     An internal e-mail between employees of the money transmitter, dated August 11, 2005, indicated that E-Care's Collections Manager "want[ed] to keep the BC address and references to them being in Canada to a minimum as far as the customer is concerned. We had to use a US address to set them up...please make sure to work with [the Collections Manager] to clearly communicate whatever you decide on for 'city, state' at the training and in our system."

179.    Accordingly the E-Care address for processing repayment of Northway loans was listed as Suite 400, 15225 104th Ave., Los Angeles, CA 90013—a non-existent address.

180.    In late 2007, a US state regulator notified E-Care that based on consumer complaints, E-Care was collecting debts without a license in violation of state regulations.

181.    On December 18, 2007, DeThomas sent a written response that she signed in her capacity as President of E-Care, stating:

> We have received your letter of November 26, 2007, referring to 'information' indicating that we are 'servicing or collecting payments on supervised loans.' We have no knowledge of the information to which you refer. We operate a telephone call service center in Winnipeg and Surrey. We do not make loans, take any assignment of loans or undertake direct collection of payments or enforce rights against consumers in respect of such loans. In fact, we do not provide these services to any lender. However, we do act for a loan broker.

182.    On July 15th, 2009, DeThomas sent a second written response that she signed in her capacity as President of E-Care, stating: "In reviewing your original correspondence we believe that we have addressed your concerns. We reaffirm that E-Care Contact Centers Ltd. does not at present collect debt from residents of [the state], nor do we plan to in the future."

183.    Northway then sent two letters in response to the state regulator, dated December 16, 2009 and February 2, 2010, asserting that: (1) E-Care provided customer service support to Northway and Northway Broker, (2) E-Care was not engaging in any debt collection activity in the state, and (3) all debt collection activity regarding the state was completed at Northway's offices in Malta.

184.    According to records from the money transmitter service, a relationship that E-Care employees established in 2005 and maintained into 2014, residents of the state in question sent over 554 loan repayments to Northway Financial totaling $310,906.46 between 2010 and 2014.

185.    The address for Northway's receiver account for each of these transactions was Suite 400, 15225 104th Avenue, Los Angeles, CA 90013.

### The NDG Enterprise Made Conflicting Statements Regarding the Application of Federal and State Law Based on its Audience

186.    In contrast to what it told consumers and regulators, the NDG Enterprise knew, as far back as 2005, that it was subject to US state and federal law, and that its loans were unlicensed, exceeded state interest rate caps, and as a consequence likely void and/or unenforceable.

187.    Between 2005 and 2013, NWL issued eighteen Offering Memos to potential investors, generally issuing two each year.

188.    The memos warned potential investors that: (1) Northway's loans were regulated  by various US state and federal agencies and subject to state usury laws, general small loan laws, and laws setting maximum fees, (2) Northway and its payday lending competitors had been subject to lawsuits seeking to void repayment of the loans involved, (3) although Northway loans were secured by wage assignments, there was a risk that Northway could not enforce the wage assignments, and (4) there was a risk that if US state regulators applied interest rate caps to Northway's loans, they would be unenforceable.

189.    From 2005 to June 2009, the NWL Offering Memoranda were signed by Peter Ash, Paul Ash and Paul Grehan, in their capacities as officers and directors, under

the statement that: "[t]his offering memorandum does not contain a

misrepresentation."

190.    The June 29, 2009 NWL Offering Memorandum warned investors that:

"An APLE's marketing efforts and the representations APLES make about
their products and services may also be subject to federal and state unfair
and deceptive practices statutes. The Federal Trade Commission enforces
the Federal Trade Commission Act and the state  attorneys general and
private plaintiffs enforce the analogous state statutes…We can provide no
assurance that APLEs are in compliance with applicable state laws."

191.    The offering memo defined APLE as "Affiliated Payday Loan Entities"

which means "any Payday Loan entity that is an Affiliate of NWCL, which brokers or

advances a Payday Loan to a Loan Recipient." This definition includes Northway and

Northway Broker.

192.    In contrast, to the NDG Enterprise's 2009 warning to potential investors,

in 2008, Grehan signed a letter assuring a TPPP service provider that Northway

complied with all US state and federal laws:

"Northway's practices are consistent with the requirements of US,
European and Australian consumer protection statutes…in our dealings
with US consumers, our business practices are compliant with Regulations
Z, B and E. Furthermore, all collection practices at Northway are
consistent with the "Fair Debt Collection Practices Act…all laws related to
the collection of debt in the jurisdiction in which the customer resides are
adhered to at all times."

193.    In 2011, an employee for the TPPP referenced the 2008 Grehan letter in an

internal e-mail describing NDG Enterprise business practices, observing that the

policies "had not changed."

194.    In further contrast to what it told consumers, the NDG Enterprise, in an

application filed with a US bank in order to process ACH transactions, acknowledged

that it was subject to US federal law:

"US Operations are governed under federal law. As detailed by NDG [Financial]'s management, US companies can operate either under the Federal law or State law, and are subject to the regulations and taxes according to the choice of law. As NDG [Financial] is an Internet company with no physical location in any state, NDG [Financial] opted to be regulated under Federal law, which provides it the freedom to operate across differing states. Challenge with opting for Federal law is the company is occasionally subject to cease and desist orders from States who are unaware they are operating under Federal law."

195. The 2010 external audit placed the NDG Enterprise on notice that its payday lending operations were subject to US federal and state law.

196. The 2010 audit report stated that: (1) the NDG Enterprise was subject to extensive regulation in the jurisdictions in which it operated; (2) there was a risk that regulatory authorities in those jurisdictions would apply specific lending legislation on loans issued to borrowers residing in those jurisdictions; (3) there was a risk that the NDG Enterprise was violating specific loan legislation in the borrowers' jurisdictions; and (4) that the interest rates on NDG Enterprise loans would exceed the maximum permissible rate of interest in some borrowers' jurisdictions, thus making the borrowers' obligations legally unenforceable.

197. According to the audit, the NDG Enterprise informed the auditor that it conducted business in accordance with the applicable laws of the respective jurisdictions.

198. According to bank records, in 2012, the NDG Enterprise discontinued its relationship with the accounting firm that conducted that audit, and replaced it with Facet Advisors, a local accounting firm in Vancouver that also serves as Sagewood's registered office.

31

199.    Further, records show that an ODFI service provider met with NDG Enterprise personnel to express concerns about the Enterprise's compliance with federal and state laws.

200.    The NDG Enterprise responded by claiming it did not need to comply with state licensing requirements because its US operations were governed by federal law and that it was "federally registered."

201.    In 2011, one of the New York based correspondent banking institutions that processed NDG Enterprise wire transactions refused to process further transactions because of concerns over the NDG Enterprise's compliance with US state and federal law.

202.    In August 2013, the New York Department of Financial Services (NYDFS) sent a letter to Northway instructing it to cease and desist from offering and collecting void loans to and from New York consumers.

203.    Between August 5 and September 2, 2013, Northway sent a letter to New York consumers, in which it stated that it would no longer offer loans to New York consumers:

> Northway Financial Corporation Ltd has decided to no longer provide loans to residents of the State of New York. Northway is incorporated in the European Union and licensed as a regulated Financial Institution. It has always adhered strictly to the terms of its license conditions, followed federal U.S. law and treated all of its customers, including those in New York, with the utmost fairness and respect.

204.    On September 30, 2013, DeThomas received an e-mail, with a subject line, "Tribal Opportunity" in which a colleague provided a mutual introduction between DeThomas and a potential venture capital partner: "Kim runs a great online lending

company out of Canada and [potential partner] is working with a large, well-capitalized tribe to start a loan program."

205.   In a September 30, 2013 NWL Offering Memorandum to potential investors, the NDG Enterprise admitted that under the terms of Northway's license with the MFSA, it was required to comply with national federal, state, and provincial truth-in-lending and fair debt collection practices in the jurisdiction in which each Loan Recipient resides.

206.   In that memo, the NDG Enterprise also announced that it would attempt to seek "Tribal Immunity" by setting up relationships with Native American Tribes located in the US:

> It is intended that any arrangements entered into by our Affiliates with Tribal Lenders will be with Tribal Lenders that qualify as federally recognized Native American tribes in the United States, that operate in the Consumer Lending Industry and that meet the legal and regulatory requirements to benefit from sovereign immunity.

207.   The offering memo also stated that the NDG Enterprise could not provide any "assurance that ASTLE's  or any other entity our Affiliates do business with that are involved in the Consumer Lending Industry are in compliance with all the laws of the jurisdiction in which Loan Recipients reside."

208.   The September 30, 20103 offering memo defines "ASTLEs" as Affiliated Short Term Lending Entities, which, like the 2009 offering memo, include Northway and Northway Broker.

209.   The September 30, 2013 Offering Memorandum was signed by DeThomas (as Chief Executive Officer, President, and a Director), Sabourin (as Director) and Wrixon (as Chief Financial Officer, Secretary, and a Director) under the heading: "This offering memorandum does not contain a misrepresentation."

## INDIVIDUAL ROLES

210.    In 2005, Peter Ash, Paul Ash, and Grehan (the Original Owners) built the NDG Enterprise and devised its strategy and practice of extending unlicensed, triple digit interest rate loans to consumers residing in New York and throughout the United States.

211.    The original NDG Enterprise structure, devised by the Original Owners, largely remains in place and has been maintained by DeThomas, Sabourin, and Wrixon (the Current Owners).

### 2005-2009: The Original Owners Put the Pieces in Place

212.    The Original Owners, between 2005 and 2009, exercised comprehensive control over NDG Enterprise operations.

213.    In 2005, E-Care, with Peter Ash as President and CEO, Paul Ash as Vice President and Chief Information Officer, and Paul Grehan as Chief Financial Officer, established a relationship with a money transmitter service for the purpose of collecting loans the NDG Enterprise extended to US consumers using the internet.

214.    In 2005, the Original Owners incorporated Blizzard, with Peter Ash as President, Paul Ash as Secretary and Paul Grehan as Treasurer.

215.    In 2005, Peter Ash was a director for both Northway and Northway Broker.

216.    The Malta Financial Services Authority (MFSA), upon issuing a license to both Northway and Northway Broker, issued a media statement on September 7, 2005 describing the newly licensed institutions as "subsidiaries of Northway Financial s.a.r.l, a company in Luxembourg which in turn is part of the NDG Group based in Canada. The

34

NDG Group specializes in providing unsecured short-term loans over the Internet to U.S., Canadian, Irish and U.K. consumers."

217.    In 2005, the Original Owners incorporated NWL and NWCL.

218.    The June 29, 2009 NWL Offering Memorandum described NDG Enterprise operations and the roles of the Original Owners:

a.   "We are a private British Columbia company established primarily as a funding vehicle to provide funding to NWCL which in turn provides funds to APLEs."

b.   "Peter Ash: (Director, President and Promoter since incorporation) For the last six years, [Mr. Ash] has provided strategic leadership to APLES and is presently responsible to provide complete leadership throughout the group."

c.   "Paul Ash: (Director, Secretary and Promoter since incorporation) Paul is the primary architect of the suite of unique technology services that have facilitated APLES' rapid growth. He coordinated the development and implementation of a new customer relationship management (CRM) software system across the group of APLE companies."

d.   "Paul Grehan: (Director, Treasurer and Promoter since incorporation) Mr. Grehan has been associated with APLES since 2003 and is responsible for corporate finance."

e.   "Potential Subscribers must appreciate the conflicts of interest which exist as a result of our principals being officers, directors and shareholders of both the Issuer, NWCL, the APLE's and their Affiliates."

**The Original Owners Dominated Control Over NDG Enterprise entities**

219.    Beginning in at least 2007, Peter and Paul Ash established affiliated private and commercial bank accounts at a major Canadian financial institution under the following names:

> a.  Private Banking: Beaufort Investments, Ltd., Compark Investments, Ltd., Sagewood Holdings, Ltd., Knightsbridge Holdings, Ltd., Peter Ash, Paul Ash.
>
> b.  Commercial: Compark Investments, Ltd. & Beaufort Investments Ltd., NDG Financial Corp, Northway Financial Corporation Ltd., Cross Canada Financial, Inc., E-Care Contact Centres, Ltd., Blizzard Interactive Corp., New World Consolidated Lenders Corp., New World Capital, Ltd., Payroll Loans First Lenders Corp., New World Lenders Corp., New World RRSP Lenders Corp., Red River Holding Company, Ltd., Emerald Willow Holding, Ltd., Twillingate Holdings, Ltd., Cross Canada Financial Limited Partnership.

220.    Bank records show that in 2007,  Peter Ash, Paul Ash, and Paul Grehan possessed signing authority over a Blizzard bank account with a US-based ODFI, which empowered them to:

> a.  Authorize drafts/instruments for the payment of money from Blizzard accounts.
>
> b.  Open or close accounts and sign signature cards for such accounts.
>
> c.  Issue instructions with respect to the transfer or payment of Blizzard funds on deposit with the bank.

221.    In 2007, Peter Ash signed a "Cash Management Services Master Agreement" with the same bank in his capacity as a Director of Northway Broker.

222.    In signing this document, Peter Ash authorized himself, Paul Ash, Paul Grehan and other officers of the NDG Enterprise, to execute domestic and international wire transfers on behalf of Northway Broker.

223.    Bank records show that until 2011, Peter Ash possessed similar signing authority over a Northway account at the same bank.

224.    In 2008, Peter Ash was appointed director of New Northway.

225.    In August 2009, an account review at a Canadian financial institution indicated that Northway transferred money from an account in which it deposited US consumer loan repayments, to accounts belonging to Sagewood, Knightsbridge and 0562752 (formerly Blackrock).

226.    That same account review showed that Northway internally transferred money from its US consumer loan repayment deposit account to affiliated accounts belonging to E-Care, Blizzard, NWCL, and NWL.

227.    An August 2010 account review at the same institution revealed that money originating from Northway's deposit account for US consumer loan repayments was funneled to accounts belonging to Knightsbridge, 0562752 as well as to individuals with "signing authority:" DeThomas, Sabourin, and Wrixon.

228.    Bank records show that in approximately October 2010, Peter and Paul Ash used cash reserves from Sagewood and Knightsbridge to finance a real estate transaction on behalf of two real estate companies they controlled, Beaufort Investments, Ltd. and Compark Investments, Ltd.

229.    During a routine review of these accounts, a bank official sent an internal e-mail on May 20, 2011, stating that "the investigative notes seem to indicate a concerning flow of funds through intercompany accounts that normally indicates kiting or money laundering. The investigative notes also point out that the operation of the accounts does not support the stated business of these companies...There are certainly many 'red flags' here."

### 2009: The Original Owners Transfer Day-To-Day Management to the Current Owners, While Continuing to Collect Dividends

230.    Beginning in 2009, the Original Owners began transferring day-to-day management of NDG Enterprise operations to DeThomas, Sabourin, and Wrixon, while maintaining  control over the NDG Enterprise as shareholders.

231.    The December 2009 NWL Offering Memorandum, signed by DeThomas, Sabourin, and Wrixon, described the roles of the Current Owners:

> a.   "Kimberly DeThomas (Director and President since November 25, 2009): Ms. DeThomas has worked for the Issuer for over 11 years and currently serves as the Chief Executive Officer of the NDG Group of Companies. Ms. DeThomas has overseen recruitment, training, development, and overall management of NDG's workforce with in Canada and overseas for the past several years as well as the launching of [NWL's] product into existing markets and new markets."

> b.   "Jeremy Sabourin (Director since November 25, 2009): Mr. Sabourin has worked for the Issuer for 7 years and currently serves as the Chief Strategy Officer for the NDG Group of Companies. During his seven years, Mr. Sabourin led all marketing efforts for NDG and oversaw the

launch of multiple lending entities in the United States at various price points. Mr. Sabourin was also the creator of the Issuer's proprietary custom scoring algorithm which predicts and manages the Issuer's bad debt."

    c.   "Bill Wrixon: (Director and Secretary since November 25, 2009): Mr. Wrixon joined the Issuer in February 2009."

232.    In May 2009, DeThomas was appointed director of Northway.

233.    In August 2009, Peter Ash resigned his position as director in Northway and Northway Broker.

234.    In November 2009, DeThomas was appointed director of Northway Broker.

235.    In a 2010 bank review of NDG Enterprise accounts, the bank listed Sagewood (50.10%) and Knightsbridge (39.899%) as "entity owners" with 25% or more ownership in NDG, Peter Ash as 100% shareholder of Sagewood, Paul Ash as 100% shareholder of Knightsbridge, and DeThomas (CEO), Wrixon (CFO), and Sabourin (CSO) as "controlling parties."

236.    NDG Enterprise profits are primarily paid out in dividends to the shareholders. In 2010, the NDG Enterprise collected $157 million in revenue, with a net profit of $33 million.

237.    As of November 30, 2011, DeThomas, Sabourin, and Wrixon were authorized with signature authority for Blizzard bank accounts at a US ODFI.

238.    On December 1, 2011, Wrixon signed a Certificate of Account Resolutions with the ODFI indicating that he was Secretary of Blizzard, with custody of its corporate

records and confirming the list of individuals authorized to sign on behalf of the corporation.

239.    According to notes from a bank relationship manager based on interviews with Grehan and Wrixon in 2011, after transferring day-to-day operational control, the Original Owners continued to collect dividends from loans targeted to US consumers, while providing "strategic direction at the board level."

240.    Those notes also indicated that the Original Owners continued to have a strong influence over the NDG Enterprise, "with many of the business practices in NDG reflective of the beliefs of ownership."

241.     On March 14, 2013, Sabourin, in his capacity as Blizzard President, personally signed an agreement with a US lead generator for its services in locating potential Northway loan recipients in the United States.

## Peter Ash used Sagewood as a Vehicle for Real Estate Ventures Unrelated to the Payday Lending Enterprise

242.    On June 23, 2011, Langley Holdings Corporation (Langley Holdings) was established in Washington State. The registered agent was a Seattle, Washington law firm.

243.     Peter Ash was listed as Langley Holdings' sole officer, with an address of Suite 200, 15127 100th Ave in Surrey, BC.

244.    Between August 4, 2011 and November 14, 2013, Sagewood, using a correspondent account based in New York, wired $53,981 to the registered agent for Langley Holdings.

245.    Between December 1, 2011 and October 10, 2013, Sagewood, using a correspondent account based in New York, sent three wire transactions totaling

$11,136.64 to a civil engineering firm located in Washington State, the first on behalf of Langley Holdings and the last two for Compark Investments, Ltd.

246.   On September 5, 2013, four days after transferring its controlling interest in NDG Financial, Sagewood wired $5,141,336.84 to a title company located in Washington State, labeled as "escrow for 32125 Weyerhaeuser."

247.   On September 9, 2013, Langley Commercial Investments purchased 32125 Weyerhaeuser Way S, Federal Way, Washington, 98001.

248.   Peter Ash is the sole officer of Langley Commercial.

249.   Langley Commercial lists its mailing address at 15127 100th Ave, #200, Surrey, BC V3R 0N9, which is the same address listed for Langley Holdings.

250.   Peter Ash operates a charitable organization with the same address as Langley Holdings and Langley Commercial.

251.   On September 10, 2013, Sagewood wired $3,129.06 to the same title company located in Washington State.

252.   On August 17, 2015,  Langley Holdings was deactivated.

### STATE LAWS PROTECTING CONSUMERS WHO TAKE OUT SMALL DOLLAR LOANS

253.   In addition to extending payday loans in states that have affirmatively tried to stop Defendants from selling unlicensed and illegal payday loans to their citizens, Defendants have originated, serviced, and collected on loans that consumers are not obligated to pay, in whole or in part, based on state licensing regulations or usury caps that render non-compliant loans, such as those offered by Defendants, void.

254.   Many states protect consumers from harmful practices associated with the origination, servicing, and collection of payday loans.

255.    Such legal protections include restrictions upon the types of entities which may engage in these types of transactions, licensing requirements, and civil and criminal usury limits.

256.    Loans that violate these laws are declared void, meaning that the lender has no legal right to collect, and the borrower is not obligated to pay, some or all of the principal or interest on the loan.

### Interest-Rate Caps

257.    The following states have enacted laws that render payday loans void if they exceed the usury limit:

    a.  Arkansas, whose state constitution provides that all contracts with interest in excess of 17% "shall be void as to principal and interest. . . ." Ark. Const. amend. 89, §§ 3, 6(b);

    b.  Minnesota, which caps interest rates for (a) written loan contracts at 8% absent applicability of another statute, Minn. Stat. § 334.01, subdiv. 1; (b) consumer short-term loans ($1,000 or less) at 21.75% APR, or the total of 33% a year on the part of the unpaid balance up to $1,125 and 19% a year on the part of the unpaid balance above $1,125, Minn. Stat. §47.59, subdiv. 3(a); and (c) consumer small loans (single installment loans of $350 or less) at 7% of loan principal between $101-$250 and 6% of loan principal between $251 and $350.  Loans that exceed these rates are void and the borrower has no obligation to pay any amounts owing on them.  Minn. Stat. §§ 334.03, 47.60, subdiv. 6, 47.601, subdiv. 6(b);

    c.   New Hampshire, which prohibits annual interest rates above 36% for

payday loans (capped at $500) and loans of $10,000 or less. N.H. Rev.

Stat. §§ 399-A:17, 399-A:12(I). Loans that do not comply with those

restrictions are void, and the lender has no right to collect any

principal, charges, or recompense. N.H. Rev. Stat. § 399-A:11(V);

    d.   New York, which prohibits any person or corporation not licensed by

the state of New York from "directly or indirectly charg[ing], tak[ing]

or receiv[ing] any interest . . . at a rate exceeding" annual interest of

16% on covered loans. N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law

§ 14-a(1). Loans that exceed the rate are void. N.Y. Gen. Oblig. Law § 5-

511; *see also Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986)

("[A] usurious transaction is void *ab initio* . . . ."); and

    e.   North Carolina imposes a cap on loans $25,000 and under, which is

the greater of 16% or the latest published noncompetitive rate for U.S.

Treasury bills with a six month maturity as of the fifteenth day of the

month plus six percent (6%) rounded to the nearest one-half of one

percent. N.C. Gen. Stat. §§ 24-1.1(a)(1), (c). North Carolina also places

a tiered set of interest-rate limits with a maximum of 30% on loans

below $15,000 and repayable between 12 and 96 months. N.C. Gen.

Stat. § 53-176(a). Loans $15,000 and under that violate those

provisions are void, and the lender has no right to collect, receive, or

retain any principal or charges. N.C. Gen. Stat. § 53-166(a),(d).

258.   Colorado prohibits annual interest above 12% on unpaid balances for

consumer loans other than supervised loans. Colo. Rev. Stat. §§ 5-1-301(12), (15)(a), 5-2-

201(1). Consumers are relieved of the obligation to pay any charge that exceeds these limits and are entitled to a refund from the lender or assignee for any excess amount that they paid. Colo. Rev. Stat. § 5-5-201(2).

259.   Defendants made loans to consumers in Arkansas, Minnesota, New Hampshire, New York, and North Carolina that charged interest at rates exceeding those allowed by the laws of the respective states, and therefore, those loans are void.

260.   Defendants made loans to consumers in Colorado that charged interest at rates exceeding those allowed by Colorado law, and therefore, consumers were relieved of the obligation to pay charges in excess of the legal limits.

### Licensing Requirements

261.   The following states have implemented licensing regimes that include measures aimed at preventing and penalizing harmful consumer lending practices: Arizona, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and Utah. The licensing regimes in these states reflect substantive consumer-protection concerns by, for instance:

   a.   ensuring that licensees possess the requisite character, integrity, and experience (Ariz. Rev. Stat. § 6-603(F)(2); Colo. Rev. Stat. § 5-2-302(2); Ind. Code § 24-4.5-3-503(2); 209 Mass. Code Regs. 20.03; N.C. Gen. Stat. § 53-168(a)(2); N.H. Rev. Stat. § 399-A:4(I); N.Y. Banking Law § 342); and

   b.   ensuring compliance with loan-term and disclosure regulations by requiring compliance examinations and investigations by state regulators as well as recordkeeping and annual reports (Ariz. Rev. Stat.

44

§§ 6-607, 6-608(A), 6-609(A)-(D); Colo. Rev. Stat. §§ 5-2-304, 5-2-305; Ind. Code § 24-4.5-3-505; Mass. Gen. Laws ch. 140 §§ 97-99; N.H. Rev. Stat. §§ 399-A:6, 399-A:10; N.Y. Banking Law §§ 348, 349; N.C. Gen. Stat. §§ 53-184).

262.   These state licensing statutes reflect the strong public policy interest in ensuring that entities seeking to engage in the consumer-lending business are vetted and supervised by regulators for compliance with consumer protections and other laws.

263.   The following state laws render payday loans void if they are made without a license. If a covered loan is made without a license in the following states, the entity has no right to collect from consumers, or the consumers have no obligation to repay certain loan amounts:

a.   Arizona, which voids covered loans of $10,000 or less that are made or procured without a license, and the lender has no right to collect any principal, finance charges, or other fees in repayment of such loans, Ariz. Rev. Stat. §§ 6-601(5)-(7), 6-602(B), 6-603(A), 6-613(b);

b.   Illinois, which voids payday loans made after January 1, 2013, without a license, and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan, 205 Ill. Comp. Stat. §§ 122/1-10, 122/4-10(h);

c.   Indiana, which voids small loans and consumer loans made without a license  and the debtor has no obligation to pay either the principal or finance charges on such loans, Ind. Code §§ 24-4.5-7-104, 24-4.5-7-409, 24-4.5-3-502(3),(5), 24-4.5-5-202(2),;

d.  Kentucky, which voids covered loans of $15,000 or less if the interest rate exceeds 8% and the loan is made without a license, as well as unlicensed deferred deposit transactions, and the lender has no right to collect any principal, charges, or recompense whatsoever on such loans, Ky. Rev. Stat. Ann. §§ 286.4-991(1), 286.4-420, 360.010(1); 286.9-010(5),(14),(21), 286.9-020, 286.9-035(1).

e.  Massachusetts, which voids covered loans of $6,000 or less if interest and expenses on the loan exceed 12% a year and the loan is made or purchased without a license, and the lender or purchaser has no right to collect money in repayment of such loans, Mass. Gen. Law. Ch. 140, §§ 96, 110;

f.  Minnesota, which voids  small, short term, and regulated loans made without a license, and the borrower is not obligated to pay any amounts owing on such loans, Minn. Stat. §§ 47.59  subdiv. 1(k), 47.60, subdiv. 1(a), subdiv. 6, 47.601, subdiv. 1(d), subdiv. 6(b)(1), 56.19, subdiv. 3;

g.  Montana, which voids deferred deposit loans made as of April 24, 2013 that are made without a license, Mont. Code Ann. §§ 31-1-703(5)(c), 31-1-712(2);

h.  New Hampshire, which voids covered loans of $10,000 or less that are made without a license, and the lender has no right to collect such loans, N.H. Rev. Stat. §§ 399-A:1(X), (XI), 399-A:2(I), (IV);

i.  New Jersey, which voids consumer loans of $50,000 or less that are made without a license, and the lender has no right to collect or receive any principal, interest, or charges on such loans, unless the act was the

result of good faith error, N.J. Rev. Stat. §§ 17:11C-2, 17-11C-3, 17-11C-33(b);

j.   New Mexico, which voids loans of $2,500 or less made by a person with no license, and the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans, N.M. Stat. § 58-15-3A;

k.   New York, which voids personal loans of $25,000 or less that are made without a license and where the interest or other charge exceeds that permitted to a licensee, and the lender has no right to collect such loans, N.Y. Banking Law §§ 340, 355;

l.   North Carolina, which voids covered loans of $15,000 or less that are made or secured for repayment without a license, and any party in violation shall not collect, receive, or retain any principal or charges with respect to such loans, N.C. Gen. Stat. § 53-166(a), (d);

m.   Ohio, which voids loans of $5,000 or less that are made without a license, and the lender has no right to collect, receive, or retain any principal, interest, or charges on such loans, Ohio Rev. Code Ann. § 1321.02; and

n.   Utah, which voids deferred deposit loans made after May 8, 2012 by persons who have not registered with the Department of Financial Institutions, and the lender has no right to collect, receive, or retain any principal or other interest or fees in connection with the loan, Utah Code Ann. §§ 7-23-102(7), 7-23-201(1)(a)(i),(7).

264.   Colorado relieves the consumer's obligation to pay finance charges to the lender or assignee where the lender or assignee has failed to obtain the requisite license. Colo. Rev. Stat. §§ 5-5-201(1), 5-2-301(1)(a), (b), 5-1-301(17).

265.   Defendants were not licensed to make loans in any US state.

266.   Defendants made loans to consumers residing in Arizona, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and Utah, and those loans are void because of Defendants' failure to acquire the required licenses.

267.   Defendants made loans to consumers residing in Colorado, and those consumers were relieved of the obligation to repay finance charges because of Defendants' failure to acquire the required licenses.

**Summary of States in Which
Defendants' Loans Are Void in Whole or in Part**

268.   Defendants' loans were void in the following states based on state licensing law, state usury law, or both:  Arizona, Arkansas,  Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and Utah.

269.   Colorado relieves consumers of the obligation to repay excess fees and finance charges for loans that exceed interest rates limits or are issued without a license.

270.   These states are hereinafter referred to as the "Subject States."

## VIOLATIONS OF THE CONSUMER
## <u>FINANCIAL PROTECTION ACT</u>

### Unfair, Deceptive, or Abusive Acts or Practices

271.    Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1), prohibit a "covered person" or "service provider" from engaging in "any unfair, deceptive or abusive act or practice." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

272.    An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

273.    An act or practice is abusive if it materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service. 12 U.S.C. §5531(d).

274.    An act or practice is also abusive if it takes unreasonable advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service. 12 U.S.C. § 5531(d).

### Count I

*Deception Relating to the Collection of Loan Payments which Consumers Did Not Owe*

275.    The Bureau realleges and incorporates by reference paragraphs 1-274 of this Complaint.

276.    Through the actions set forth above, Defendants represented expressly or by implication that consumers residing in the Subject States were obligated to repay loan amounts, an obligation that in fact did not exist because the loans violated state licensing and/or usury laws that declared such amounts void.

277. Through the following actions, Defendants reinforced the misrepresentations that consumers were obligated to pay debts that were void in the Subject States:

     a. Sending executed loan agreements;

     b. Sending demand letters for payment;

     c. Originating ACH debit entries from consumer bank accounts;

     d. Offering and accepting repayment through money service transmitters; and

     e. Contacting consumers by telephone to demand repayment.

278. Defendants falsely represented that they had the legal right to collect certain loan payments for loans that were void under state law.

279. Defendants falsely represented that consumers had the legal obligation to pay the loan amounts for loans which were void under state law.

280. In numerous instances, consumers residing in Subject States were not under a legal obligation to repay the void amounts.

281. Defendants' misrepresentations were likely to mislead reasonable consumers.

282. Defendants' misrepresentations were material.

283. Defendants' misrepresentations, actions, and materially incomplete statements constitute deceptive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count II

*Unfairness Relating to the Collection of Loan Payments that Consumers Did Not Owe*

284.   The Bureau realleges and incorporates by reference paragraphs 1-283 of this Complaint.

285.   Defendants caused substantial injury by forcing consumers residing in the Subject States to pay illegal amounts that they did not owe.

286.   Consumers were unlikely to know that Subject States' usury laws and licensing requirements rendered Defendants' loans void, and thus consumers were unable to avoid paying illegal amounts to which Defendants were not entitled.

287.   Consumers could not reasonably avoid paying illegal amounts because Defendants repeatedly asserted that state law did not apply to the loan agreements.

288.   The injuries sustained by consumers residing in the Subject States were not outweighed by countervailing benefits to consumers or to competition.

289.   Defendants' actions constitute unfair acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count III

*Abusiveness Relating to the Collection of Loan Payments that Consumers Did Not Owe*

290.   The Bureau realleges and incorporates by reference paragraphs 1-289 of this Complaint.

291.   The consumer's legal obligation to repay is a material term, cost, and condition of the loan.

292.   As set forth above, Defendants materially interfered with consumers' ability to understand that they were not under legal obligation to repay the loan amounts that were void under state law.

51

293.    Consumers residing in the Subject States likely were unaware that Defendants lacked the legal authority to collect the loans because the loans violated usury and licensing laws in those states.

294.    Defendants took unreasonable advantage of consumers' lack of understanding regarding the enforceability of the loans by collecting debts to which Defendants were not legally entitled and by repeatedly asserting that state law did not apply to the loan agreements.

295.    Defendants' actions constitute abusive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count IV

### *Deception Relating to Applicability of US Federal and State Law*

296.    The Bureau realleges and incorporates by reference paragraphs 1-295 of this Complaint.

297.    In loan agreements and communications with consumers, Defendants represented that they and the loan agreements were not subject to US federal or state law.

298.    By contrast, Defendants told their service providers that they are, in fact, subject to US federal law.

299.    In fact, Defendants are subject to US federal and applicable state law.

300.    Defendants' external auditor placed Defendants on notice that they are subject to the laws of the borrowers' jurisdictions.

301.    Defendants told service providers that their practices complied with US consumer protection statutes and laws related to the collection of debt in the jurisdiction in which the customer resides.

52

302.    Defendants' representations that they were not subject to US federal or applicable state law were likely to mislead reasonable consumers.

303.    The governing law applicable to the parties and their respective rights and responsibilities relating to the loans was a material condition of the product.

304.    Defendants' representations that they were not subject to US federal or applicable state law were material.

305.    Defendants' representations constitute deceptive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count V

*Abusiveness Relating to Applicability of US Federal and State Law*

306.    The Bureau realleges and incorporates by reference paragraphs 1-305 of this Complaint.

307.    Defendants' loan agreements and its communications with consumers materially interfered with consumers' abilities to understand that US federal and applicable state laws applied to Defendants and governed disputes arising from the use of Defendants' loans.

308.    The governing law applicable to the parties and their respective rights and responsibilities relating to the loans was a condition of the product.

309.    Defendants' actions constitute abusive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count VI

*Deception Relating to Consequences of Non-Payment*
*(As to Corporate Defendants NDG Financial, Northway, Northway Broker, E-Care,*
*Blizzard, NWL, NWCL, PLFL, NWRRSP and Individual Defendant DeThomas)*

310.   The Bureau realleges and incorporates by reference paragraphs 1-309 of this Complaint.

311.   Defendants, in numerous instances, represented to consumers that non-payment of debt would result in lawsuits, arrest, imprisonment, or wage garnishment.

312.   When the Defendants made these representations, they did not intend to take the threatened actions.

313.   Defendants did not have the legal authority to take some of the actions they threatened.

314.   Defendants' representations were designed to increase the likelihood that consumers would repay the debt.

315.   Defendants admitted to their ODFI service provider that, "in order to garnish wages Northway would have to get a judgement [sic] first. Since Northway does not sue individuals in the United States, wage garnishment is not available to Northway as a method to collect form US customers. In addition, Northway has no intention in employing garnishment as a collection technique."

316.   Defendants' representations to US consumers regarding the actions Defendants would take were false and misleading and constitute deceptive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## <u>VIOLATION OF THE CREDIT PRACTICES RULE</u>

317.   The Credit Practices Rule (CPR) is a rule promulgated by the Federal Trade Commission (FTC) under Section 18 of the FTC Act, 15 U.S.C. § 57a.

318.    The Bureau is authorized to enforce a rule prescribed under the FTC Act by the FTC with respect to an unfair or deceptive act or practice to the extent that such rule applies to a covered person or service provider with respect to the offering or provision of a consumer financial product or service as if it were a rule prescribed under section 1031, 12 U.S.C. § 5531, of the CFPA. The Bureau therefore may enforce the CPR. 12 U.S.C. § 5581(b)(5)(B)(ii).

319.   The CPR defines a "lender" as "a person who engages in the business of lending money to consumers within the jurisdiction of the Federal Trade Commission." 16 C.F.R. § 444.1(a).

320.   Northway and Northway Broker are "lenders" as defined under the CPR and are "covered persons" under the CFPA.

321.   The Credit Practices Rule prohibits lenders, in connection with the extension of credit to consumers, from taking or receiving from a consumer an obligation that constitutes or contains an assignment of wages or other earnings unless: (i) the assignment by its terms is revocable at the will of the debtor, (ii) the assignment is a payroll deduction plan or preauthorized payment plan, commencing at the time of the transaction, in which the consumer authorizes a series of wage deductions as a method of making each payment, or (iii) the assignment applies only to wages or other earnings already earned at the time of the assignment. 16 C.F.R. § 444.2(a)(3).

322.   The Bureau is authorized to bring a civil action against any person that violates the CPR. 12 U.S.C. §§ 5564(a), 5581(b)(5)(B)(ii).

## Count VII

*Conditioning the Extension of Credit on an Irrevocable Wage Assignment Clause*

323.    The Bureau realleges and incorporates by reference paragraphs 1-322 of this Complaint.

324.    In numerous instances, in connection with the extension of credit to consumers, Defendants have taken or received from consumers an obligation that constitutes or contains an assignment of wages or other earnings where the assignment: (i) by its terms is not revocable at the will of the consumer, (ii) is not a payroll deduction plan or preauthorized payment plan, commencing at the time of the transaction, in which the consumer authorizes a series of wage deductions as a method of making each payment, and (iii) does not apply only to wages or other earnings already earned at the time of the assignment, in violation of Section 444.2(a)(3) of the Credit Practices Rule, 16 C.F.R. § 444.2(a)(3).

## Count VIII

*Unfairness Relating to Conditioning the Extension of Credit on an Irrevocable Wage Assignment Clause*

325.    The Bureau realleges and incorporates by reference paragraphs 1-324 of this Complaint.

326.    Defendants' practice of conditioning some loan agreements upon irrevocable wage assignment clauses caused or was likely to cause substantial injury to consumers.

327.    Wage assignments occur without the procedural safeguards of a hearing and opportunity to assert defenses or counter claims.

328.    The use of irrevocable wage assignments causes serious and detrimental interference with employment relationships, negatively affects promotions, pay raises, and job assignments, and can result in job loss.

329.    Further, the use of irrevocable wage assignments disrupts consumers' finances and can make it difficult for a consumer to purchase necessities or discharge other obligations in a timely fashion.

330.    Consumers cannot reasonably avoid these injuries because some loans are conditioned upon the wage assignment clause and are irrevocable.

331.    Finally, these injuries are not outweighed by countervailing benefits to consumers or to competition.

332.    Defendants' actions constitute unfair acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count IX – Against Relief Defendants Only

333.    Relief Defendants Peter Ash, Sagewood, Paul Ash, Knightsbridge, Paul Grehan, 0562752, Kimberly DeThomas, Emerald Willow, Jeremy Sabourin, Red River, William Wrixon, and Twillingate have received, directly or indirectly, funds or other assets from Defendants that are traceable to funds obtained from Defendants' consumers through the unfair, deceptive, abusive, and unlawful acts or practices described herein.

334.    The Relief Defendants were signatories on bank accounts into which Defendants deposited void Northway loan repayments from consumers residing in the Subject States.

335.    Relief Defendants have no legitimate claims to such funds and Relief Defendants will be unjustly enriched if they are not required to disgorge or give up such funds or the value of the benefit they received.

## THIS COURT'S POWER TO GRANT RELIEF

336.    Under Section 1055 of the CFPA, 12 U.S.C. § 5565, this Court has "jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law . . ." including the CFPA. 12 U.S.C. § 5565(a)(1). This relief includes rescission, refund of monies, restitution, disgorgement or compensation for unjust enrichment, payment of damages or other monetary relief, public notification regarding the violation, limits on the activities or functions of the person, and civil money penalties. 12 U.S.C. § 5565(a)(2). In addition, the CFPB may recover its costs in connection with the action, if it is the prevailing party. 12 U.S.C. § 5565(b).

## PRAYER FOR RELIEF

337.    Wherefore, the CFPB, pursuant to Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, request that the Court:

a.  Permanently enjoin the Defendants from committing future violations of the CFPA, the CPR, or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b.  Award damages and other monetary relief as the Court finds necessary to redress injury to consumers resulting from the Defendants' violations of the CFPA and CPR including but not limited to restitution and the refund of monies paid;

c.  Order disgorgement against Defendants and Relief Defendants of ill-gotten gains;

d.  Award the costs of bringing this action;

e.  Award other injunctive relief as appropriate, including but not limited to the cessation of collection activities and the correction of information furnished to any credit reporting agencies; and

f.  Award additional relief as the Court may determine to be just and proper.


Dated: December 11 , 2015          Respectfully submitted,


Anthony Alexis
*Enforcement Director*

Deborah Morris
*Deputy Enforcement Director*

Craig Cowie
*Assistant Litigation Deputy*

/s/ Charles R. Gayle_____
Charles R. Gayle
*Enforcement Attorney*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Gayle): 202-435-9555
Fax: 202-435-7722
E-mail: charlie.gayle@cfpb.gov
*Attorneys for Consumer Financial Protection Bureau*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of December, 2015, the foregoing First Amended Complaint was electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


_/s/ Charles R. Gayle_____

Charles R. Gayle
Enforcement Attorney
Consumer Financial Protection Bureau