**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Consumer Financial Protection Bureau, | |
| Plaintiff, | |
| v. | Case No. 15cv5211 (CM) |
| NDG Financial Corp., Northway Financial Corp., Ltd., Northway Broker, Ltd., E-Care Contact Centers, Ltd., Blizzard Interactive Corp., New World Consolidated Lending Corp., New World Lenders Corp., Payroll Loans First Lenders Corp., New World RRSP Lenders Corp., Peter Ash, Sagewood Holdings, Ltd., Kimberly DeThomas, Jeremy Sabourin, William Wrixon, | |
| Defendants, | |
| Peter Ash, Sagewood Holdings, Ltd., Paul Ash, Knightsbridge Holdings Ltd., Paul Grehan, 0562752 B.C. Ltd., Kimberly DeThomas, Emerald Willow Holdings, Ltd., Jeremy Sabourin, Red River Holdings Company Ltd., William Wrixon, Twillingate Holdings Ltd. | |
| Relief Defendants. | |

**MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................1

FACTUAL BACKGROUND..............................................................................................5

ARGUMENT ...................................................................................................................10

I.   THIS COURT MAY EXERCISE SPECIFIC PERSONAL JURSIDCTION OVER ALL
DEFENDANTS AND RELIEF DEFENDANTS UNDER NEW YORK'S LONG-ARM
STATUTE OR UNDER FED. R. CIV. P. 4(K)(2) ....................................................10

   A.   New York's long-arm statute authorizes personal jurisdiction over Defendants
because they made loans to New York consumers through their agents, Northway,
Northway Broker and E-Care ..............................................................................11

      1.   Northway, Northway Broker, and E-Care "transacted business" with
New York consumers.......................................................................................15

      2.   Each of the Defendants knew about, consented to, and benefitted from
Northway, Northway Broker, and E-Care's business transactions with
New York consumers.......................................................................................16

      3.   As joint participants in the payday lending business enterprise, the Ash,
NDG and Grehan Defendants exercised sufficient control over New York
business transactions executed by their agents, Northway, Northway Broker
and E-Care ......................................................................................................17

   B.   Exercising personal jurisdiction over Defendants is consistent with Due Process
and is reasonable ..................................................................................................20

   C.   Defendants' nationwide contacts establish personal jurisdiction under
Fed. R. Civ. P. 4(k)(2)........................................................................................21

II.  THE FAC STATES A CLAIM FOR RELIEF UNDER THE CFPA FOR UNFAIR,
DECPETIVE, AND ABUSIVE PRACTICES ........................................................25

   A.   NDG Financial, the Original Owners, and the Current Owners are each "Covered
Persons" or "Service Providers" under the CFPA ...............................................26

      1.   NDG Financial is a "Covered Person"..............................................................27

      2.   Peter Ash and Sagewood are "Covered Persons" ..............................................28

      3.   Paul Ash and Knightsbridge are "Covered Persons"..........................................29

      4.   The Current Owners are "Covered Persons" .....................................................29

   B.   Defendants engaged in Unfair, Deceptive and Abusive Acts and Practices................30

   C.   Each member of the NDG Enterprise is liable for the acts of Northway, Northway
Broker and E-Care ...............................................................................................32

      1.   All Defendants are subject to common enterprise liability for UDAAP violations
under the CFPA................................................................................................32

      2.   All Defendants are subject to alter-ego liability for UDAAP violations under the
CFPA...............................................................................................................35

      3.   All Defendants are liable under agency principles .............................................37

      4.   The Original and Current Owners are liable as individuals..................................38

D.  This Court should deny any motion to dismiss the Relief Defendants........................40

E.  The Bureau's claims are not an effort to enforce state usury laws ............................41

III. THE BUREAU'S CLAIMS SHOULD NOT BE DISMISSED AS UNTIMELY OR RETROACTIVE..................................................................................................................43

A.  The Ash Defendants have failed to establish a statute of limitations defense on the face of the complaint..................................................................................................43

B.  The Bureau's CFPA claims are not retroactive .........................................................44

IV. THE BUREAU'S STRUCTURE IS CONSTITUTIONAL ...............................................45

V.  CONCLUSION...................................................................................................................48

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AINS, Inc. v. United States*,
   56 Fed. Cl. 522 (Fed. Cl. 2003) ...................................................................................48

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*,
   388 F.3d 405 (3d Cir. 2004)........................................................................................47

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................26, 31

*Astoria Fed. Savings & Loan Ass'n v. Solimino*,
   504 U.S. 104 (1991)...................................................................................................37

*Barnhart v. Thomas*,
   540 U.S. 20 (2003)....................................................................................................30

*Basquiat v. Kemper Snowboards*,
   No. 96 CIV. 0185 (LAP), 1997 WL 527891 (S.D.N.Y. Aug. 25, 1997)........................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................26, 31

*Bond v. United States*,
   __ U.S. __, 134 S. Ct. 2077, 2083 (2014)..................................................................44

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)...................................................................................................21

*Cameron v. Fogarty*,
   806 F.2d 380 (2d Cir. 1986)......................................................................................37

*Centrifugal Force, Inc. v. Softnet Communication, Inc.*,
   No. 08 Civ. 5463 (CM)(GWG) 2009 WL 1059647 (S.D.N.Y. Apr. 17, 2009)...........11, 12

*CFPB v. CashCall, Inc.*,
   No. CV 15-7522-JFW (RAOx), 2015 WL 9591569 (C.D. Cal. Dec. 30, 2015) ...........3, 43

*CFPB v. Gordon*, —F.3d.--,
   2016 WL 1459205 (9th Cir. Apr. 14, 2016) ...............................................................34

*CFPB v. ITT Educ. Servs., Inc.*,
   No. 14-CV-00292, 2015 WL 1013508 (S.D. Ind. Mar. 6, 2015) .......................26, 46, 48

*CFPB v. Morgan Drexen, Inc.*,
   60 F.Supp. 3d 1082 (C.D. Cal. 2014) ................................................................34, 46, 48

*CFTC v. EJS Capital Management, LLC*,
   No. 14cv3107 (CM), 2015 WL 5679688 (S.D.N.Y. Sept. 24, 2015) ...............................41

*CFTC v. Kimberlynn Creek Ranch, Inc.*,
   276 F.3d. 187 (4th Cir. 2002) .............................................................................41, 42

*Chatwal Hotels & Resorts, L.L.C. v. Dollywood Co.*,
   90 F.Supp. 2d 97 (S.D.N.Y. 2015)..........................................................................11, 21

*Chloe v. Queen Bee of Beverly Hills, L.L.C.,*
    616 F.3d 158  (2nd Cir. 2010)......................................................11, 12, 13, 21
*Citigroup Inc. v. City Holding*
    97 F.Supp. 2d 549 (S.D.N.Y 2000).............................................................12
*Commonwealth of Pa. v. Think Fin., Inc.,*
    No. 14-CV-7139, 2016 WL183289 (E.D. Pa. Jan. 14, 2016)...........................34
*CutCo Indus., Inc. v. Naughton,*
    806 F.2d 361 (2d Cir. 1986)......................................................13, 14, 17
*Dardana Ltd. v. Yugansknefiegaz,*
    317 F.3d 202 (2d Cir. 2003).......................................................................21
*Delaware Watch Co. v. FTC,*
    332 F.2d 745 (2d Cir. 1964).......................................................................33
*Deutsche Bank Sec., Inc., v. Montana Bd. Of Invs.,*
    7 N.Y.3d 65 (2006) ....................................................................................14
*Ellul v. Cong. Of Christian Bros.,*
    774 F.3d 791 (2d Cir. 2014).......................................................................45
*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,*
    651 F.3d 329 (2d Cir. 2011).......................................................................30
*Eskofot A/S v. E.I. Du Pont De Nemours & Co.,*
    872 F.Supp. 81 (S.D.N.Y. 1995)................................................................22
*Foman v. Davis,*
    371 U.S. 178 (1962)...................................................................................50
*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.,*
    130 S. Ct. 3138 (2010) ...............................................................................47
*FTC v. Bronson Partners, LLC,*
    647 F.Supp.2d 373 (D. Conn. Dec. 4, 2009) .........................................36, 42
*FTC v. E.M.A. Nationwide,*
    767 F.3d 611 (6th Cir. 2014) .....................................................................33
*FTC v. Five-Star Auto Club,*
    97 F.Supp. 2d 502 (S.D.N.Y. 2000)......................................................38, 39
*FTC v. Gem Merchandising Corp.,*
    87 F.3d 466 (11th Cir. 1996) .....................................................................36
*FTC v. Med. Billers Network Inc.,*
    542 F.Supp.2d 283 (S.D.N.Y. 2008)..............................................32, 38, 39
*FTC v. Nat'l Urological Grp., Inc.,*
    645 F.Supp.2d 1167 (N.D. Ga. 2008) ........................................................33
*FTC v. Tax Club, Inc.,*
    994 F.Supp.2d 461 (S.D.N.Y. 2014)......................................................35, 39
*FTC v. Think Achievement,*
    144 F.Supp.2d 1013 (N.D. Ind. Oct. 18, 2000).............................................41

*FTC v. Wash. Data Res.*,
    856 F. Supp. 2d 1247 (M.D. Fla. 2012) ..................................................33

*FTC v. Wyndham Worldwide Corp.*,
    No. 13-1887(ES), 2014 WL 2812049 (D.N.J. June 23, 2014) ........................33

*Gomez v. Resurgent Capital Servs., LP*,
    129 F. Supp. 3d 147 (S.D.N.Y. 2015)..................................................38

*Grove Press, Inc. v. Angleton*,
    649 F.2d 121 (2d Cir. 1981)...........................................................13

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935)....................................................................46

*In re Aluminum Warehousing Antitrust Litigation*,
    No. 13-md-2481 (KBF), No. 14-cv-3116,
    2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015) ........................................22

*In re Parmalat Securities Litigation*,
    375 F.Supp.2d 278 (S.D.N.Y. June 28, 2005) ....................................37, 38

*John Wiley & Sons, Inc. v. Treeakarabenjakul*,
    No. 09 Civ. 2108 (CM), 2009 WL 1766003 (S.D.N.Y. June 18, 2009)..............12

*Lafferty v. St. Riel*,
    495 F.3d 72 (3d Cir. 2007)...........................................................34

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)...........................................................22

*Madden v. Midland Funding, LLC*,
    786 F.3d 246 (2d Cir. 2015).......................................................43, 44

*Maersk, Inc. v. Neewra, Inc.*,
    554 F.Supp.2d 424 (S.D.N.Y. 2008) ..............................................13, 14

*McCrann v. RIU Hotels, S.A.*,
    No. 09 Civ. 9188 (CM), 2010 WL 5094396 (S.D.N.Y. Dec. 6, 2010)..............13

*Mistretta v. United States*,
    488 U.S. 361 (1989)....................................................................49

*Morrison v. Olson*,
    487 U.S. 654 (1988)....................................................................47

*Morissette v. United States*,
    342 U.S. 246 (1952)....................................................................34

*Nat'l Union Fire Ins. Co. v. BP Amoco*,
    319 F.Supp.2d 352 (S.D.N.Y. 2004)..............................................17, 18

*O'Melveny & Myers v. FDIC*,
    512 U.S. 79 (1994)....................................................................36

*Packer v. TDI Systems, Inc.*,
    959 F.Supp. 192 (S.D.N.Y.1997)....................................................13

*Porina v. Mayward Shipping Co.*,
    521 F.3d 122 (2d Cir. 2008)............................................................................50

*P.F. Collier & Son Corp. v. FTC*,
    427 F.2d 261 (6th Cir. 1970) ...............................................................33, 35

*Ross v. UKI Ltd.*,
    No. 02 Civ. 9297(WHP), 2004 WL 384885 (S.D.N.Y. Mar. 1, 2004)............................17

*Ruotolo v. City of New York*,
    514 F.3d 184 (2d Cir. 2008)............................................................................50

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998)............................................................................41

*State Teachers Retirement Bd. v. Fluor Corp.*,
    654 F.2d 843 (2d Cir. 1981)............................................................................50

*Two's Co. Inc. v. Hudson*,
    No. 13-cv-3338-NSR, 2014 WL 903035 (S.D.N.Y. Mar. 6, 2014)............................13

*United States v. TEVA Pharmaceuticals USA Inc.*,
    No. 13 Civ. 3702 (CM), 2016 WL 750720 (S.D.N.Y. Feb. 22, 2016) ............................26

*Universal Trading & Inv. Co., Inc. v. Credit Suisse (Guernsey) Ltd.*,
    560 Fed. Appx. 52 (2d Cir. 2014)............................................................................49

*Whitaker v. Am. Telecasting, Inc.*,
    261 F.3d 196 (2d Cir. 2001)............................................................................49

*World-Wide Volkswagen Corp. v Woodson*,
    444 U.S. 286 (1980)............................................................................22

**Statutes**

12 U.S.C. § 242............................................................................49

12 U.S.C. § 243............................................................................48, 49

12 U.S.C. § 4512(b)(2)............................................................................49

12 U.S.C. § 4516............................................................................48, 49

12 U.S.C. § 5481(1)............................................................................27, 30

12 U.S.C. § 5481(5)............................................................................27

12 U.S.C. § 5481(6)(A)............................................................................27, 30

12 U.S.C. § 5481(6)(B)............................................................................27, 28

12 U.S.C. § 5481(15)............................................................................27

12 U.S.C. § 5481(15)(A)(i)............................................................................27, 28

12 U.S.C. § 5481(15)(A)(x)............................................................................28

12 U.S.C. § 5481(25)(B)............................................................................27, 28, 29, 30

12 U.S.C. § 5481(25)(C)(i)............................................................................27, 28, 29, 30

12 U.S.C. § 5481(25)(C)(ii)............................................................................29, 30

12 U.S.C. § 5481(26)(A)(i)............................................................................27, 28, 30

12 U.S.C. § 5491(c)(3)............................................................................47

12 U.S.C. § 5497(a) ............................................................................................47, 48

12 U.S.C. § 5536(a)(1)(B) ...................................................................................26, 34

N.Y.C.P.L.R. § 302(a)(1)...................................................................10, 11, 12, 13, 18

**Rules**

Fed. R. Civ. P. 4(k)(2)...................................................................................2, 10, 11, 21

Fed. R. Civ. P. 8 ..................................................................................................26, 31

Fed. R. Civ. P. 12(b)(6)...............................................................................................26

**Other Materials**

Memorandum of Law in Support of NDG Defendants' Motion to Dismiss ....30, 40, 46, 47, 48, 49

Memorandum of Law in Support of Motion to Dismiss by Sagewood Holdings, Ltd,

Knightsbridge Holdings, Ltd., Peter Ash, and Paul Ash ...................................................28, 42, 46

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Ash Defendants[1], Grehan Defendants, and NDG Defendants are or were participants in a joint online payday lending enterprise ("the Enterprise"), an interlocking group of corporations and individuals that profit from collecting loan repayments from New York and US consumers that the consumers did not legally owe and to which members of the Enterprise had no legal claim. The members of the Enterprise executed this illegal scheme by misrepresenting that federal and state law did not apply to the loans or to members of the Enterprise, which materially interfered with consumers' ability to understand their legal repayment obligations under applicable law. Various permutations of the six individual defendants—Peter Ash, Paul Ash, Grehan, DeThomas, Sabourin, and Wrixon—have masterminded the Enterprise from its inception as its creators, owners, controllers, and exclusive beneficiaries.

Defendants repeatedly asserted that consumers were obligated to repay the loans when Defendants knew that to be false, taking unreasonable advantage of consumers' lack of understanding regarding the legal status of the loans. Defendants further attempted to conceal their illegal practices by providing blatantly false information to service providers and state regulators, even falsely claiming at one point to be "federally registered" to lend in the United States when no such system of registration even exists.

Just as they did with consumers, Defendants and Relief Defendants now seek refuge behind their complex web of foreign corporations, erroneously arguing both that this Court does not have jurisdiction over them and that they cannot be held responsible for the harms they

---

[1] The Bureau uses the short titles for each defendant used in that defendant's Memorandum of Law in support of a Motion to Dismiss.  The "Ash Defendants" are Peter Ash, Sagewood, Paul Ash, and Knightsbridge. The "Grehan Defendants" are Paul Grehan and 0562752. The "NDG Defendants" are all remaining defendants.

inflicted upon consumers in New York and throughout the United States through their illegal practices. Defendants constructed the Enterprise's complex corporate structure, made up of subsidiaries in Canada, Malta and Luxembourg, specifically for the purpose of reaching into New York and the United States to unlawfully collect payments for high-cost payday loans from New York and US consumers while evading accountability for their unlawful actions. And each Defendant profited directly from this scheme, which has operated for *more than nine years*.

As a result, each of the Defendants is subject to this Court's jurisdiction and is either liable for the unlawful conduct or is properly a relief defendant. The law in New York is clear— participation in a joint enterprise to transact business with New York consumers subjects each participant to personal jurisdiction under New York's long-arm statute. Even if New York's long-arm statute did not apply, personal jurisdiction would still attach under Fed. R. Civ. P. 4(k)(2) because the Defendants expressly directed their loans towards the United States as a whole. In addition to being liable for their own actions, Defendants also are liable under several theories of non-principal liability—common enterprise liability, agency liability, and alter-ego liability—for which Federal law provides precisely to prevent defendants such as these from misusing the corporate form to commit illegal acts.

All that is required to survive a motion to dismiss is a short and plain statement of facts notifying the defendants of facially plausible claims for relief. The First Amended Complaint ("FAC") exceeds this standard. The FAC alleges in great detail the actions of and relationships between the various defendants that make each liable (either directly or indirectly) for the unlawful conduct: falsely representing that federal and state law did not apply to the loans or to the Defendants, harming consumers by collecting money they did not legally owe, and collecting loan repayments by misrepresenting the consequences of nonpayment and using illegal

irrevocable wage assignment clauses. The FAC also alleges in sufficient detail that the Relief Defendants received portions of the ill-gotten gains collected as a result of this unlawful conduct.

Defendants' remaining arguments fall flat, because each Defendant is a "covered person" under the CFPA; this action does not improperly enforce state law or impose a federal usury cap; this action is not time-barred; and the Bureau is constitutional. First, NDG Financial, the Original Owners (Peter Ash, Paul Ash, Grehan), and the Current Owners (DeThomas, Sabourin, Wrixon) contend that they are not covered persons under the CFPA. As Defendants concede, Northway, Northway Broker, and E-Care provided financial services, and therefore are covered persons. The defendants in question are related persons that are deemed to be covered persons based on either their ownership of Northway, Northway Broker, and E-Care, their ownership of other companies that ultimately own Northway, Northway Broker, and E-Care, or their material participation in NDG Financial, Northway, Northway Broker, or E-Care affairs. Further, NDG Financial is an affiliated service provider for other covered persons in the Enterprise.

Next, the Ash and NDG Defendants mischaracterize this action as an attempt to enforce state usury or consumer finance laws. It is not. Nor does it impose an unlawful federal usury cap. The gravamen of the suit is the allegation that the Enterprise collected money that consumers were not obligated to repay under applicable law. The Enterprise admitted to its investors that the legal status of its loans was questionable, while withholding this fact from US consumers. The Federal District Court for the Central District of California recently rejected a similar challenge from a similarly situated defendant. *See CFPB v. CashCall, Inc.*, No. CV 15-7522-JFW (RAOx), 2015 WL 9591569 (C.D. Cal. Dec. 30, 2015).

The Ash Defendants also erroneously argue that this suit is time-barred. The Bureau's CFPA claims concern conduct that occurred on or after July 21, 2011. The Ash Defendants have

3

failed to meet their burden of demonstrating that the Bureau knew, or even should have known, of the unlawful conduct at issue in the action more than three years before the filing of this action. Indeed, Defendants' position is that the Bureau knew, or should have known, of the unlawful conduct as of July 21, 2011—*before* any of the conduct at issue here occurred, and by implication they claim that the Bureau must know of all possible unlawful conduct across the nation as of the date on which authority transferred to the Bureau. This argument is meritless.

Defendants' final meritless attack is a Hail Mary attempt to stop this suit from proceeding by challenging the constitutionality of the Bureau itself. This claim has been rejected by every court thus far to have addressed it and it must fail here as well. As courts have consistently recognized, the power to remove the head of an agency for cause—a power that the President has here—ensures that the President has sufficient oversight over a regulatory agency like the Bureau. And nothing in the Constitution precludes Congress from authorizing an agency to receive its funds from sources other than the annual appropriations process, as it has done with respect to the Bureau. Congress maintains full authority over that funding, and full ability to oversee the Bureau. Defendants fail to explain why these features, which are common among other agencies, are unconstitutional in the case of the Bureau: for example, the other banking regulatory agencies are funded in a similar manner, and many agencies have heads that may be removed only for cause. Indeed, both the Federal Reserve Board and the Federal Housing Finance Agency receive their funds outside the appropriations process and have heads that may be removed only for cause, as the Bureau does.

The Bureau requests that this Court deny the motions to dismiss. In the alternative, the Bureau requests jurisdictional discovery and leave to file a Second Amended Complaint.

**FACTUAL BACKGROUND**

The Enterprise is a collection of individuals and commonly controlled companies located in Canada and Europe that includes or has included each of the named Defendants and Relief Defendants. The six individual defendants, in various combinations, founded the Enterprise and have continuously owned and controlled it, using the various corporate Defendants for their personal financial benefit.

The Enterprise collectively originated, serviced, and collected payday loans to and from consumers residing in the United States, including New York. FAC ¶¶ 2, 7, 120. Consumers in the "Subject States" were not legally obligated to repay these loans in whole or in part. FAC ¶¶ 158,196, 256-270. Presumably in order to maintain its profits from its business model, and in furtherance of the joint business venture, Northway falsely told consumers and state officials that federal and state law did not apply to its loans, FAC ¶¶ 160, 167-170, and E-Care collected loan repayments by threatening actions the Enterprise never intended to take: lawsuits, arrest, imprisonment and wage garnishment. FAC ¶¶ 161-165. Northway also originated loans with irrevocable wage assignment clauses and collected on those loans using those clauses. FAC ¶¶ 154-157, 161.

In 2005, Peter Ash, Paul Ash, and Paul Grehan (the Original Owners), Canadian citizens, created the Enterprise as a single unit to extend and collect payday loans from US consumers over the internet. FAC ¶¶ 112 – 119. The Enterprise generated revenue by charging interest (starting at 599.12%), non-sufficient funds ("NSF") fees, and late fees. FAC ¶¶ 32, 158, 160. From the outset, the Original Owners knew or should have known that these loans were void or unenforceable under state law due to the high interest rates. FAC ¶ 188. Instead of securing a license from any US state authority to lend to US consumers, the Original Owners chose to issue

5

the Enterprise's loans through Northway and Northway Broker, which were licensed by the

Malta Financial Services Authority (MFSA) in the country of Malta. FAC ¶¶ 26, 30, 216.

The Enterprise is a group of individuals and interwoven European and Canadian-based

companies. FAC ¶¶108 - 116. The European Group included Northway and Northway Broker,

while the Canadian Group included NDG Financial, E-Care, Blizzard, NWCL, NWL, PLFL, and

NWRRSP. FAC ¶¶ 109, 114. The Original and Current Owners blurred the corporate lines

between the various companies. For example, they held themselves out to service providers as a

single unit in the "NDG Corporate Fact Sheet," which described the companies collectively as

the "NDG Group." FAC ¶ 118a. The companies also held themselves out as a single unit to their

external auditor. FAC ¶ 112. The Enterprise combines financial statements of its European and

Canadian Groups of companies. FAC ¶ 113. These combined financial statements represent the

collective results of each entity's role in the Enterprise's operation and refer to the entities

collectively as the "NDG Group." FAC ¶¶ 112, 115. The Original Owners warned potential

investors of the conflicts of interest between the companies due to the Original Owners acting as

officers, directors and shareholders of NWL, NWCL, Northway, Northway Broker, and their

affiliates. FAC ¶ 218e. The entities and individuals also commingled funds. ¶¶ 147, 148, 225-

227, 229. In addition, the companies shared employees, some of whom used e-mail accounts for

NDG Financial, Northway and E-Care. FAC ¶¶ 143-144.

Each Enterprise member played a unique and integral role in the payday lending joint

venture, without which the Enterprise could not succeed. Northway originated loans and was

named on the loan agreements. FAC ¶¶ 125, 167. Northway Broker managed the Enterprise's

"DBA" websites, and was named on loan agreements as the "broker" for the loan transaction.

FAC ¶¶ 31, 123, 133. Blizzard controlled marketing by working with lead generators to identify

potential US consumers. FAC ¶¶ 122, 128-132. NWL, NWCL, PLFL and NWRRSP ("the Funding Entities") raised the capital that Northway then extended to US consumers as loan principal. FAC ¶124. E-Care collected the debts. FAC ¶ 126. NDG Financial managed the entire operation and the service provider relationships that were required to originate loans to and collect loans from US consumers, such as relationships with US-based banks and payment processors to disburse loan amounts and collect payments. FAC ¶¶ 127, 139, 144.

Both groups were under the ultimate control of the Original Owners until 2013. FAC ¶ 111. Each individual maintained his share of the Enterprise through 100% ownership in an alter-ego holding company: Sagewood (Peter Ash), Knightsbridge (Paul Ash), and 0562752, formerly Blackrock Capital Corp. (Grehan). FAC ¶¶ 118e, 119. Furthermore, from 2005-2009, the Original Owners dominated control over Enterprise operations. Some combination of the three Original Owners held director or officer positions in each of the European and Canadian entities. FAC ¶¶ 67, 213, 215, 217, 218e. 224. Peter and Paul Ash also controlled bank accounts in the name of each NDG Enterprise entity while Grehan exercised signing authority over Blizzard and Northway Broker accounts. FAC ¶¶ 219-220, 222.

In 2009, the Original Owners transferred day-to-day management over the Enterprise to DeThomas, Sabourin, and Wrixon, but retained overall control and ownership of the Enterprise through their alter-ego holding companies. From 2009 to 2013, the Original Owners continued to exercise control over the Enterprise, providing strategic direction at the board level. FAC ¶ 239. The Original Owners also continued to profit from the collection of loans made to US consumers during this period through receipt of dividends and money wired to their alter-ego holding companies directly from US-based Northway loan repayment deposit accounts. FAC ¶ 225.

The Current Owners began managing Enterprise operations in 2009. DeThomas oversaw the overall management of the Enterprise's workforce in Canada and Europe and served as a director of Northway and Northway Broker. FAC ¶ 231a. Sabourin led all Enterprise marketing efforts and oversaw the launch of multiple lending entities in the United States. FAC ¶ 231b. Wrixon exercised management responsibilities as Chief Financial Officer of NDG Financial and an officer in numerous Enterprise entities. FAC ¶ 231c. Each of the Current Owners exercised signing authority over numerous Enterprise entity bank accounts in the United States. FAC ¶¶ 227, 235, 237. In 2013, the Original Owners transferred their controlling interests in the Enterprise to the Current Owners, who controlled their interests through alter-ego holding companies just as the Original Owners did: Emerald Willow (DeThomas), Red River (Sabourin), and Twillingate (Wrixon). FAC ¶¶ 70, 83, 87, 100-103, 111.

*The Characteristics of the Northway Loans*

The Enterprise generates revenue from interest and fees on Northway loans. FAC ¶¶ 32, 160. The Enterprise markets and offers loans to consumers throughout the US through Northway and Northway Broker via several DBA websites. FAC ¶¶ 118f, 158. No Enterprise member has ever possessed a license to lend in any US state. FAC ¶ 265. Enterprise loans range from $100-$1500, must be repaid within fourteen days, and have Annual Percentage Rates (APRs) ranging from 599.12% to 703%. FAC ¶ 158. The Enterprise has collected repayments from consumers residing in all fifty states, including states like New York where the loans are void based on state usury limits or licensing requirements. FAC ¶¶ 23, 120, 152, 166, 256, 259, 260, 263, 266, 267.

The loan agreements identified Northway as the loan originator and Northway Broker as the "broker." FAC ¶¶ 167-168. The MFSA required that Northway's loans comply with the national, federal, and state consumer protection laws where loan recipients reside. FAC ¶ 205.

Investor statements signed by the Original and Current Owners as officers and directors of the Funding Entities stated that the loans were: (1) regulated by US state and federal agencies and subject to state usury laws, (2) subject to lawsuits seeking to void repayment, (3) secured by potentially unenforceable wage assignment clauses, (4) potentially unenforceable due to state interest rate caps, and (5) potentially non-compliant with US state and federal laws. FAC ¶¶ 188, 206. In 2010, The Enterprise's external auditor warned the shareholders that laws of borrowers' jurisdictions applied to its loans, and warned that because the loans were non-compliant, US consumers had no legal obligation to repay. FAC ¶ 196. Despite this knowledge, Defendants continued to collect loan payments from US consumers (including New York residents) that those individuals did not owe and to which the Enterprise had no legal claim.

*The Enterprise's representations regarding the legal status of its loans and the applicable law*

In spite of what the Enterprise told investors, it told consumers, state regulators, and its own service providers *the exact opposite*, presumably to increase the amounts collected by the Enterprise and distributed to its members. Northway told consumers in loan agreements that US federal and state laws *did not* apply to Northway, Northway Broker, or the loan terms. FAC ¶¶ 167-168. Northway and E-Care told consumers in the Subject States that they were obligated to repay the loans. FAC ¶¶ 160, 170. They also falsely told consumers that they would be sued, have their wages garnished, or even be prosecuted if they failed to repay. Northway also included irrevocable wage assignment clauses in their loan agreements to collect repayments. FAC ¶¶ 154-157, 161. Members of the Enterprise also furnished information regarding consumer repayment obligations to credit reporting agencies, including at least 15,000 trade lines belonging to New York residents dating back to July 2011. FAC ¶ 166. Those consumers were not legally obligated to repay any Northway loan amounts. FAC ¶¶ 253, 259, 256.

9

The Enterprise received numerous inquiries and cease and desist requests from state regulators beginning as early as 2007 and continuing into 2014. FAC ¶¶ 172,180. In response, members of the Enterprise told state regulators they were not bound by state laws, and attempted to obscure the connection between its Canadian and European operations. FAC ¶¶ 180-184. In some cases, a Maltese law firm, acting on behalf of Northway and Northway Broker, responded to state regulators by reasserting that Northway loans were not subject to state law. FAC ¶ 174.

Members of the Enterprise also lied to the Enterprise's service providers. E-Care requested that a money service transmitter assist in hiding its Canadian operations from US consumers in setting up its account and by listing a false California address. FAC ¶ 178. When a bank confronted the Enterprise with concerns about its compliance with state licensing NDG Financial falsely claimed that it was "federally registered" in order to convince the bank that it did not have to comply with state licensing requirements. FAC ¶ 200.

## **ARGUMENT**

**I.      THIS COURT MAY EXERCISE SPECIFIC PERSONAL JURSIDCTION OVER ALL DEFENDANTS AND RELIEF DEFENDANTS UNDER NEW YORK'S LONG-ARM STATUTE OR UNDER FED. R. CIV. P. 4(K)(2)**

The Ash, NDG and Grehan Defendants are each subject to jurisdiction in New York based on New York Civil Procedure and Laws Rule (CPLR) § 302(a)(1) because each transacted business in New York through agents working under their control and for their benefit. N.Y.C.P.L.R. § 302(a)(1)(McKinney 2004). Moreover, the exercise of personal jurisdiction over each set of defendants comports with due process, and is consistent with the purposes of the minimum contacts analysis. Despite Defendants' lengthy arguments regarding general jurisdiction, the question at issue is not whether the exercise of general jurisdiction over them

would be appropriate. Rather, the salient issue is whether this Court can exercise jurisdiction over these Defendants in this case.

This Court may also exercise personal jurisdiction over the Defendants based on their contacts with the United States as a whole under Fed. R. Civ. P. 4(k)(2), assuming New York's long-arm statute did not apply. Defendants continuously and systematically directed their payday lending business towards the United States, and the Bureau's claims arise from those activities.

To determine personal jurisdiction over a non-domiciliary in a federal question case, courts engage in a two-step inquiry. *Chatwal Hotels & Resorts, L.L.C. v. Dollywood Co.*, 90 F.Supp. 2d 97, 102 (S.D.N.Y. 2015) (citing *Chloe v. Queen Bee of Beverly Hills, L.L.C.,* 616 F.3d 158, 163 (2nd Cir. 2010)). First, the court determines whether the forum state's long-arm statute permits the exercise of jurisdiction. If it does, the court then considers whether personal jurisdiction comports with due process. *Id.* at 106 (citing *Chloe,* 616 F.3d  at 164). Because CPLR §302 does not reach as far as due process permits, if a defendant is amenable to New York long-arm jurisdiction, the constitutional standard is satisfied. *Id.*

At the pretrial stage, where no jurisdictional discovery has been conducted, a plaintiff need only establish a prima facie case of personal jurisdiction. *Centrifugal Force, Inc. v. Softnet Communication, Inc.*, No. 08 Civ. 5463 (CM)(GWG) 2009 WL 1059647, at *2, (S.D.N.Y. Apr. 17, 2009). All pleadings and affidavits are to be construed in the light most favorable to the plaintiff and where doubts exist, they must be resolved in the plaintiff's favor. *Centrifugal Force,* 2009 WL 1059647, at *2.

A.   **New York's long-arm statute authorizes personal jurisdiction over Defendants because they made loans to New York consumers through their agents, Northway, Northway Broker, and E-Care**

New York's long-arm statute authorizes jurisdiction where the defendant, "in person *or through an agent*… transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y.C.P.L.R. § 302(a)(1) (emphasis added). New York courts have regularly found that defendants claiming to have "no office, employee, property, bank account, or operation in New York" have nonetheless engaged in purposeful business transactions in New York sufficient to confer personal jurisdiction. Even where a Defendant never sets foot in New York, jurisdiction may be appropriate because "[it] is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *John Wiley & Sons, Inc. v. Treeakarabenjakul,* No. 09 Civ. 2108 (CM), 2009 WL 1766003, at *6 (S.D.N.Y. June 18, 2009)(internal citations omitted).

The Second Circuit has concluded that, under New York's long-arm statute, "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe*, 616 F.3d at 170; *see also Citigroup Inc. v. City Holding*, 97 F.Supp.2d 549, 564 (S.D.N.Y.2000) ("A single transaction of business is sufficient to give rise to jurisdiction under CPLR § 302(a)(1), even where the defendant never enters the state, if the claim arises out of the transaction."). Thus, for example, "selling merchandise in New York and receiving payment therefrom" is enough to "fall[] within the purview of New York's long arm statute." *Two's Co.*, 2014 WL 903035 at * 4.

There is another basis for jurisdiction:  in the Second Circuit, defendants operating highly interactive websites that offer and sell products or services to New York consumers have "transacted business" pursuant to CLPR 302(a)(1). *See Chloe*, 616 F.3d at 170-71. Where personal jurisdiction is derived from internet contacts, New York courts use a "spectrum of interactivity" analysis to determine whether a website constitutes the transaction of business within the state. *McCrann v. RIU Hotels, S.A.*, No. 09 Civ. 9188 (CM), 2010 WL 5094396, at *5 (S.D.N.Y. Dec. 6, 2010) (internal citations omitted). The more interactive a website is with its users (such as allowing a user to obtain goods or services on-line), the more likely the website's operator will be deemed to have conducted business within the state. *Id*. Courts will generally confer jurisdiction over defendants that operate fully interactive websites where consumers can access the site and purchase products. *See Two's Co*, 2014 WL 903035 at * 4.

In addition, New York cases establish that personal jurisdiction over one entity can be imputed to other entities, including an individual corporate officer, under N.Y.C.L.P.R. §302's "through an agent" language. *Packer v. TDI Systems, Inc.*, 959 F.Supp. 192, 201 (S.D.N.Y.1997). In determining whether agency exists for the purposes of N.Y.C.L.P.R. §302, courts "have focused on the realities of the relationship in question rather than the formalities of agency law." *Maersk, Inc. v. Neewra, Inc.*, 554 F.Supp.2d 424, 446 (S.D.N.Y. 2008) (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)). Specifically, the alleged agent must have acted in the state for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal. *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981); *see also*, *Maersk*, 554 F.Supp. 2d at 446. A sufficient amount of control may involve the ability of the principal to influence the acts or decisions of the agent by virtue of the parties' respective roles. *Maersk*, 554 F.Supp. 2d at 446. Sufficient control also exists "where

there is joint control of a business enterprise similar to that existing in a partnership or joint venture." *CutCo*, 806 F.2d at 366. Under traditional agency law, participation in a partnership makes each partner an agent of the others. *Id.* Accordingly, personal jurisdiction will attach in a situation where the purported agent committed their various acts on behalf of, with instructions from, or for the benefit of the principal, and participated in a jointly controlled common enterprise sufficiently analogous to a partnership or joint venture. *See Maersk*, 554 F.Supp. 2d at 441; *see Cutco*, 806 F.2d at 366.

In this case, there can be no dispute that Northway, Northway Broker, and E-Care transacted business in New York, and are therefore subject to jurisdiction in New York—because they made loans to New York consumers through highly interactive DBA websites, and collected debts from New York consumers. Blizzard also purposefully targeted New York consumers, and operated software that automatically redirected New York consumers to the DBA websites. FAC ¶¶ 128-132. There is also no dispute that each of the Ash Defendants, NDG Defendants and Grehan Defendants knew about, benefitted from, and exercised more than some control over the New York loan transactions executed by Northway, Northway Broker and E-Care, and therefore should have reasonably expected to defend their actions in New York. *See Deutsche Bank Sec., Inc., v. Montana Bd. Of Invs.*, 7 N.Y.3d 65, 71 (2006) (recognizing that commercial actors using electronic means to project themselves into New York to conduct business transactions should reasonably have expected to defend their actions in New York). As joint participants in the Enterprise's payday lending business venture directed at US and New York residents, each of the Ash, NDG, and Grehan Defendants is subject to personal jurisdiction in New York based on the transactions with New York consumers executed by Northway, Northway Broker and E-Care.

Finally, exercising personal jurisdiction comports with Due Process and is reasonable, including because, as discussed, *infra*, the Defendants *expected* to be sued in the United States based on US lending activities. This lawsuit should come as no surprise to any of the Defendants.

**1.    Northway, Northway Broker, and E-Care "transacted business" with New York consumers**

Northway, Northway Broker, and E-Care conducted transactions with consumers residing in New York and throughout the United States. FAC ¶¶ 23, 27, 31-32, 40, 120,123 125-126, 152, 159, 160, 166, 176, 180-185, 191-192, 194, 259, 266. The Enterprise, in its "corporate fact sheet," admitted that its products and services were provided in the United States "*through Northway Financial Corporation Ltd., and Northway Broker, Ltd.*" FAC ¶ 118a (emphasis added). Blizzard software redirected potential applicants to the DBA websites, where they could apply for Northway loans. FAC ¶ 132. The DBA websites were fully interactive, allowing consumers to apply for, accept, and manage the loans originated by Northway. FAC ¶¶ 134-138. Both Northway and Northway Broker were named parties on the loan agreements. FAC ¶¶ 167-168. In August 2013, the New York Department of Financial Services (NYDFS) sent Northway a cease and desist letter instructing Northway to stop offering and collecting void loans in New York. FAC ¶ 202. In response, Northway sent a letter to New York consumers stating that it would no longer offer loans in New York. FAC ¶ 203. The requirements for personal jurisdiction over Northway and Northway Broker are easily satisfied—both on the basis of the "transaction[s]" with consumers and on the basis of the interactive websites.

E-Care also easily meets the requirements for jurisdiction. E-Care collected delinquent Northway loan repayments in New York and throughout the United States. FAC ¶¶ 40, 126, 159, 176-179, 184, 185. By seeking and obtaining payments from New York consumers, E-Care "transact[ed] . . . business in the state within the meaning of the long-arm statute.

> **2.    Each of the Defendants knew about, consented to and benefitted from Northway, Northway Broker and E-Care's business transactions with New York consumers**

The Defendants all profited from the loans collected from consumers residing in New York and throughout the United States, so there can be no question that each Defendant knew about, consented to and benefitted from New York business transactions. FAC ¶¶ 187-188. Profits generated from Northway loans to US consumers were disbursed in the form of dividends to its shareholders, which included both the Original and Current Owners. FAC ¶ 236. Accordingly, the Original and Current Owners benefitted by virtue of their positions as shareholders and high-level executives alone. *See Basquiat v. Kemper Snowboards*, No. 96 CIV. 0185 (LAP), 1997 WL 527891, at *3 (S.D.N.Y. Aug. 25, 1997) (observing that the relatively high-ranking position of an individual defendant within a small company necessarily implies that the defendant will derive financial benefit from the in-state activities of their agent). Furthermore, BMO Harris records show money flowing from Northway loan deposit accounts in the United States to Bank of Montreal accounts belonging to Sagewood, Knightsbridge, 0562752, DeThomas, Sabourin, Wrixon, as well as NDG Financial, E-Care, Blizzard, NWL, NWCL, PLFL, and NWRRSP. FAC ¶¶ 219, 225-228.

The Ash, NDG, and Grehan Defendants knew that Northway's loans were directed towards consumers throughout the United States, including New York. The Enterprise specifically marketed its loans to New York residents through Blizzard, collected money from New York consumers dating back to July 2011, and furnished information on trade lines belonging to New York residents dating back to July 2011. FAC ¶¶ 131,166.

Moreover, based on communications received from external auditors, state regulators, and service providers, the Ash, NDG and Grehan Defendants each knew that the Enterprise's

unlawful practices were causing harm to US consumers, *but ignored those warning signs*. *See supra* at 8; FAC ¶¶ 171-173, 194,196. For example, in 2012, both BMO Harris and HSBC expressed concerns about the Enterprise's failure to comply with licensing laws in the United States. FAC ¶¶ 199, 201. Shortly thereafter, NDG Financial terminated its relationship with its accounting firm and hired a Vancouver-based accountant to conduct its external audits. FAC ¶ 198. This firm, Facet Advisors, currently serves as Sagewood's registered office. *Id.*

> **3.    As joint participants in the payday lending business enterprise, the Ash, NDG and Grehan Defendants exercised sufficient control over New York business transactions executed by their agents, Northway, Northway Broker, and E-Care**

It is well settled in the Second Circuit that joint control of a business enterprise—similar to that in a partnership or joint venture—is sufficient to establish *prima facie* the "some control" element of the agency test for long-arm jurisdiction. *CutCo.* 806 F.2d at 366. *See also Ross v. UKI Ltd.*, No. 02 Civ. 9297(WHP), 2004 WL 384885, at *7 (S.D.N.Y. Mar. 1, 2004); *Nat'l Union Fire Ins. Co. v. BP Amoco*, 319 F.Supp.2d 352, 360-64 (S.D.N.Y. 2004). Formal legal requirements of a partnership or joint-venture relationship need not be established to satisfy the "some control" element of agency. *Nat'l Union*, 319 F.Supp. 2d at 361.

Several decisions in this District illustrate that both formal and informal relationships among defendants and their agents can satisfy the "some control" test for long-arm jurisdiction based on business transactions through an agent. For instance, in *National Union Fire Ins. Co. of Pittsburgh v. BP Amoco*, the court found an agency relationship between out-of-state defendants and a foreign broker (Aon) that the defendants had hired to solicit an insurance company for the defendants' global oil and gas projects. Aon solicited National Union, the New York-based plaintiff, to insure the defendants' gas projects. When National Union sued the defendants, the court found personal jurisdiction based on the Aon-National Union negotiations in New York,

17

even absent New York contacts by defendants themselves. *National Union* illustrates that even where arrangements between business entities are "similar to" or "sufficiently analogous to a joint venture or partnership" sufficient control exists to satisfy the "some control" element of long-arm jurisdiction under Section 302(a)(1). *Nat'l Union,* 319 F.Supp. 2d at 360-368.

Defendants cannot avoid the simple fact that each jointly participated in a payday lending business venture that collected repayments on void loans from consumers residing in New York and throughout the United States. The corporate fact sheet, external audit, and MSFA licensing announcement refer to the entities as a single group. FAC ¶¶ 112, 118a, 216. The audit combines the entities' financial statements and describes the common control of Sagewood, Knightsbridge and 0562752. FAC ¶¶ 112, 115. Group ownership was then transferred to Emerald Willow, Red River and Twillingate. Unlike in *National Union*, all of the Defendants in this case *were* formally affiliated, as Defendants admitted to their investors. FAC ¶ 218e.

Moreover, as joint participants in the payday lending business venture, the Original and Current Owners knew about, consented to, benefitted from and had "some control" over the New York business transactions of Northway, Northway Broker, and E-Care. The Original Owners established each of those entities, so they were familiar with the operations of each. After transitioning into their roles solely as shareholders, they continued to benefit from and consent to receive the profits generated from: (1) the interest on loans originated by Northway, (2) broker fees charged by Northway Broker, and (3) late and NSF fees collected by E-Care. Additionally, from July 21, 2011 until September 1, 2013, the Original Owners exercised enough control over the payday lending enterprise to influence business practices by providing enough "strategic guidance" to the point that Enterprise practices "reflected their beliefs." FAC ¶¶ 239-240.

The same is true for the Current Owners who, through their positions as directors and officers responsible for day-to-day management of Enterprise business activities, jointly participated in the payday lending enterprise and thus knew about and consented to the New York activities of Northway, Northway Broker and E-Care. FAC ¶¶ 118d, 180-184, 231- 235, 237-238. As owners, they benefitted from those activities as well and received money from Northway loan repayments. FAC ¶¶ 227- 236.

In addition, both the Original and Current Owners possessed authority to control decisions to collect loan repayments that consumers did not legally owe. The Original Owners established the corporate structure of the Enterprise as a whole. FAC ¶ 118. They decided to have the loans licensed in Malta rather than the United States. FAC ¶¶ 1181, 118o, 212-217. They *personally* signed investor statements warning that interest and fees on Northway loans, the sources of Enterprise revenue, exceeded limits under US state law and that Northway was not complying with applicable state laws. FAC ¶¶ 188 -190. As stated above, even in their roles as shareholders, the Original Owners provided strategic guidance and the Enterprise's business practices reflected their beliefs. FAC ¶¶ 239-240.

The Current Owners controlled Enterprise marketing efforts and representations regarding Northway loan terms—including statements regarding applicable law. FAC ¶ 190. DeThomas possessed enough control to engage in negotiations to work with a Native American Tribe in an attempt to issue loans that purportedly would not have to comply with US federal or state laws. FAC ¶¶ 204-206, 231. Sabourin led all NDG Group marketing efforts and as Blizzard President, entered marketing agreements with lead generators. FAC ¶ 241. Wrixon represented the company in discussions with banks regarding company operations. FAC ¶ 238-239.

The Original and Current Owners knew that because of their decisions, Northway's loans to New York consumers were void and assertions that federal and state law did not apply to the loans were false. This is not a case where personal jurisdiction is being asserted over random corporate officials who had no role in the offending conduct. Accordingly, this Court should find that the Ash, NDG and Grehan Defendants transacted business in New York through the actions of Northway, Northway Broker, and E-Care.

### B. Exercising personal jurisdiction over Defendants is consistent with Due Process and is reasonable

Exercising personal jurisdiction satisfies the Due Process Clause where "the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction" and where it "comports with traditional notions of fair play and substantial justice" to assert jurisdiction. *Chloe*, 616 F.3d at 164. As explained above, Defendants had sufficient contacts with New York given their lending, collections, and website activity in the state. It is also consistent with "fair play and substantial justice" to subject them to jurisdiction in New York. Since 2005, the NDG Enterprise fully expected to be sued in the United States over its lending practices. FAC ¶ 188. It warned investors that Enterprise practices may violate state law and that potential lawsuits would seek to void Northway loan repayments. FAC ¶¶ 188, 190. It has received cease and desist requests from state regulators since at least 2007. FAC ¶¶ 171-172. It has operated as an international business enterprise spanning two continents for nine years. FAC ¶ 109. It even admitted to transacting business with New York consumers. FAC ¶ 203. For the Defendants now to assert that a New York lawsuit would present unidentified "burdens" is simply beyond belief. Indeed, given the Defendants' contacts with New York, "the exercise of jurisdiction is favored," and Defendants can defeat it only by making "'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Chloe*, 616 F.3d at 165 (quoting *Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). They have not, and cannot come close to making such a showing.

Moreover, because the New York long-arm statute is more restrictive than federal due process requirements, by virtue of satisfying the long-arm statute, the minimum contacts and reasonableness requirements of due process have been met in this case. *Chatwal*, 90 F.Supp. 3d at 108. Therefore, this Court should deny Defendants' motion to dismiss on the basis of personal jurisdiction.

### C. Defendants' nationwide contacts establish personal jurisdiction under Fed. R. Civ. P. 4(k)(2)

Assuming, *arguendo,* the absence of long-arm personal jurisdiction, this Court may exercise personal jurisdiction over the Ash, NDG and Grehan Defendants based on each Defendant's contacts with the United States as a whole. Fed. R. Civ. P. 4(k)(2) confers personal jurisdiction over a defendant if the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment. *Dardana Ltd. v. Yugatskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003). To make this determination, the Second Circuit engages in the same "two-step analysis" as it does under the Fourteenth Amendment: (1) "whether the defendant has sufficient minimum contacts with the United States as a whole to justify the court's exercise of personal jurisdiction," and (2) "whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case." *Porina v. Mayward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008).

The Second Circuit will find that a foreign corporation has minimum contacts with the United States if it: (1) transacts business in the United States, (2) performs an act in the United States, or (3) performs an act elsewhere that has an effect inside the United States. *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F.Supp. 81, 87 (S.D.N.Y. 1995). To evaluate minimum contacts on the basis of conduct outside the United States, the Second Circuit uses an "effects

21

test." *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-2481 (KBF), No. 14-cv-

3116, 2015 WL 6472656, at *7 (S.D.N.Y. Oct. 23, 2015). Such exercise of personal jurisdiction

is constitutionally permissible if the defendant expressly aimed its conduct at the forum. *Licci ex*

*rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)).

Minimum contacts may be satisfied on the basis of  specific jurisdiction. *In re Aluminum*

*Warehousing*, 2015 WL 6472656, at *7. "Specific jurisdiction exists when a defendant

purposefully availed itself of the privilege of doing business in the forum and could foresee

being haled into court there." *Id.* at *7 (quoting *Licci,* 732 F.3d at 170). Purposeful availment

provides the defendant with clear notice that it is subject to suit in the relevant forum. *See World-*

*Wide Volkswagen Corp. v Woodson*, 444 U.S. 286, 297 (1980).

Each of the twenty-one named Defendants, whether acting within the United States or

internationally, plays its part in deliberately targeting of United States consumers for profit—

including New York consumers. Although there is significant overlap between the various

defendants and their roles at various stages (particularly in terms of sharing management,

personnel, and resources), the Enterprise's lending cycle follows a reasonably consistent pattern.

The process begins with (1) NWL (and prior to their dissolution, began with (2) PLFL

and (3) NWRRSP), which raise capital to fund the loans the Enterprise offers to American

consumers. FAC ¶¶ 47-57, 124. These various fundraising companies, in turn, pass the newly-

raised funds to (4) NWCL, which, in turn, funnels the funds to Northway. FAC ¶ 56-57. The

Enterprise relies on (5) Blizzard to identify potential borrowers—for that purpose, Blizzard

collaborates with lead generators to identify customers—specifically including customers within

the United States.  FAC ¶¶ 128-132. Once the borrowers are identified, DBA websites operated

by (6) Northway Broker are used to facilitate applications for the loans, which (7) Northway

originates with the capital provided by NWCL. ¶¶ 48, 58, 123. After the loans are made, (8) E-Care collects delinquent repayments, FAC ¶ 126, and deposits them into US-based bank accounts maintained by (9) NDG Financial or otherwise handles the repayments through US-based payment processors maintained by NDG Financial. FAC ¶¶ 139-144.

Until 2013, (10) Sagewood, (11) Knightsbridge, and (12) 0562752 owned the Enterprise. FAC ¶ 110. These companies were, respectively, wholly-owned alter-egos of (13) Peter Ash, (14) Paul Ash, and (15) Grehan, FAC ¶ 14-16, 59, 93, 98, 235, 242-252, each of whom exercised control over the Enterprise prior to 2009. FAC ¶ 212. In 2009, the Ash brothers and Grehan began to transfer control to DeThomas, Sabourin, and Wrixon, who have managed the Enterprise since that time. FAC ¶ 231. Each has exercised control as an officer of one more members of the Enterprise through deliberate actions targeting the United States. For example: in 2013, (16) Sabourin, as President of Blizzard (as well as numerous other officer positions in the Enterprise, FAC ¶¶ 81-84), signed an agreement with a US lead generator to identify potential American borrowers, FAC ¶ 241; (17) DeThomas, as CEO of NDG Financial (as well as numerous other officer positions in the Enterprise, FAC ¶¶ 72-79), apparently negotiated with at least one Native American tribe to form partnerships to offer loans to American consumers, FAC ¶¶ 204-206; and (18) Wrixon, as the Chief Financial Officer of NDG Financial (as well as numerous other officer positions in the Enterprise, FAC ¶¶ 86-88), controls the United States bank accounts and US-based payment processors used to disperse the Enterprise's profits from American consumers. FAC ¶¶ 139-144, 237-238.  (19) Red River, (20) Emerald Willow, and (21) Twillingate currently own shares in NDG Financial FAC ¶¶ 13, 22, 70, 100, 102, 111. Like Sagewood, Knightsbridge, and 0562752 before them, these three companies, as the Enterprise's only shareholders, receive dividends from the Enterprise's profits. FAC ¶¶ 22, 136.

Specific jurisdiction exists in this case because the Bureau's claims arise from business activities that each Defendant expressly aimed towards the United States as a whole since 2005. From 2005 to 2013, NWL investor statements signed by each of the Original and Current Owners expressly identified the United States as the target market for the Enterprise's loans. FAC ¶¶ 187-190, 205-209. The 2013 NWL offering memo expressed the Enterprise's intent to form partnerships with Native American Tribes formally recognized by the federal government. FAC ¶¶ 205-206. Even the MFSA recognized that the NDG Group was using Northway and Northway Broker to issue loans specifically directed at US consumers. FAC ¶ 216.

The "NDG Group's" external audit stated that each corporate defendant, under the common control of Sagewood, Knightsbridge, and 0562752, *specialized* in providing payday loans over the internet to US consumers. FAC ¶¶ 112 -116. The "NDG Corporate Fact" sheet expressly stated that the "NDG Financial Group" *was focused on* providing loans in the United States, through Northway and Northway Broker. FAC ¶ 118a. Finally, Blizzard expressly targeted United States consumers. FAC ¶¶ 130 – 132. The Funding Entities raised the money to fund the principal for loans originated by Northway. All of these actions had effects in the United States, as demonstrated by the number of cease and desist requests issued by US state regulators, as well as the $500 million or more collected from US consumers since July 2011.

Members of the Enterprise also maintained business relationships throughout the United States. NDG Financial maintained accounts with Illinois-based BMO Harris on behalf of Northway, Northway Broker, New Northway, Cumberland and Blizzard. Peter Ash, Paul Ash and Paul Grehan had signing authority over a Blizzard account at that bank dating back to 2007. FAC ¶¶ 220-221. NDG Financial also told BMO Harris that "US Operations are governed under federal law" and claimed that its US Operations were "federally registered." FAC ¶ 194.

24

NDG Financial established accounts with payment processers and money transmitter servicers located in the United States. FAC ¶ 140. Grehan signed a letter assuring a payment processor that Northway complied with US state and federal laws. FAC ¶¶ 140, 192. E-Care even utilized a false Los Angeles address when setting up its MoneyGram account to collect repayments from US consumers. FAC ¶¶ 176 – 179. Finally, NWL warned investors that it *expected* the Enterprise to be sued in the US based on its lending practices. FAC ¶¶ 188-191.

Furthermore, in light of the foregoing facts, it would certainly be reasonable to subject the Defendants to personal jurisdiction, given the government's interest in obtaining relief on behalf of US citizens, as Defendants themselves seemed to recognize in their investor statements. FAC ¶ 188. Defendants have failed to advance any semblance of a compelling case as to why it would be unreasonable to exercise jurisdiction over an international company with locations in Europe and North America that directed its financial products to US consumers for nine years.

## II.    THE FAC STATES A CLAIM FOR RELIEF UNDER THE CFPA FOR UNFAIR, DECEPTIVE AND ABUSIVE PRACTICES

The FAC exceeds the pleading standards set forth by Fed. R. Civ. P. 8, and by the Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 675-79 (2009). Rule 8 establishes a liberal standard—a complaint need only set forth a "short and plain statement" that gives a defendant fair notice of plaintiff's grounds for entitlement for relief, and nothing about *Twombly* or *Iqbal* changes that standard. *See, e .g., United States v. TEVA Pharmaceuticals USA Inc.*, No. 13 Civ. 3702 (CM), 2016 WL 750720, at *11. Further, the FAC need only plead facts that plausibly give rise to a right to relief, it need not—as Defendants appear to suggest—prove those facts. *See CFPB v. ITT Educ. Servs., Inc.*, No. 14-CV-00292, 2015 WL 1013508 at *32, (S.D. Ind. Mar. 6, 2015).

Defendants' challenges under Fed. R. Civ. P. 12(b)(6) are both substantive and procedural. The substantive challenges assert that the FAC fails to allege facts sufficient to conclude that: (1) Defendants are covered persons and service providers, (2) Defendants engaged in unfair, deceptive or abusive practices, (3) Defendants operated as a Common Enterprise and (4) Relief Defendants received money to which they are not legally entitled. The procedural challenges assert that: (1) this action is time-barred, (2) this action is an impermissible attempt to federalize state usury and consumer protection law, and (3) the structure of the Bureau itself is unconstitutional. Neither the substantive nor procedural objections have merit.

### A.  NDG Financial, the Original Owners and the Current Owners are each "Covered Persons" or "Service Providers" under the CFPA

The CFPA's prohibition on engaging in unfair, deceptive or abusive acts or practices applies to "covered persons" and "service providers." 12 U.S.C. § 5536(a)(1)(B). The statute defines "covered person" to include "any person that engages in offering or providing a consumer financial product or service," such as loans or debt collection. 12 U.S.C. § 5481(6)(A); *see also id.* §§ 5481(5), (15). In addition, the CFPA deems "related persons" to mean "covered persons" for purposes of any provision of Federal consumer financial law. 12 U.S.C. § 5481(25)(B). The term "related person" includes: (1) any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, . . . [a] covered person," and (2) "any shareholder, consultant, joint venture partner, or other person… who materially participates in the conduct of the affairs of [a] covered person." 12 U.S.C. § 5481(25)(C)(i)(ii).

A "service provider" is a person that provides a material service to a covered person in connection with the offering or provision of a consumer financial product or service by such person, including a person that participates in designing, operating or maintaining the product or

service. 12 U.S.C. § 5481(26)(A)(i). A service provider that is an affiliate of the "covered person" to whom it provides services—in that it "controls, is controlled by, or is under common control" with the covered person—is itself a "covered person." 12 U.S.C. §§ 5481(1), (6)(B).

The FAC sufficiently pleads that NDG Financial, the Original Owners and the Current Owners each fall into one or more of the above categories.

### 1.   NDG Financial is a "Covered Person"

NDG Financial is both a "covered person" and a "service provider" based on its relationships with E-Care, Northway, and Northway Broker, each of which is a covered person itself based on its activities. Northway originates payday loans, FAC ¶¶ 27, 29; 12 U.S.C. § 5481(15)(A)(i). Northway Broker acts as a "broker;" FAC ¶¶ 31, 34, 12 U.S.C. § 5481(15)(A)(i); and E-Care collects Northway's payday loan debts. FAC ¶ 40, 12 U.S.C. § 5481(15)(A)(x). NDG Financial is the controlling shareholder of E-Care, and is therefore a "related person" that is deemed to be a "covered person." FAC ¶ 36; 12 U.S.C. §§ 5481(25)(B)-(C)(i).

NDG Financial is also a "service provider" because it participates in operating and maintaining the payday loans services provided by Northway and Northway Broker. FAC ¶ 25; 12 U.S.C. § 5481(26)(A)(i). For example, NDG Financial manages the banking and payment processing relationships required to transfer money to and from US consumers on behalf of Northway and Northway Broker. FAC ¶¶ 25, 112-116, 143-145. In addition, NDG Financial is a "covered person" because it is an "affiliate" of the covered persons—Northway and Northway Broker—for which it acts as a service provider. 12 U.S.C. § 5481(6)(B) ("[T]he term 'covered person' means any affiliate of a person described in subparagraph (A) if such affiliate acts as a

service provider to such person."). Therefore, NDG Financial is both a "service provider" and a "covered person." 12 U.S.C. § 5481(6)(B). FAC ¶¶ 25, 112-116, 143-145.

### 2. Peter Ash and Sagewood are "Covered Persons"

Peter Ash is indistinguishable from his alter-ego holding company, Sagewood, which held a controlling interest in both NDG Financial and New Northway, each of which is a "covered person" itself. FAC ¶¶ 61-66. The so-called "corporate layers" between Mr. Ash and Northway/Northway Broker do not, as the Ash Defendants contend, insulate him from "related person" status. *See* Ash Mem. 17. Each "layer" is a link in a chain of "related persons" deemed to be "covered persons" based on controlling interests in subsidiary companies. The chain ends with Northway and Northway Broker, both covered persons as set forth *supra* in Section II.A.1. Peter Ash holds a controlling interest in Sagewood, which holds a controlling interest in New Northway, which holds a controlling interest in Cumberland, which holds a controlling interest in both Northway and Northway Broker. FAC ¶¶ 9, 12, 14, 61-64. Thus, Cumberland, New Northway, Sagewood and Peter Ash are each "related persons" deemed to be "covered persons." 12 U.S.C. §§ 5481(25)(B)-(C)(i).  Peter Ash is also a covered person because he "materially participated" in NDG Financial affairs by providing "strategic direction" to NDG Financial (also a covered person) through his position as a shareholder. FAC ¶ 239; 12 U.S.C. § 5481(C)(ii).

On the Canadian side, the chain is shorter, as Sagewood owns a controlling interest in NDG Financial, which holds a controlling interest in E-Care, which is itself a covered person, *see supra* Section II.A.1. FAC ¶¶ 9, 12, 14, 36, 40. Accordingly, NDG Financial, Sagewood and Peter Ash are each "related persons" deemed to be "covered persons." 12 U.S.C. §§ 5481(25)(B)- 5481(25)(C)(i).

### 3.      Paul Ash and Knightsbridge are "Covered Persons"

Paul Ash and Knightsbridge are "related persons" deemed to be "covered persons" as
materially participating shareholders of and joint venture partners with NDG Financial and New
Northway, each of which is a "covered person" based on the chain of relationships described
*supra* in Section II.A.2. 12 U.S.C. §§ 5481(25)(B)-(C)(ii). Paul Ash materially participated in
NDG Financial affairs as a shareholder, and influenced the Enterprise's business practices as a
whole by providing "strategic direction at the board level." FAC ¶¶ 239-240. Paul Ash also
controlled an NDG Financial account with the Bank of Montreal. FAC ¶ 219b.

Knightsbridge is Paul Ash's alter-ego, as demonstrated by his 100% ownership of
Knightsbridge shares as well as his use of Knightsbridge bank accounts to conduct personal real
estate transactions unrelated to the payday lending enterprise. FAC ¶ 228. Thus, for the reasons
discussed in section II.C.2, *infra,* Paul Ash's material participation in NDG Financial affairs can
also be attributed to Knightsbridge, and both are "covered persons."

### 4.      The Current Owners are "Covered Persons"

The Current Owners' (DeThomas, Sabourin, and Wrixon) statuses as officers of NDG
Financial, E-Care and NWL (each of which is a "covered person" itself) is alone enough to make
them "related persons" deemed to be "covered persons." FAC ¶¶ 72, 73, 83, 86-87, 118d; 12
U.S.C. § 5481(25)(C)(i). DeThomas is also a director of Northway and Northway Broker. FAC
¶¶ 77-78. Contrary to Defendants' assertion (*see* NDG Mem. 22), the "charged with managerial
responsibility" element of § 5481 applies only to an "employee" alleged to be a related
person/covered person. *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d
329, 335 (2d Cir. 2011) (quoting *Barnhart v. Thomas*, 540 U.S. 20 (2003) ("Under the 'rule of
the last antecedent, ... a limiting clause or phrase ... should ordinarily be read as modifying only

29

the noun or phrase that it immediately follows.'"). But even if that requirement applied to directors and officers, it would be met—because directors and officers by virtue of their position alone possess "managerial responsibility."

The Current Owners are also "covered persons" because they are employees with managerial responsibility for NDG Financial, E-Care, Northway, and NWL, each of which is a "covered person." FAC ¶¶ 22, 25, 47, 57, 86, 209, 231; 12 U.S.C. §§ 5481(1), 5481(6)(A)-(B), 5481(25)(B)-(C)(ii), 5481(26)(A)(i). They are each directors and officers of NDG Financial and E-Care, and DeThomas is also a director of Northway and Northway Broker. DeThomas and Sabourin exercise managerial responsibility for all aspects of the Enterprise, as they admit. FAC ¶ 231. Wrixon represented the Enterprise in meetings with BMO Harris about NDG Financial operations, maintained custody over company records, and exercised signing authority over Blizzard's bank accounts. FAC ¶¶ 237-239. Finally the NDG corporate fact sheet lists all three of the Current Owners as NDG Financial "management." FAC ¶ 118d.

## B. Defendants engaged in Unfair, Deceptive, and Abusive Acts and Practices

Defendants erroneously claim that the FAC fails to plead sufficiently certain elements required to prove unfair, deceptive, or abusive practices: namely, (1) the specific individual loans of which collection was unlawful; (2) the unfair injury to consumers from their practices; (3) the materiality of the deceptive statements; and (4) the lack of consumers' understanding of the terms of the loans. They are wrong for two reasons. First, *Twombly* and *Iqbal* do not require the pleading of specific evidence. *See* discussion *supra* in Section II. Second, the purpose of Fed. R. Civ. P. 8 is to provide Defendants with notice of alleged unlawful conduct and a plausible factual basis for relief. *See id*. The FAC exceeds this standard by describing in great detail the operations of the Enterprise, the role each Defendant played within the Enterprise, how each Defendant is affiliated with each other, and the acts, practices and harms that form the basis of this suit.

Nothing more is required to survive a motion to dismiss. The FAC clearly pleads that Defendants collected repayment for loans that are void or otherwise uncollectible under state law. FAC ¶¶ 152, 253. The Bureau does not have to plead the individual identity of loans for which collection was unlawful to survive a motion to dismiss, and holding the Bureau to such a standard would fly in the face of the purposes of Fed. R. Civ. P. 8. The FAC also clearly pleads that Defendants unfairly collected money that consumers do not legally owe—an obvious injury that has no countervailing benefits.

Defendants' expressly false representations regarding consumer repayment obligations and the applicable law were material. Express representations that are shown to be false are presumed material. *FTC v. Medical Billers Network, Inc.*, 543 F.Supp.2d 283, 304 (S.D.N.Y. 2008). The Defendants knew that consumers did not fully understand the loan terms or the legal status of the loans. FAC ¶ 170. Accordingly, they sent letters to complaining consumers seeking to mislead consumers into thinking their state laws did not apply. *Id.* These letters plausibly dissuaded consumers from exercising their rights under state law and suggest that the Defendants themselves considered their representations to be material. *Id.*

Finally, the FAC sufficiently pleads that Defendants leveraged Northway's Maltese location, the overall complexity of its corporate structure, and blatantly false statements that federal and state law did not apply to their loans to materially interfere with consumers' ability to understand the terms and conditions of their loans. FAC ¶¶ 169-178, 181, 183, 190, 194, 200. The FAC does not have to *prove* that these actions materially interfered with consumers' understanding; it just has to *allege* that they did so, which it has done. Indeed, the Defendants themselves did not believe that consumers fully understood the loan terms or the legal status of

the loans. FAC ¶ 170. Far less is required to survive a motion to dismiss. As such, this Court

should deny the Defendants' motions to dismiss on these grounds.

> **C.  Each member of the NDG Enterprise is liable for the acts of Northway, Northway Broker, and E-Care**

Despite having regularly disregarded their own corporate forms, the Enterprise now

attempts to hide behind corporate formalities in an effort to stave off legal responsibility for its

lending activities. Its efforts are unavailing. Contrary to Defendants' assertions, the FAC alleges

facts that would clearly support a finding that all Defendants can be liable for the acts of

Northway, Northway Broker, and E-Care under three separate theories of liability—common

enterprise, alter-ego, and agency.

> **1.  All Defendants are subject to common enterprise liability for UDAAP violations under the CFPA.**

Faced with the FAC's allegations in support of the claim that the Enterprise operates as a

common enterprise, Defendants contend that, as a legal matter, the Bureau cannot assert a

common enterprise liability theory for unfair, deceptive, or abusive conduct under the CFPA. But

common enterprise liability exists to address precisely this situation: "where the public interest is

involved . . . a strict adherence to common law principles [of corporate separateness] is not

required . . ., where strict adherence would enable the corporate device to be used to circumvent

the policy of the statute." *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 267 (6th Cir. 1970). If

"the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a

'maze' of integrated business entities," a court may disregard "'corporateness'" and impose joint

and several liability on all entities involved in the common enterprise. *FTC v. E.M.A.*

*Nationwide*, 767 F.3d 611, 637 (6th Cir. 2014) (quoting *FTC v. Wash. Data Res.*, 856 F. Supp.

2d 1247 (M.D. Fla. 2012)). Common enterprise liability is essential "in situations where

corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with 'a clear mechanism for avoiding the terms of the order.'" *FTC v. Nat'l Urological Grp., Inc.*, 645 F.Supp.2d 1167, 1182 (N.D. Ga. 2008) (citing *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964)). Courts have found common enterprise liability under the FTC Act for these reasons, which apply with full force to the CFPA as well.

Moreover, Congress drafted the CFPA's prohibition on "any unfair [or] deceptive . . . act or practice" to mirror the FTC Act's prohibition on "unfair or deceptive acts or practices." *Compare* 12 U.S.C. § 5536 with 15 U.S.C. § 45(a).  And it is well established that "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette v. United States*, 342 U.S. 246, 263 (1952); *see also, e.g., Lafferty v. St. Riel*, 495 F.3d 72, 81-81 (3d Cir. 2007) (noting "the common canon of statutory construction that similar statutes are to be construed similarly"). Consistent with this established principle, courts have interpreted the CFPA's prohibition on "unfair, deceptive, and abusive acts and practices" to incorporate concepts that apply to "unfair and deceptive" practices under the FTC Act. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Gordon*, __F.3d.__, 2016 WL 1459205, 9 & n.7, 8 (9th Cir. Apr. 14, 2016) (adopting, for CFPA purposes, "the test for holding an individual liable for a corporation's actions used under the FTC Act" because "Congress used very similar phrasing" in the two statutes); *id.* at *8 & n.7 (adopting "established meaning" of "deceptive act or practice" under the FTC Act for purposes of the CFPA); Order, *Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.*, No. 8:13-1267, at *13 (C.D. Cal. Nov. 25, 2014) (ECF No. 198) (same). Common enterprise liability is no different—and given the similarities in the statutory

33

provisions, courts must presume that Congress, in borrowing the FTC Act's language in the CFPA, intended to adopt the associated common enterprise liability as well.[2]

In determining whether a common enterprise exists among a set of corporate defendants, courts consider a set of non-dispositive factors, including "whether they (1) maintain officers and employees in common, (2), operate under common control, (3) share offices, (4) commingle funds, and (5) shared advertising and marketing"—all factors that reveal that no real distinction exists between the corporate defendants. *See FTC v. Tax Club, Inc.,* 994 F.Supp.2d 461 (2014); *FTC v. Wyndham Worldwide Corp.*, No. 13-1887(ES), 2014 WL 2812049 (June 23, 2014). Contrary to Defendants' suggestions, as no one factor is controlling, courts routinely consider a variety of factors to understand "the pattern and frame-work of the whole enterprise." *FTC v. Consumer Health Benefits* at *5; *Wyndham Worldwide* at *7.

When interacting with consumers, regulators, and this Court, the Enterprise represents itself as a set of distinct and barely-related corporate entities.  In contrast, in its dealings with its service providers, auditors, and investors, the Enterprise held itself out as a set of interrelated bodies, unified by the common goal of lending to residents in the United States. In addition to the extensive overlap described in the Bureau's Factual Background, *supra*, the Enterprise

---

[2] Defendants point to *Commonwealth of Pa. v. Think Fin., Inc.,* No. 14-CV-7139, 2016 WL183289 (E.D. Pa. Jan. 14, 2016) for the proposition that the CFPA does not contemplate a common enterprise theory. The CFPB is not a party in that action, but in its brief discussion of the question, the *Think Finance* court merely observed that "the FTCA limited enforcement to the FTC," and that the CFPA covers "abusive" conduct in addition to the "unfair" and "deceptive" conduct covered by the FTCA. *Id.* at *26. Who may enforce a statute does not change the significant similarities between the statutes or the strong presumption that they should be interpreted in similar manners. Nor does the CFPA's additional prohibition of "abusive" practices undermine the Bureau's ability to plead common enterprise theories. Indeed, the inclusion of an additional category of prohibited conduct only increases the "public interest . . . involved," and thus the need to ensure a defendant does not "circumvent the policy of the statute." *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 267 (6th Cir. 1970).

entities combined their financial statements for external audits. FAC ¶¶ 112-115. The Enterprise

also shared employees and operated under common control. FAC ¶¶ 67, 72-89, 218, 231. From

2005-2009, the Original Owners not only acted as shareholders, but some combination of them

held roles as officers or directors of multiple NDG Enterprise companies. FAC ¶¶ 189, 212-218.

The same is true from 2009 to the present with respect to the Current Owners. FAC ¶¶ 209, 230-

234. The Enterprise even warned investors of the conflicts of interest that existed because the

"principals" were officers and directors of the affiliated companies. FAC ¶ 218e. Further, NDG

employees were interchangeable with Northway and E-Care employees, communicating with

service providers using a combination of e-mail accounts from each company. FAC ¶¶ 143-145.

The entities shared office space and commingled money. FAC ¶¶ 147-148, 229. As there was no

distinction between the companies, they operated as a common enterprise, and therefore, each

Defendant is jointly and severally liable with the others.

> **2.      All Defendants are subject to alter-ego liability for UDAAP violations
> under the CFPA.**

Where "federal statutory regulation . . . is comprehensive and detailed[,] matters left

unaddressed in such a scheme are presumably left subject to the disposition provided by state

law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994). Consistent with this principles,

courts have recognized the availability of alter-ego liability under the FTC Act, and have applied

state law in determining the precise legal test to determine whether an individual and a

corporation are each other's alter-egos. *See, e.g.*, *FTC v. Gem Merchandising Corp.*, 87 F.3d

466, 470 (11th Cir. 1996) (assuming availability of alter-ego liability for FTC Act claims if

factual predicates are met); *FTC v. Bronson Partners, LLC*, 674 F.Supp.2d 372, (D.Conn. 2009)

(applying law of defendant's state of incorporation to identify standard for alter-ego liability and

finding alter-ego liability for FTC Act claims).

Where a wrongdoer is an entity's "alter-ego," the entity may be held liable in New York for the wrongdoer's misconduct. Such liability also exists under New York law where a corporation has been so dominated by an individual or another corporation and its separate identity has been disregarded to the degree that it primarily transacted the dominator's business rather than its own—and this domination has been used to commit a fraud or other wrong that causes the plaintiff's loss. *See, e.g., In re Parmalat Securities Litigation*, 375 F.Supp.2d 278, 291-92 (S.D.N.Y. June 28, 2005).

Whether an entity is the alter-ego of another entity is a fact specific question that turns on factors similar to the common enterprise analysis, including (1) failure to adhere to corporate formalities, (2) undercapitalization, (3) intermingling of funds, (4) overlap in ownership, staff and directorship, (5) common use of office space, (6) the degree of discretion shown by the wrongdoer, (7) whether the dealings between the entities are at arm's length, and (8) whether the corporations are treated as independent profit centers. *In re Parmalat* at 292.

In this case, each Defendant is an alter-ego of Northway, Northway Broker, and E-Care; each is therefore liable for those entities' acts under the theory of alter-ego liability. As discussed above, each individual defendant owned their own specific alter-ego holding companies, which, in turn, existed solely for the purpose of owning and controlling the enterprise. Additionally, as alleged in the FAC, Peter and Paul Ash used their respective holding companies for personal financial transactions wholly unrelated to the payday lending operations of the enterprise. FAC ¶¶ 228, 242-252. These facts clearly establish alter-ego liability of each individual defendant and their alter-ego holding companies for the misconduct of the companies they held.

### 3.        All Defendants are liable under agency principles

Congress legislates against the backdrop of the common law. *Astoria Fed. Savings &*
*Loan Ass'n v. Solimino*, 504 U.S. 104, 108 (1991). "[W]here a common-law principle is well
established, … the courts may take it as given that Congress has legislated with an expectation
that the principle will apply" absent contrary indications. *Id.*; *cf. also Cameron v. Fogarty*, 806
F.2d 380, 388 (2d Cir. 1986) (holding that § 1983 incorporated common-law defense because
members of the enacting Congress "were familiar with common-law principles, … and … likely
intended these common-law principles to obtain, absent specific provisions to the contrary").
Under common law of agency, a principal is liable for the wrongdoing committed by its agent.
Consistent with this understanding, courts have repeatedly held federal consumer-protection
statutes to incorporate common-law principles of agency liability. *See, e.g.*, *Gomez v. Resurgent*
*Capital Servs.*, LP, 129 F. Supp. 3d 147, 157 (S.D.N.Y. 2015) ("[H]olding debt collectors
vicariously liable [under the FDCPA] for their agents' actions is consistent with traditional
common law principles."); *Clark v. Capital Credit & Coll. Servs., Inc.*, 460 F.3d 1162, 1173 (9th
Cir. 2006) (holding that "general principles of agency . . . form the basis of vicarious liability
under the FDCPA"). The CFPA is no different—Congress passed that law against the backdrop
of common-law agency principles, and those principles therefore apply to the CFPA.

The law is clear that under the FTCA, a principal is liable for misrepresentations made by
her agents. *FTC v. Five-Star Auto Club, Inc.*, 97 F.Supp.2d 502, (S.D.N.Y May 17, 2000); *see*
*also FTC v. Medical Billers Network, Inc.*, 543 F.Supp.2d 283, 319 (S.D.N.Y. Mar. 31, 2008).
Further, under New York law, a principal is liable for the acts of an agent when there is
agreement between the principal and agent that the agent will act for the principal and the
principal retains a degree of control over the agent. *Parmalat,* 375 F.Supp.2d at 290. In the

discussion in section I.A.3., *supra,* addressing specific personal jurisdiction through an agent under New York's long-arm statute, the Bureau has described the FAC's extensive factual allegations that establish each Defendant's role as a joint participant in the payday lending business venture. Although the standards for principal-agent liability are concededly higher than those required for jurisdiction, the facts alleged in that discussion are more than adequate to satisfy the higher standard for agency liability. Each Defendant was a joint participant in the payday lending business venture. Therefore, the Ash, NDG, and Grehan Defendants are each liable for the acts of the other members of the Enterprise.

### 4.    The Original and Current Owners are liable as individuals

Peter Ash, Paul Ash, Grehan, DeThomas, Sabourin, and Wrixon are each individually liable for their actions in creating and maintaining the Enterprise's business practice of collecting loans amounts from US consumers that they were not legally obligated to repay and to which the Enterprise was not legally entitled.

An individual is liable for the unfair, deceptive or abusive acts of a corporation if the individual: (1) had authority to control the corporate defendants or participated directly in the wrongful acts or practices and (2) had some knowledge of the acts or practices. *See FTC* v. *Tax Club Inc.*, 994 F.Supp.2d 461, 471 (quoting *FTC v. Five-Star Auto Club*, 97 F.Supp. 2d 502, 535 (S.D.N.Y. 2000)). Authority to control the company can be inferred from active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer. *Id.* at 471 (quoting *FTC v. Med. Billers Network Inc.,* 542 F.Supp.2d 283, 320 (S.D.N.Y. 2008)). An individual's assumption of the role of president and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation to be held liable under the FTC Act. *Id.* at 471 (quoting *Five-Star Auto Club*, 97 F.Supp.2d at 538).

Both the Original and Current Owners signed investor statements admitting that (1) US federal and state laws applied to the demand and collection of Northway loans, (2) Northway loans were void under state laws, and (3) the Enterprise's lending practices may not comply with US federal and state laws. The Original Owners signed these statements between 2005 and 2009, while the Current Owners signed the statements between 2009 and 2013. There can be no question that both sets of individuals knew that the Enterprise was making false statements in order to collect void loans.

In addition, both the Original and Current Owners possessed the authority to control these practices. The Original Owners, even after stepping back from day-to-day management in 2009, retained control over the Enterprise's operations by providing "strategic guidance" at the board level. Grehan himself exercised enough control over the company in 2011 that he represented it in an interview with a bank seeking background about NDG operations. FAC ¶ 239. The Original Owners also continued to collect dividends from Northway revenue that they knew or should have known included void loan repayment amounts. FAC ¶

The Current Owners too exercised plenary authority over Enterprise practices until it "exited the US market." *See* NDG Mem.1. Some combination of the Current Owners held director or officer roles in each of the named NDG Enterprise entities. FAC ¶ 231. Each Current Owner exercised signing authority over NDG Enterprise entity accounts with BMO Harris and the Bank of Montreal. FAC ¶ 237. DeThomas was authorized to negotiate potential partnerships with Native American Tribes on behalf of the Enterprise. FAC ¶¶ 204-206. Sabourin was authorized to bind the company in agreements lead generation companies. FAC ¶ 241.Wrixon was authorized to represent the company in due diligence discussions with bank service providers. FAC ¶ 239.

**D.      This court should deny any motion to dismiss the Relief Defendants**

The Relief Defendants argue the FAC fails to state a claim because (1) the relief

defendant doctrine is limited to fraud and (2) the FAC does not allege non-conclusory facts that

show the Relief Defendants "have no legitimate interest in the property." Both positions are

without merit.

First, the concept of proceeding against a "relief defendant" as the possessor of ill-gotten

gains is not limited to fraud, but has been applied in SEC, CFTC and FTC cases. *See*, e.g., *SEC*

*v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998), *CFTC v. EJS Capital Management, LLC*, No.

14cv3107 (CM), 2015 WL 5679688,  at *4-5 (S.D.N.Y. Sept. 24, 2015), *FTC v. Think*

*Achievement*, 144 F.Supp.2d 1013 (N.D. Ind. Oct. 18, 2000). Given the similarity of the roles of

the Bureau in the consumer financial protection field and the roles of those regulatory agencies

in their respective spheres, it is appropriate for the Bureau to proceed against relief defendants

under these circumstances. *See CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d. 187, 192 n.4

(4th Cir. 2002).

It is also clear the federal courts have exercised broad equitable powers to recover ill-

gotten gains for victims of wrongdoing, whether from the original wrongdoer or from one who

received the proceeds after the wrong has been done. *Id.* In exercising their equitable powers,

federal courts relying on the doctrine of unjust enrichment have ordered a party unjustly

enriched to disgorge illegally obtained profits, regardless of whether the unjustly enriched party

participated in the illegal activity. *See Think Achievement*, 144 F.Supp. 2d at 1020.

The FAC alleges facts that could plausibly establish that the Enterprise received *at least*

$500 million in loan repayments via ACH and then sent that money, including repayments to

which the Enterprise was not legally entitled, to Canadian accounts belonging to Sagewood,

Knightsbridge, 0562752, DeThomas, Sabourin and Wrixon. FAC ¶¶ 106, 146, 147, 151, 152, 186, 188, 227, 256, 259, 260, 333-335. As Enterprise profits are paid out in dividends to the shareholders, Emerald Willow, Red River, and Twillingate also received Northway loan repayments to which they were not legally entitled. FAC ¶¶ 236, 256, 259, 260, 265-267, 333-335. Peter and Paul Ash were unjustly enriched as the alter-egos of Sagewood and Knightsbridge respectively. *See FTC v. Bronson Partners, LLC*, *supra at* 391 (applying alter ego doctrine where there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice); FAC ¶¶ 224-245; Ash Mem.7.

This Court should also reject the Grehan Defendants' argument that the disgorgement claim is time-barred. The FAC alleges that NDG Enterprise profits were primarily paid out in dividends to the shareholders, including Grehan/0562752. FAC ¶ 236. Grehan presumably continued to receive those dividends until transferring his ownership interests in 2013. Further, the FAC asserts facts indicating that the dividends included amounts collected on void or otherwise uncollectible loans—amounts to which Grehan and 0562752 were not legally entitled. FAC ¶¶ 333-335. The Grehan Defendants' objection therefore relies on a factual determination inappropriate for resolution at this stage.

Finally, any challenge to the "legitimacy" of the funds inherently requires a factual analysis, and as such is inappropriate at this stage. *See Kimberlynn Creek*, 276 F.3d at 192 ("[A] claimed ownership interest must not only be recognized in law; it must also be valid in fact.").

### E.  The Bureau's claims are not an effort to enforce state usury laws

Defendants argue that the FAC fails to state a claim because the Bureau's claims are an impermissible effort either to enforce state usury laws or to establish a usury limit. Neither is

true. Each state's laws determine whether or not Defendants' loans to consumers in that state are collectible. However, Defendants violate federal law, as the FAC pleads, when they take or demand payment for debts that are not collectible. In other words, given that the applicable state law has rendered a loan uncollectible, the FAC alleges that it is an unfair, deceptive, and abusive act or practice to demand or take payments from consumers for amounts that the consumers are not obligated to pay.

The only court to address this issue recently rejected a payday lender's motion for judgment on the pleadings in a factually similar case. Order Denying Defendants' Motion for Judgment on the Pleadings, *CFPB v. CashCall, Inc., et.al.*, (C.D.Cal. Dec. 30, 2015, No. CV 15-7522-JFW, Doc. 110) at *2. In that case, the Bureau alleged that the payday lender committed various unfair, deceptive, and abusive acts or practices by collecting amounts that were not legally owed under applicable state law. *Id.* at *1. The court recognized that "the proper question in the context of a CFPA claim is whether the plaintiff has alleged an action that falls within the broad range of conduct prohibited by the CFPA." *Id.* at *2. Although in that case, as here, "Defendants' alleged violations of state law are necessary to the Bureau's claims," the alleged conduct is still "within the broad range of conduct prohibited by the CFPA." *Id.* The court also determined that the Bureau was "not seeking to establish a usury limit. Instead, the Bureau [was] seeking to enforce a prohibition on collecting amounts that consumers do not owe." *Id.*

Indeed, state laws concerning the collectability of debt provide analogous examples of how violations of state law may undergird violations of federal laws. Several circuits have held that debt collectors violate the FDCPA's prohibition on collecting amounts not permitted by law when they attempt to collect debts that are void under state law. *See, e.g. Madden v. Midland Funding, LLC,* 786 F.3d 246, 254 (2d Cir. 2015), *petition for cert. filed on other grounds,* 2015

42

WL 7008804 (U.S. Nov. 10, 2015) (No. 15-610) (attempt to collect interest higher than permitted by New York law would violate FDCPA if the law of New York governed the contract). Just as it violates the FDCPA to collect debts that consumers, by virtue of state law, do not actually owe, it also violates the CFPA.

Presumably in an effort to distinguish this Circuit's FDCPA jurisprudence, Defendants argue that the CFPA would need to incorporate state law to permit the Bureau to advance these claims. But they offer no reason why incorporation should be necessary for the Bureau's theory. In *Madden*, *supra*, this Circuit determined that a provision of the FDCPA prohibiting false representations of "the legal status of any debt" provided the basis for a violation of the statute where debt collectors attempted to collect interest higher than would be permitted by state law. This provision plainly lacks the "clear and definite" statement required by *Bond v. United States*, __ U.S. __, 134 S. Ct. 2077, 2083 (2014) for incorporation of state law. This Circuit has even recognized that the use of collection methods prohibited by state law may violate the FDCPA's prohibition on the "use of any false representation or deceptive means to collect or attempt to collect any debt," *Madden*, *supra* at 254, a provision which lacks even the barest indication of incorporating state law.

## III. THE BUREAU'S CLAIMS SHOULD NOT BE DISMISSED AS UNTIMELY OR RETROACTIVE

### A. The Ash Defendants have failed to establish a statute of limitations defense on the face of the complaint

The Ash Defendants' arguments regarding the date of discovery are utterly without merit. They offer no reasons as to why the Bureau knew, or even should have known, that the Enterprise had engaged in the unlawful conduct at issue here as of July 21, 2011 (the date on which authority to enforce Federal consumer financial law transferred to the Bureau). Indeed, the

Ash Defendants' argument requires the Bureau to have known about their unlawful conduct before it even happened and to know about all of the unlawful conduct in the nation as of that date. Their argument also requires the Bureau to know that the Enterprise was violating the law before the Bureau even issued a CID, or, in other words, to know about the unlawful conduct before having done *any* investigation of that conduct. This argument leads to patently absurd results and should be rejected.

Even if the Court disagrees with the Bureau's view that Defendants have espoused an absurd date of discovery in this case, a ruling on statute of limitations grounds would be premature. A "statute of limitations is ordinarily an affirmative defense" and may be decided on a motion to dismiss only "if the defense appears on the face of the complaint." *Ellul v. Cong. Of Christian Bros.*, 774 F.3d 791, 798, n.12 (2d Cir. 2014). Dismissal on timeliness grounds is therefore inappropriate at this stage.

## B.    The Bureau's CFPA claims are not retroactive

The Sagewood Defendants baldly assert that the Bureau seeks to apply the CFPA retroactively to conduct occurring before that statute's effective date. To the contrary, the Bureau has brought no claims under the CFPA for conduct prior to July 21, 2011—the counts in question are limited to conduct after that date, and the Bureau has not suggested that its CFPA claims are intended to extend to earlier conduct.[3] Peter Ash specifically contends that because he "ceded operational control and resigned his directorships in 2009," Ash Mem.19, n.14, any CFPA claims against him are retroactive. Ash's liability for CFPA violations arises entirely from

---

[3] The Bureau's recitation of events prior to July 21, 2011 is relevant to questions of jurisdiction and, in many cases, Defendants' awareness that their practices were subject to and non-compliant with state and federal laws. The Bureau has also raised two claims under the Credit Practices Rule, which went into effect on March 1, 1985, and therefore encompasses all of the conduct described in the Amended Complaint.

44

his actions after July 21, 2011, including, *inter alia*, his service as a director, officer, and 100%
owner of Sagewood and ultimately the Enterprise as a whole.

## IV.        THE BUREAU'S STRUCTURE IS CONSTITUTIONAL

In a last-ditch attempt to escape liability, Defendants contend that this case must be
dismissed because the Bureau is unconstitutionally "insulat[ed] from Congressional and
Presidential oversight." NDG Mem. at 32-35. According to Defendants, the Bureau's structure
violates "the doctrine of separation of powers" because the Bureau Director is removable only
for cause and the agency is funded outside of the annual appropriations process. *See* NDG Mem.
at 33. This contention—which has been rejected by every court thus far to have addressed it[4]—
fails. Well-established precedent makes clear that these features do not impermissibly "insulate"
the Bureau from either the President or Congress, and Defendants cannot show that these
features taken together add up to an unconstitutional sum of their constitutional parts.

*Executive Oversight*. Defendants object that the Bureau Director's for-cause removal
protection prevents the President from exercising his constitutional duty to "take Care that the
Laws be faithfully executed," U.S. Const. Art. II, § 3. NDG Mem. at 34. Longstanding Supreme
Court precedent forecloses this contention. In *Humphrey's Executor v. United States*, the
Supreme Court approved identical for-cause removal protections for Federal Trade Commission
members. 295 U.S. 602, 621-22, 632 (1935) (approving provision authorizing President to
remove commissioners for "inefficiency, neglect of duty, or malfeasance in office"); *see also* 12
U.S.C. § 5491(c)(3) (same removal standard for Bureau Director). As the Court later reaffirmed,
the power to remove such officials for cause gives the President "ample authority to assure that

---

[4]    *CFPB v. ITT Educ. Servs., Inc.*, -- F.3d --, 2015 WL 1013508, at *7-14 (S.D. Ind. 2015);
*CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086-92 (C.D. Cal. 2014).

the [official] is competently performing his or her statutory responsibilities"—and such for-cause

removal limitations thus do not "interfere impermissibly with [the President's] constitutional

obligation to ensure the faithful execution of the laws." *Morrison v. Olson*, 487 U.S. 654, 692-93

(1988); *see also Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138,

3161 (2010) (concluding that "a single level of good-cause tenure" preserved sufficient

presidential oversight). Defendants offer no reason why for-cause removal gives the President

sufficient authority over the FTC commissioners, but not over the Bureau Director. In both cases,

the President maintains his full authority under Article II.

   *Congressional Oversight*. Defendants fare no better in contending that the Bureau's

funding impermissibly insulates it from congressional oversight. Congress established funding

for the Bureau by authorizing it to obtain funds reasonably necessary to carry out its mission

from the combined earnings of the Federal Reserve System, up to specified annual limits. 12

U.S.C. § 5497(a). Congress, moreover, retains full power to change that funding pursuant to the

ordinary legislative process. Contrary to Defendants' suggestion (NDG Mem. at 33), nothing in

the Appropriations Clause (or any other constitutional provision) prevented Congress from

funding the Bureau in this manner. Indeed, it is well established that Congress may fund

agencies as it chooses, either through annual appropriations bills or through some other

mechanism.[5] *See Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*, 388 F.3d

405, 409 (3d Cir. 2004) (explaining that "Congress may . . . decide not to finance a federal entity

---

[5] Consistent with this well-established authority, Congress has likewise provided other financial
regulators with indefinite funding outside the annual appropriations process. *See* 12 U.S.C. § 16
(Office of the Comptroller of the Currency); *id.* § 243 (Federal Reserve Board); *id.* § 1755
(National Credit Union Administration); *id.* § 1817(b) (Federal Deposit Insurance Corporation);
*id.* § 4516 (Federal Housing Finance Agency); 12 U.S.C. § 1462a(i) (2010) (former Office of
Thrift Supervision).

with appropriations," but rather through some other funding mechanism); *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (Fed. Cl. 2003) (holding that Congress may authorize an agency to obtain and use funds from a specified source "without first appropriating the funds as it does in typical appropriation and supplemental appropriation acts"); *see also Morgan Drexen, Inc.*, 60 F. Supp. 3d at 1089 (approving Bureau's funding); *ITT Educ. Servs.*, 2015 WL 1013508, at *12 (same). Furthermore, the CFPB is funded through a mechanism similar to that of the other banking regulatory agencies (*e.g.*, the Federal Reserve and the Office of the Comptroller of the Currency), who are also not appropriated. And the statutory provision that precludes the House and Senate *Appropriations Committees* from reviewing the Bureau's primary funding, 12 U.S.C. § 5497(a)(2)(C), does nothing to change the power that *Congress* has to control the Bureau's funding.

*Combination*. For these reasons, both the President and Congress retain their full constitutional authority to oversee the Bureau, and Defendants cannot show that either for-cause removal or the Bureau's funding violates any constitutional provision. Apparently recognizing that both of these challenged features are "not problematic on their own" (NDG Mem. at 34), Defendants contend that "the combination of these traits" nonetheless violates the separation of powers by insulating the Bureau "from *both* the Executive and Congress." NDG Mem. at 33, 35. But this argument rests on a mistaken premise—as explained above, the Bureau *is not* insulated from those branches. The President retains his full authority under Article II, and Congress retains its full authority under Article I. The Bureau remains fully accountable to those branches—and, through them, to the People—in the way the Constitution demands.

Defendants also miss the mark in suggesting that this combination of features is unconstitutional because it is "novel." NDG Mem. at 32. For starters, Congress's choice to

combine for-cause removal with funding outside the annual appropriations process is hardly

novel. *See, e.g.*, 12 U.S.C. § 242 (Federal Reserve Board members may be "removed for cause");

*id.* § 243 (Federal Reserve Board funding); *id.* § 4512(b)(2) (Federal Housing Finance Agency

Director may be removed "for cause"); *id.* § 4516 (FHFA funding). Besides, the Supreme Court

has made clear that "[o]ur constitutional principles of separated powers are not violated . . . by

mere anomaly or innovation." *Mistretta v. United States*, 488 U.S. 361 (1989). To prevail,

Defendants must show that the Bureau's structure—whether novel or not—actually violates

some separation-of-powers principle. They have not made and cannot make that showing.

## CONCLUSION

Although the Defendants' arguments are unavailing, should this Court disagree and find

the FAC deficient, the Bureau requests that this Court permit the Bureau to conduct jurisdictional

discovery.  "The standard for awarding jurisdictional discovery is low; [the Bureau] need only

plead 'legally sufficient allegations of jurisdiction' and may do so 'through [its] own affidavits

and supporting materials[,] containing … facts that, if credited …, would suffice to establish

jurisdiction over the defendant.'" *Universal Trading & Inv. Co., Inc. v. Credit Suisse (Guernsey)

Ltd.*, 560 Fed. Appx. 52, *55-56 (2d Cir. 2014) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261

F.3d 196, 208 (2d Cir. 2001)). The FAC alleges a wide range of direct contact with the United

States—and with New York—by various members of the Enterprise, and jurisdictional discovery

would be appropriate to confirm the accuracy and extent of those allegations.

Should this Court grant a motion to dismiss, the Bureau also requests leave to file a

Second Amended Complaint. Leave to amend is liberally granted except in cases of "undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies

by amendments previously allowed, undue prejudice to the opposing party by virtue of

allowance of the amendment, futility of amendment, etc." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178 (1962)). There has been no undue delay, bad faith, or other dilatory motive by the Bureau. Nor has the Bureau "repeated[ly]" failed to cure deficiencies. Finally, for the reasons alleged in the FAC, amendment would not be futile, nor would leave unduly prejudice Defendants.  *See, e.g. State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (leave to amend caused no prejudice where no trial date had been set and no summary judgment motion had been filed).

The Defendants have purposefully reached into this jurisdiction to commit illegal acts in violation of the CFPA's prohibition against unfair, abusive and deceptive practices, as well as the Credit Practices Rule. The FAC pleads numerous facts describing the unlawful acts and practices, each Defendant's role in those acts and practices, and why those acts and practices harm consumers and entitle the Bureau to relief. Accordingly, the FAC sets forth plausible facts sufficient to establish personal jurisdiction over all Defendants, as well as facts sufficient for this Court to award relief upon all alleged counts. The FAC need do nothing more to survive a motion to dismiss. For all the foregoing reasons, this Court should deny the Defendants' motions to dismiss. In the alternative, the Bureau respectfully requests that this Court grant leave for the Bureau to conduct jurisdictional discovery and to amend its pleading.

Dated April 26, 2016            Respectfully submitted,


Anthony Alexis
*Enforcement Director*

Deborah Morris
*Deputy Enforcement Director*

Craig Cowie
*Assistant Litigation Deputy*

_ _/s/ Charles R. Gayle_____ _____
Charles R. Gayle
Mark B. Samburg
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Gayle): 202-435-9555
Telephone (Samburg): 202-435-9710
Fax: 202-435-7722
E-mail: charlie.gayle@cfpb.gov
E-mail: mark.samburg@cfpb.gov
*Attorneys for Consumer Financial Protection Bureau*