UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
D··· · · · D·        12/2/16

—————————————————————————x

CONSUMER FINANCIAL PROTECTION BUREAU,

      Plaintiff,

    -against-                  No. 15-cv-5211 (CM)

NDG FINANCIAL CORP., *et al.*,

      Defendants.

—————————————————————————x

## DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

McMahon, C.J.:

      This action was brought by Plaintiff, the Consumer Financial Protection Bureau ("CFPB") against a group of twenty-one interconnected corporations and individuals (collectively, "Defendants")[1] that allegedly operated a cross-border online payday lending scheme. Via three separate motions to dismiss (Dkt. Nos. 64, 67, and 81), Defendants argue that the first amended complaint ("FAC") should be dismissed because: (1) the Court lacks personal jurisdiction, (2) the claims presented are time-barred or retroactive, (3) the FAC fails to state a claim, and (4) the CFPB is unconstitutional.

      For the reasons set forth below, Defendants' motions to dismiss are DENIED.

---

[1] Fourteen individuals or corporations are named defendants in this matter ("Named Defendants"): NDG Financial Corp.; Northway Financial Corp., Ltd.; Northway Broker, Ltd.; E-Care Contact Centers, Ltd.; Blizzard Interactive Corp.; New World Consolidated Lending Corp.; New World Lenders Corp.; Payroll Loans First Lenders Corp.; New World RRSP Lenders Corp.; Peter Ash; Sagewood Holdings, Ltd.; Kimberly DeThomas; Jeremy Sabourin; and William Wrixon. Twelve individuals or corporations are named as relief defendants ("Relief Defendants"), five of which are also Named Defendants: Peter Ash; Sagewood Holdings, Ltd.; Paul Ash; Knightsbridge Holdings, Ltd.; Paul Grehan; 0562752 B.C., Ltd.; Kimberly DeThomas; Emerald Willow Holdings, Ltd.; Jeremy Sabourin; Red River Holdings Company Ltd.; William Wrixon; and Twillingate Holdings Ltd.

## Background Facts

The twenty-one Defendants are interconnected corporate entities or individuals that the CFPB alleges jointly operated an online payday lending scheme that made loans to U.S. customers in violation of state usury laws, and then used unfair, deceptive, and abusive practices ("UDAAP") to collect on the loans and profit from those revenues, thereby violating the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5536(a), enacted as Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 ("Dodd-Frank Act"). The CFPB also alleges that some of Defendants' loan agreements contained irrevocable wage assignment clauses that violated the Credit Practices Rule, 16 C.F.R. § 444.2(a)(3). The CFPB seeks permanent injunctive relief, restitution, refund of monies paid, and disgorgement of ill-gotten gains.

## I.   Defendants' Corporate Structure

Defendants are a collection of individuals and corporations located in Canada and Malta that the CFPB asserts operated as "a seamless unit to offer unlicensed and usurious payday loans over the Internet to US consumers" from 2005 to 2013. (Am. Compl. ¶ 7, Dkt. No. 47.) Defendants can best be organized into four major groups based on their post-2009 corporate structure and the nature of the allegations against them: (1) the European Group; (2) the Canadian Group; (3) the Owners Group; and (4) the Officers/Directors Group.

### A.   European Group

The European Group consists of Defendants (all of which are Named Defendants) Northway Financial Corp. Ltd. ("Northway"), Northway Broker, Ltd. ("Northway Broker"), and related non-defendant entities. Northway and Northway Broker are both registered private limited liability companies ("PLLCs") based out of Sliema, Malta. (*Id.* ¶¶ 26, 30.) Since 2009,

both are indirect subsidiaries of non-defendant New Northway S.A. ("New Northway"), through non-defendant Cumberland Holdings Ltd. (*Id.* ¶¶ 11, 63-64, 109.)

According to the CFPB, Northway "extends credit to US consumers in the form of payday loans" via a series of Internet "doing business as" ("DBA") websites. (*Id.* ¶ 27.) These DBA websites have various names, including "CashTransferCenters.com; PRLDirect.com; 247Greenstreet.com; GreenPicket.com; PaydayAvenue.com; CashTaxi.com; PixyCash.com; SonicPayday.com; and Zip19.com." (*Id.*) The CFPB alleges that Northway originates the loans in all fifty states, including New York. (*Id.* ¶ 152.)

The loans are generally short term, usually fourteen days, "ranging from $100-$1500 with finance charges between $19.26 and $26.98 per $100 borrowed." (*Id.* ¶ 153.) Due to the short-term nature of the loans, this results in an annual percentage rate ("APR") ranging from 599% to 703%. (*Id.* ¶ 158.) In addition, some of the loan agreements include an irrevocable wage assignment clause that provides, in essence, that "if the consumer defaults on the loan for more than seven days from the date that payment is due, the consumer authorizes the NDG Enterprise to instruct the consumer's employer to pay the outstanding loan amount directly to the NDG Enterprise from the consumer's wages." (*Id.* ¶ 155.) According to the FAC, such clauses were invoked on numerous occasions to collect money directly from consumers' payroll accounts. (*Id.* ¶ 156.)

Northway Broker provides "money brokering services to US consumers applying for payday loans from Northway via the DBA websites." (*Id.* ¶ 31.) According to the CFPB, Northway Broker generates revenue through broker fees for Northway's loans as well as non-sufficient funds ("NSF") fees collected when consumers default on loan payments. (*Id.* ¶ 32.) As such, Northway Broker is a party to the loan agreements with consumers. (*Id.* ¶ 31-32.) It also

3

"contract[s] with credit reporting agencies that provide background information on potential Northway loan applicants." (*Id.* ¶ 35.)

## B. Canadian Group

The Canadian Group consists of the following Defendants (all of which are Named Defendants only): NDG Financial Corp. ("NDG"); NDG's direct subsidiaries E-Care Contact Centers Ltd. ("E-Care"), Blizzard Interactive Corp. ("Blizzard"), and New World Consolidated Lenders Corp. ("NWCL"); and NWCL's subsidiaries New World Lenders Corp. ("NWL"), Payroll Loans First Lenders Corp. ("PLFL"), and New World RRSP Lenders ("NWRRSP"). All of the Canadian Group Defendants were or are Canadian corporations. (*Id.* ¶¶ 17, 36, 42, 49, 51-52, 54.) NDG and E-Care share the same principal place of business, an address in Surrey, British Columbia, but have other additional addresses throughout Canada. (*Id.* ¶¶ 17-20, 37-39.) Blizzard has its principal place of business in Winnipeg, Manitoba, although it also allegedly shares some addresses with E-Care and NDG. (*Id.* ¶¶ 42-43.) NWL and NWCL are incorporated in British Columbia, as were PLFL and NWRRSP, which have both been dissolved. (*Id.* ¶¶ 49-55.)

The FAC contains few direct allegations against NDG, other than that unnamed NDG "personnel" allegedly "established and managed banking and payment processing relationships with US-based service providers on behalf of [NDG's] subsidiaries and entities with which it is under common control." (*Id.* ¶ 25.)

E-Care allegedly collects the loans extended by Northway, as well as provides services to Northway such as "managing Northway's relationships with banks, Third Party Processors (TPPP), and credit reporting agencies . . . ." (*Id.* ¶¶ 40-41.)

Blizzard allegedly identifies potential customers for Northway by generating a target demographic profile, which it then sends to third-party lead generator services. (*Id.* ¶¶ 44-45.)

4

Blizzard, working with a lead generator, specifically targeted potential consumers in New York and New Jersey in June 2013. (*Id.* ¶ 131.) It also allegedly "maintains software that redirects its purchased leads to the DBA websites." (*Id.* ¶ 132.)

NWCL, NWL, PLFL, and NWRRSP (collectively, the "Funding Entities") were or are fundraising vehicles for raising capital for Northway to distribute as loans. (*Id.* ¶¶ 47-56.) The FAC does not allege that this fundraising activity took place in the United States, or that the fundraising itself was in any way illegal.

## C.     Owners Group

According to the FAC, New Northway and NDG were each controlled by three separate corporations from 2009 to 2013: (1) Sagewood Holdings Ltd. ("Sagewood"), which owned 50.1% of shares in New Northway and NDG; (2) Knightsbridge Holdings Ltd. ("Knightsbridge"), which owned 39.8% of each; and (3) 0562752 B.C. Ltd. ("0562752"), which owned 10.1% of each. (*Id.* ¶¶ 62, 92, 97.) In turn, each of these three corporations was wholly-owned by one of the three individual Defendants: (1) Peter Ash owned 100% of Sagewood; (2) Paul Ash owned 100% of Knightsbridge; and (3) Paul Grehan owned 100% of 0562752. (*Id.* ¶¶ 14-16.)

The FAC alleges that, around September 1, 2013, control was transferred from Sagewood, Knightsbridge, and 0562752 to three new corporations: (1) Emerald Willow Holdings, Ltd. ("Emerald Willow") assumed Sagewood's shares; (2) Red River Holdings Company, Ltd. ("Red River") assumed Knightsbridge's shares; and (3) Twillingate Holdings, Ltd. ("Twillingate") assumed 0562752's shares. (*Id.* ¶¶ 13, 22, 111.)

All Owners Group Defendants are listed as Relief Defendants only, except for Peter Ash and Sagewood, which are listed as both Named Defendants and Relief Defendants.

5

### D.   Officers/Directors Group

The last group of Defendants are three officers of the various corporate Defendants: Kimberly DeThomas, Jeremy Sabourin, and William Wrixon. The FAC also refers to these individuals as the "Current Owners," but does not provide any details about their ownership interests. (*See id.* ¶ 211.) The CFPB's brief more directly alleges that these individuals are, respectively, 100% owners of Emerald Willow, Red River, and Twillingate. (Pl.'s Mem. of Law in Opp'n to Defs.' Mots. to Dismiss ("Pl's Br.") at 8, Dkt. No. 90.) Each of the three Defendants in the Officers/Directors Group is listed as both a Named Defendant and a Relief Defendant.

DeThomas is allegedly the Chief Executive Officer ("CEO") of NDG and E-Care; the CEO, President, and Director of NWL; CEO and President of NWRRSP; Director of PLFL, NWCL, Northway, Northway Broker, and Blizzard; and charged with "managerial responsibility" over NDG and E-Care. (Am. Compl. ¶¶ 72-79.)

Sabourin is allegedly the Chief Operation Officer ("COO") of NDG; the President of Blizzard; an "officer or director" for E-Care, each of the Funding Entities, and Red River; and charged with "managerial responsibility" over NDG, E-Care, Blizzard, NWL, and NWCL. (*Id.* ¶¶ 81-85.)

Wrixon is allegedly the Chief Financial Officer ("CFO") of NDG, Blizzard, and NWL; an "officer or director" for E-Care, Blizzard, PLFL, NWCL, and Twillingate; and charged with "managerial responsibility" over NDG, E-Care, Blizzard, NWL, and NWCL. (*Id.* ¶¶ 86-88.)

## II.   Defendants' Alleged Actions

The FAC includes nine counts, based on five types of alleged activity: (1) that Defendants' misrepresentations to consumers that they owed money on illegal loans constituted "deceptive" (Count I), "unfair" (Count II), and "abusive" (Count III) practices under the CFPA, 12 U.S.C. § 5536(a)(1)(B); (2) that Defendants' misrepresentations to consumers that U.S. and

6

state laws did not apply to their loans constituted "deceptive" (Count IV) and "abusive" (Count V) practices under the CFPA, *id.*; (3) that Defendants' misrepresentations regarding the repercussions of nonpayment constituted "deceptive" practices under the CFPA, *id.* (Count VI);[2] (4) that Defendants' conditioning of loans on illegal wage assignment clauses violated the Credit Practices Rule, 16 C.F.R. § 444.2(a)(3) (Count VII), and constituted an "unfair" practice under the CFPA, 12 U.S.C. § 5536(a)(1)(B) (Count VIII); and (5) that the Relief Defendants possess funds illegally obtained through this enterprise (Count IX).

## A.   Misrepresentations Regarding Loan Validity

Counts I through III are based on the allegation that Defendants "represented expressly or by implication that consumers . . . were obligated to repay loan amounts, an obligation that in fact did not exist because the loans violated state licensing and/or usury laws that declared such amounts void." (Am. Compl. ¶ 276.) Specifically, E-Care "contact[ed] delinquent consumers by phone, email, and letter, restating the consumer's obligation to repay the principal and interest in full, along with a $39.00 NSF fee, and a $20.00 late payment fee." (*Id.* ¶ 160.)

The loans were void, the CFPB argues, because various state laws prohibit charging APRs at the levels that Defendants charged (from 599% to 703%). For example, New York makes it illegal for an unlicensed person or corporation to, directly or indirectly, charge interest at a rate exceeding 16% annually on covered loans. *See* N.Y. Gen. Oblig. Law § 5-501(1)-(2); N.Y. Banking Law § 14-a(1). Loans exceeding that rate are void *ab initio* as usurious. N.Y. Gen. Oblig. Law § 5-511(1). Additionally, New York prohibits engaging in the business of making personal loans of $25,000 or less without a license. N.Y. Banking Law § 340. Such loans are

---

[2] Count VI is asserted against only the European Group Defendants, the Canadian Group Defendants, and DeThomas.

7

void if their interest rates exceed those permitted to a licensee. *Id.* § 355. In such case, "the lender shall have no right to collect or receive any principal, interest or charge whatsoever." *Id.*

## B.     Misrepresentations Regarding Applicability of U.S. and State Laws

Counts IV and V allege that Defendants falsely represented to consumers that U.S. and state laws did not apply to their loans. These representations were made in the loan agreements themselves, which indicated "that US federal and state laws did not apply to Northway and Northway Broker, the consumer's account, or to the terms of the loan agreement." (Am. Compl. ¶ 168.) Additionally, if consumers contacted Defendants to "report a complaint, dispute a charge, or request reimbursement," Defendants would assert "that the consumers' state laws did not apply." (*Id.* ¶ 169.) The FAC includes a portion of a form letter allegedly sent in response to consumer inquiries, which stated:

> If you take a moment to review the attached loan agreement, you will see that [Northway] is a Financial Institution licensed and regulated in accordance with the European Union (EU) Directives. As such, the laws of the Republic of Malta (member State of the European Union), not the state of [consumer's state of residence] applies to its terms. We provided you with this notice so that you would understand the terms of your loan.

(*Id.* ¶ 170.)

By contrast, the CFPB asserts, Defendants acknowledged to potential investors (in biannual Offering Memoranda issued between 2005 and 2013), to at least one U.S. bank (in an application to process Automated Clearing House ("ACH") transactions), and to its auditors (in a 2010 external audit), that Northway's loans were indeed subject to U.S. and state laws. (*Id.* ¶¶ 186-209.) According to the FAC, Northway's loans were void in the following states based on state licensing law, state usury law, or both: Arizona, Arkansas, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York,

8

North Carolina, Ohio, and Utah. (*Id.* ¶ 268.) Additionally, consumers in Colorado were not obligated to pay the excess fees and finance charges that Northway levied. (*Id.* ¶ 269.)

## C.   Misrepresentations Regarding Consequences of Non-Payment

Count VI alleges that certain Defendants (the European Group, the Canadian Group, and DeThomas) misrepresented to consumers the consequences of non-payment of the loans. E-Care allegedly "falsely represented to consumers that non-payment of debt would result in lawsuit, arrest, imprisonment, or wage garnishment," despite the fact that E-Care lacked "the intention or legal authority to take such actions." (*Id.* ¶ 161.)

## D.   Use of Irrevocable Wage Assignment Clauses

Counts VII and VIII allege that Northway sometimes conditioned its loans on irrevocable wage assignment clauses. According to the FAC, the standard clause provided that, "if the consumer defaults on the loan for more than seven days from the date that payment is due, the consumer authorizes the NDG Enterprise to instruct the consumer's employer to pay the outstanding loan amount directly to the NDG Enterprise from the consumer's wages." (*Id.* ¶ 155.)

Not only were the clauses included in the loan agreements, but the CFPB alleges they were actually enforced using ACH debit entries. (*Id.* ¶¶ 156-57.) The CFPB claims such clauses can result in "serious and detrimental interference with employment relationships," can "negatively affects promotions, pay raises, and job assignments," can "result in job loss," and can "disrupt[] consumers' finances and . . . make it difficult for . . . consumer[s] to purchase necessities or discharge other obligations in a timely fashion." (*Id.* ¶¶ 328-29.)

## E.   Unjust Enrichment

Lastly, the FAC alleges that the Relief Defendants (the Owners Group and the Officers/Directors Group) have been unjustly enriched by their receipt of funds or other assets

9

that are traceable to the funds unlawfully obtained from consumers. (*Id.* ¶¶ 333-35.) The CFPA

empowers this Court to provide various forms of equitable or legal relief in such circumstances.

*See* 12 U.S.C. § 5565(a)(1)-(2).

## Procedural History

The CFPB filed its initial complaint against Defendants in July 2015. Sagewood moved

to dismiss the complaint on November 17, 2015, and then withdrew that motion on December

17, 2015. (Dkt. Nos. 41, 53.) Pursuant to a stipulation among the parties, the CFPB filed an

amended complaint on December 11, 2015. (Dkt. No. 47.) Defendants then filed three separate

motions to dismiss: Paul Ash, Peter Ash, Sagewood, and Knightsbridge moved on March 16,

2016 (the "Ash Motion" and the "Ash Brief") (Dkt. Nos. 64 & 65); the European Group, the

Canadian Group, and the Officers/Directors Group moved on March 16, 2016 (the "NDG

Motion" and the "NDG Brief") (Dkt. Nos. 67 & 68); and Grehan and 0562752 moved on April

11, 2016 (the "Grehan Motion" and the "Grehan Brief") (Dkt. Nos. 81 & 85). Each of the

motions seeks a dismissal of the FAC under Rule 12(b)(2), for lack of personal jurisdiction, and

dismissal under Rule 12(b)(6), for failure to state a claim upon which relief can be granted, on

multiple (and frequently overlapping) grounds.

## Discussion

## I.   Personal Jurisdiction

All Defendants argue that this Court lacks personal jurisdiction over them, and therefore

the FAC must be dismissed under Rule 12(b)(2). Because the CFPB has made a *prima facie*

showing of jurisdiction over all twenty-one Defendants, Defendants' motions to dismiss are

denied.

## A.    Legal Standard

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears

the burden of establishing that the court has jurisdiction over the defendants. *In re Magnetic*

*Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003); *DiStefano v. Carozzi N. Am., Inc.*,

286 F.3d 81, 84 (2d Cir. 2001). The plaintiff's burden of proof "depends upon the procedural

context in which the jurisdictional challenge in raised." *Navaera Scis., LLC v. Acuity Forensic*

*Inc.*, 667 F. Supp. 2d 369, 373 (S.D.N.Y. 2009). Where, as here, no evidentiary hearing has been

held, the plaintiff "need make only a *prima facie* showing by its pleadings and affidavits that

jurisdiction exists." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). A *prima*

*facie* showing requires that the plaintiff "plead facts which, if true, are sufficient in themselves to

establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.*, 975 F. Supp. 562, 564

(S.D.N.Y. 1997). Conclusory allegations that merely restate the legal standard are insufficient to

constitute a *prima facie* showing – plaintiffs must cite specific facts supporting their legal

conclusions. *See Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184-85 (2d Cir. 1998); *Weiss v. Barc,*

*Inc.*, No. 12 Civ. 7571, 2013 WL 2355509, at *1 (S.D.N.Y. May 29, 2013). "Legal conclusions

couched as factual allegations are not factual allegations and cannot substitute for them." *In re*

*Ski Train Fire*, 230 F. Supp. 2d 376, 382 (S.D.N.Y. 2002); *see also Chaplin v. Kido Indus. Co.,*

*Ltd.*, No. 10 Civ. 5711, 2011 WL 2314866, at *2 (S.D.N.Y. June 7, 2011).

A determination regarding personal jurisdiction requires a factual inquiry that goes

beyond the complaint, therefore "all pertinent documentation submitted by the parties may be

considered in deciding the motion." *Pilates, Inc. v. Pilates Inst.*, 891 F. Supp. 175, 178 n.2

(S.D.N.Y. 1995) (internal quotation marks omitted). All pleadings and affidavits are to be

construed in the light most favorable to the plaintiff, and any doubt is to be resolved in the

plaintiff's favor. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985).

11

### B.     Analysis

All parties agree that the Court lacks general jurisdiction over Defendants, none of which is domiciled in the United States. The only question is whether, as the CFPB asserts, this Court has specific jurisdiction over them. The specific jurisdiction analysis in New York is a two-fold inquiry. First, the Court must determine whether New York law permits the exercise of personal jurisdiction over any Defendant. Second, the Court must determine whether exercising jurisdiction comports with due process. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).

The CFPB argues that the Court has jurisdiction over all Defendants via the "transacting business" prong of New York's long-arm statute. The statute provides, in relevant part, that "a court may exercise personal jurisdiction over any non-domiciliary, . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state . . . ." C.P.L.R. § 302(a)(1). The transacting business requirement "requires only a minimal quantity of activity, provided that it is of the right nature and quality." *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782)*, 731 F. Supp. 587, 592 (S.D.N.Y. 1990). A single transaction may be sufficient for personal jurisdiction under § 302(a)(1), and physical presence by the defendant in New York is not required. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999).

Even the CFPB acknowledges (at least implicitly) that not all Defendants had direct contact with the New York forum. Indeed, as discussed below, it appears from the FAC that only Northway, Northway Broker, E-Care, and Blizzard did. The CFPB's theory of jurisdiction therefore hinges on treating all Defendants as a unified entity, such that the contacts made by those Defendants may justifiably be imputed to the others. To do so, the CFPB must establish that Northway, Northway Broker, E-Care, and Blizzard acted as either "agent[s]" or "mere department[s]" of the other Defendants. *Jazini*, 148 F.3d at 184. Because I conclude that the

12

CFPB has plausibly alleged the existence of an agency relationship among all Defendants, there is no need to evaluate whether some or all Defendants would also qualify under the "mere department" test, or whether jurisdiction would lie under Fed. R. Civ. P. 4(k), which the CFPB asserts as an alternative.

### 1. Certain Defendants Had Direct Contacts with the New York Forum

The FAC contains allegations that are more than sufficient to establish that Northway, Northway Broker, E-Care, and Blizzard directly engaged in the transaction of business in New York and other states.

Northway is alleged to be the originator of loans that are made over the Internet to consumers in New York and other states, and the operator of the DBA websites. (Am. Compl. ¶¶ 27, 152.) Northway Broker provides the consumers with brokerage services for which it collects fees and, along with Northway, is a named party to the loan agreements. (*Id.* ¶¶ 31-32.) The operation of the DBA websites and the provision of financial services to New York consumers are two separate potential grounds for satisfying the transacting business test.

Courts in New York use a "spectrum of interactivity" test to determine whether the operation of a website constitutes the transaction of business in New York. *McCrann v. RIU Hotels S.A.*, No. 09 Civ. 9188, 2010 WL 5094396, at *5 (S.D.N.Y. Dec. 6, 2010). This spectrum ranges from essentially passive websites, which are considered analogous to a widely-circulated advertisement and do not establish personal jurisdiction, to highly interactive websites that, for example, allow a defendant to knowingly and repeatedly transmit computer files to customers in other states. *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).

The CFPB alleges that the DBA websites operated by Northway were highly interactive, allowing customers to apply for, accept, and manage their loans online. Consumers would establish accounts on the websites with unique usernames and passwords. (Am. Compl. ¶ 135.)

Users would be required to provide their checking account number, social security number, date of birth, and home address. (*Id.* ¶ 137.) Funds would be distributed directly into consumer's checking accounts via an ACH credit. (*Id.* ¶ 138.) This level of interactivity undoubtedly falls at the high end of the internet commercial activity spectrum. *Citigroup*, 97 F. Supp. 2d at 565 & n.8.

But, beyond the websites themselves, the CFPB alleges that New York consumers actually *received* loans to which Northway and Northway Broker were named parties – loans which form the basis of this lawsuit. Indeed, the FAC includes a portion of a form letter sent to New York consumers by Northway in late 2013 (after it received a cease-and-desist letter from the New York Department of Financial Services) stating that "Northway Financial Corporation Ltd has decided to no longer provide loans to residents of the State of New York. . . . It has always adhered strictly to the terms of its license conditions, followed federal U.S. law and treated all of its customers, *including those in New York*, with the utmost fairness and respect." (Am. Compl. ¶ 203 (emphasis added).) There is no question that the extension of consumer credit and the provision of brokerage services are qualifying business activities for purposes of the New York long-arm statute. The FAC clearly alleges that Northway and Northway Broker transacted business in New York.

E-care's debt-collection efforts also constitute transacting business within New York. According to the FAC, E-Care contacted consumers by phone, e-mail, and letter in order to obtain repayment. (*Id.* ¶¶ 40-41, 160.) While the FAC does not provide details of specific transactions between E-Care and New York consumers, it does plausibly allege the extension of credit to New York consumers by Northway and Northway Broker, followed by debt-collection efforts to those same consumers by E-Care. Even minimal active efforts to collect debts from a

14

single New York consumer – such as mailing a debt collection letter or contacting a debtor by

phone – can be sufficient to establish personal jurisdiction. *See Eades v. Kennedy, PC Law

Offices*, 799 F.3d 161, 168 (2d Cir. 2015); *Sisler v. Wal-Mart Stores, Inc.*, No. 02 Civ. 602A,

2003 WL 23508105, at \*1 (W.D.N.Y. Dec. 24, 2003); *Sluys v. Hand*, 831 F. Supp. 321, 324

(S.D.N.Y. 1993). Furthermore, E-Care used New York correspondent bank accounts to conduct

wire transfers between the enterprise's U.S. customers and its own Canadian accounts. (Am.

Compl. ¶¶ 147-51.) As the New York Court of Appeals recently confirmed, deliberate use of

New York-based correspondent accounts to further an international scheme can be sufficient

standing alone to meet the "transacting business" requirement. *See Al Rushaid v. Pictet & Cie*,

No. 180, 2016 WL 6837930 (N.Y. Nov. 22, 2016). Based on these allegations, this Court has

personal jurisdiction over E-Care under New York's long-arm statute.

Lastly, Blizzard allegedly used a lead generator service to target New York and New

Jersey consumers, and allegedly maintains software to redirect those consumers to the DBA

websites operated by Northway. (Am. Compl. ¶¶ 131-32.) Such activities, which directly and

intentionally target New York residents, meet the transacting business requirement. *See, e.g.*,

*Lawson v. Full Tilt Poker Ltd.*, 930 F. Supp. 2d 476, 484 (S.D.N.Y. 2013).

The FAC thus contains sufficient factual allegations to conclude that the Court has

personal jurisdiction under New York's long-arm statute over Northway, Northway Broker, E-

Care, and Blizzard (the "New York Defendants") through their direct business transactions in

New York. Personal jurisdiction over the remaining entities and individuals (the Owners Group,

the Officers/Directors Group, and the Funding Entities) only exists if it can be imputed from the

New York-based activities of the New York Defendants.

15

## 2. The FAC Plausibly Alleges the Existence of an Agency Relationship Between Defendants

New York's long-arm statute notes that jurisdiction may be established by a defendant's activities conducted either "in person or *through an agent*." CPLR § 302 (emphasis added). Although courts assessing the existence of an agency relationship for purposes of § 302 "have focused on the realities of the relationship in question rather than the formalities of agency law," *CutCo*, 806 F.2d at 366, there are traditionally four elements to consider. The alleged agent must have acted (1) for the benefit of, (2) with the knowledge of, (3) with the consent of, and (4) under the control of, the principal. *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981); *see also CutCo*, 806 F.2d at 366.

The CFPB plausibly alleges that the Owners Group benefitted from, knew about, consented to, and controlled, the activities of the New York Defendants. The FAC alleges that the proceeds of the payday loans extended by Northway and Northway Broker and collected by E-Care were primarily distributed to the Owners Group via shareholder dividends. (Am. Compl. ¶ 236.) These dividends, which may have amounted to millions of dollars annually, continued to be distributed to Peter Ash, Paul Ash, and Grehan through their respective companies after the 2009 handoff of "operational control" to the Officers/Directors Group until the transfer of ownership to Emerald Willow, Red River, and Twillingate in 2013. (*Id.* ¶¶ 236, 239.) As the ultimate shareholders (and, in some cases, founders) of all of the New York Defendants, the Owners Group undoubtedly had knowledge of and consented to those entities' general activities. The FAC includes details about specific actions that Peter Ash, Paul Ash, and Grehan took to establish the payday lending operation and to direct profits to themselves through accounts belonging to Sagewood, Knightsbridge, and 0562752. (*See, e.g.*, *id.* ¶¶ 118(g)-(q), 225-28.) Lastly, the Owners Group, even if they lacked the formal status of a partnership or joint venture,

16

nonetheless indirectly jointly owned the New York Defendants and thus exercised sufficient

control over them to satisfy the agency test. *See Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*,

319 F. Supp. 2d 352, 361 (S.D.N.Y. 2004); *see also CutCo*, 806 F.2d at 366.

      Despite Defendants' arguments, this is not a case like *Gerstle v. National Credit

Adjusters, LLC*, 76 F. Supp. 3d 503, 508-10 (S.D.N.Y. 2015), where the plaintiff merely alleged

that the corporation's employee vaguely "authorized and permitted" the forum-targeting conduct

by the corporation. The Owners Group Defendants indirectly owned all of the New York

Defendants until 2013. The FAC details how each individual in the Owners Group possessed

signing authority over various bank accounts used by the other Defendants to transfer proceeds

from the payday loan scheme to other entities and to themselves for personal use. (Am. Compl.

¶¶ 219-29.) Even after ceding day-to-day control of the companies to the Officers/Directors

Group, Peter Ash, Paul Ash, and Grehan continued to collect dividends and provide strategic

direction to the point that the companies continued to reflect their beliefs. (*Id.* ¶¶ 239-40.) This is

sufficient, certainly at the pleading stage, to establish an agency relationship.

      Similarly, the FAC alleges that the Officers/Directors also benefitted from, had

knowledge of, consented to, and exercised control over, the activities of the New York

Defendants. Although the FAC is vague about what ownership role the Officers/Directors

currently play, it does clearly allege that the Officers/Directors have received profits from the

payday loan scheme. (*Id.* ¶ 227.) The allegations also clearly show that the Officers/Directors

Group had knowledge of, consented to, and exercised control over, the scheme, and details their

personal roles in recruiting employees, training staff, marketing the loans, and managing the

companies. (*Id.* ¶¶ 205-09, 230-41.) DeThomas, for example, allegedly signed letters to a state

financial regulator as President of E-Care regarding their alleged debt collection practices. (*Id.*

¶¶ 181-85.) Sabourin allegedly signed an agreement as President of Blizzard with a lead generator to locate potential customers in the United States. (*Id.* ¶ 241.) Wrixon allegedly signed a certification confirming he was Secretary of Blizzard and the custodian of its corporate records. (*Id.* ¶ 238.) All three individual Owners Group Defendants were signatories to the biannual offering memoranda that described the enterprise's debt-collection practices. (*Id.* ¶¶ 187-91.) The FAC contains more than adequate factual detail to support the allegation that the Officers/Directors acted as principals over the New York Defendants.

Finally, the FAC sufficiently pleads that Funding Entities meet the test for an agency relationship, although this presents a closer question. The FAC alleges that funds were transferred from the accounts used to collect the enterprise's consumer loan repayment deposits to accounts belonging to each of the Funding Entities, among other Defendants. (*Id.* ¶¶ 147, 226.) The FAC alleges that NWL issued biannual offering memoranda (signed by the individual Owners Group Defendants) between 2005 and 2013 that were used to solicit potential investors in the payday lending scheme. (*Id.* ¶¶ 187-91, 218.) These memoranda described how entities like Northway and Northway Broker were the Funding Entities' "affiliates" that made and collected the payday loans to U.S. consumers, which is how the entire enterprise generated revenue. (*Id.* ¶¶ 187-91.) These allegations make clear that the Funding Entities knew about, consented to, and benefited from the payday lending activities of the New York Defendants.

The only close question is whether the Funding Entities exerted any degree of "control" over any of the New York Entities. This requirement, for purposes of § 302, is generally applied flexibly, requiring only "some measure" of control by the "principal" over the "agent." *Mayes v. Leipziger*, 674 F.2d 178, 181 (2d Cir. 1982). This minimal level of required control does not need to be formal or direct. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000).

18

Such control has been readily found among corporations where the "agent" is a wholly-owned

subsidiary of the "principal," but it has also been found in numerous occasions among corporate

affiliates like those at issue here. *See Palmieri v. Estefan*, 793 F. Supp. 1182, 1194 (S.D.N.Y.

1992); *Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 130 (S.D.N.Y.

1991); *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). The FAC alleges, with

significant detail, how the work of the New York Defendants was interrelated to the activities of

the Funding Entities, which could not solicit investors absent the rest of the payday lending

operation. The FAC also alleges that all of the corporate Defendants are or were ultimately

owned (and thus *formally* controlled) by a small group of individuals, who also serve or served

in various overlapping officer and director positions at the different entities. This level of

interconnection, financial reliance, and mutual benefit between the Funding Entities and the New

York Defendants is sufficient, at least at the pleading stage, to establish long-arm jurisdiction

over the Funding Entities.

### 3. The Exercise of Personal Jurisdiction over Defendants Comports with Due Process

Having determined that New York's long-arm statute would extend the state's

jurisdiction over all twenty-one Defendants, I must assess whether the exercise of this

jurisdiction comports with federal due process. This analysis has two related components: the

"minimum contacts" test and the "reasonableness" inquiry. *Metro. Life Ins. Co. v. Robertson-

Ceco Corp.*, 84 F.3d 560, 567-58 (2d Cir. 1996).

The first test asks whether the defendant has sufficient "minimum contacts" with the

forum to justify the court's exercise of personal jurisdiction. Where, as here, the case is

predicated on specific jurisdiction, minimum contacts exist "where the defendant purposefully

availed itself of the privilege of doing business in the forum and could foresee being haled into

19

court there." *Bank Brussels Lambert*, 305 F.3d at 127 (internal quotation marks omitted) (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001)).

Here, according to the FAC, Defendants, through the actions of their agents Northway, Northway Broker, E-Care, and Blizzard, intentionally targeted New York consumers with their payday loans and generated profits from those consumers. Blizzard, for example, allegedly used a lead generator service to locate potential New York customers, and then directed them to the DBA websites where they could apply for loans from Northway and Northway Broker. In 2013, New York's state financial regulator sent Defendants a cease-and-desist letter regarding their New York lending activities. (Am. Compl. ¶¶ 172-73.) In response, Northway sent a letter to its New York consumers saying it was halting its New York lending activity. (*Id.* ¶ 203.) The FAC's allegations suggest that Defendants were fully aware that they were extending credit to consumers in New York, and thus Defendants could foresee being subject to litigation here as a result of their actions.

The second aspect of the due process inquiry asks whether the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice," that is, whether it is reasonable under the circumstances of the particular case. *Metro. Life*, 84 F.3d at 568. Courts are to consider five factors when assessing reasonableness:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id.* While the exercise of jurisdiction is favored where minimum contacts have been found to exist, jurisdiction may be defeated where the defendant presents "a compelling case that the

presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

Defendants present no compelling reason why the exercise of personal jurisdiction would be unreasonable in this case. The NDG Motion asserts that, because Defendants are located in Canada and Malta, litigating in New York imposes a significant burden. This may be true, but all of the other factors weigh in the CFPB's favor. The CFPB seeks to remedy wrongs allegedly committed against New York consumers in violation of federal law, which favors a finding of jurisdiction. Furthermore, evidence of the loans made to consumers may come, at least in part, from consumers themselves, who would be located in this forum. Judicial economy and the interests of the forum thus outweigh any burden imposed on Defendants.

I therefore conclude that the exercise of personal jurisdiction over all Defendants is proper, and Defendants' motions to dismiss under Rule 12(b)(2) are denied.

## II.     Failure to State UDAAP Claims Under the CFPA

Defendants argue for dismissal of the CFPA UDAAP-based claims because: (1) the FAC fails to allege that certain Defendants are covered by the CFPA's provisions, (2) it fails to extend liability to all Defendants under a "common enterprise" theory, (3) it fails to provide details on specific consumer transactions, and (4) it is an improper attempt to enforce state usury law. Each of these arguments fails.

In deciding a motion to dismiss under Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

However, to survive a motion to dismiss, "a complaint must contain sufficient factual

matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.

at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks, citations, and

alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [his] claims

across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.*

at 570; *Iqbal*, 556 U.S. at 680.

## A.    Applicability of the CFPA

Defendants first argue that the FAC's UDAAP claims should be dismissed because Peter

Ash, Sagewood, NDG, and the members of the Officers/Directors Group are neither "covered

persons" nor "service providers" under the CFPA, and thus are not covered by its restrictions. 12

U.S.C. § 5481(6), (26). The Ash Motion also argues that Paul Ash and Knightsbridge are not

covered by the CFPA's definitions, but, as they are named as Relief Defendants only, that is

irrelevant.

The CFPA's UDAAP provision prohibits any "covered person" or "service provider"

from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1). The

law defines "covered person" to mean (1) "any person that engages in offering or providing a

consumer financial product or service" and (2) "any affiliate" of such person if the affiliate "acts

as a service provider" to them. § 5481(6). An "affiliate" of a covered person means "any person

22

that controls, is controlled by, or is under common control with" the covered person. § 5481(1). A "service provider" means (with some exceptions not relevant here) "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service." § 5481(26)(A). Although the term "material service" is not defined in the CFPA, it includes "participat[ing] in designing, operating, or maintaining [a] consumer financial product or service." 12 U.S.C. § 5481(26)(A)(i).

Additionally, the CFPA law treats as a "covered person" any person meeting the definition of a "related person." § 5481(25)(B). The definition of "related person" includes any "director," "officer," "controlling shareholder," or "agent" of a covered person, any "employee charged with managerial responsibility for" a covered person, and "any shareholder, consultant, joint venture partner, or other person" who "materially participates in the conduct of the affairs of [a] covered person." § 5481(25)(C)(i)-(ii).

Starting with where the parties agree, Defendants do not contest that the FAC plausibly alleges that Northway, Northway Broker, and E-Care are all covered persons by either extending loans to U.S. consumers, collecting payments on those loans, or providing brokering services. *See* § 5481(5), (15)(A)(i), (x). The FAC also alleges that Blizzard and the Funding Entities provide material services to covered persons by recruiting investors and identifying potential customers for Northway and the other entities. Blizzard and the Funding Entities are all commonly controlled with Northway, Northway Broker, and E-Care, and thus qualify as covered persons themselves as affiliates and service providers of covered persons.

NDG, in addition to being a "related person" by virtue of its status as controlling shareholder of Blizzard and E-Care, is also a service provider to Northway and Northway Broker because it provided material services to those entities. According to the FAC, NDG personnel

23

"established and managed banking and payment processing relationships with US-based service providers on behalf of its subsidiaries and entities with which it is under common control." (Am. Compl. ¶ 25.) NDG staff communicated with Originating Depository Financial Institution ("ODFI") service providers and TPPPs using Northway, Northway Broker, and E-Care email addresses. (*Id.* ¶¶ 143-44.) As the CFPB notes, relationships with ODFIs and TPPPs are necessary in order to transfer money to and from U.S. consumers, a vital component of the enterprise's payday lending business. (Pl.'s Br. at 27.) NDG's services were thus important for "operating" and "maintaining," § 5481(26)(A)(i), the consumer financial services Northway and Northway Broker were providing, under the ordinary meaning of those terms. *See CFPB v. ITT Educ. Servs., Inc.*, No. 1:14 Civ. 00292, 2015 WL 1013508, at *25 (S.D. Ind. Mar. 6, 2015). NDG thus also falls into the statute's definition of service provider.

Peter Ash and Sagewood, as controlling shareholders of other covered persons (NDG, Northway, Northway Broker, Blizzard, E-Care, and the Funding Entities), also qualify as covered persons through their status as "related persons." § 5481(25)(B), (C)(i). Although the FAC contains allegations that suggest the material participation by the other members of the Owners Group – Paul Ash, Knightsbridge, Grehan, 0562752, Red River, Twillingate, and the current controlling shareholder Emerald Willow – each is only named as a Relief Defendant, meaning their status as a covered person is not at issue.

Lastly, each member of the Officers/Directors Group, as an officer or director of multiple covered persons, (*see* Am. Compl. ¶¶ 72-88), qualifies as a related person under the CFPA.[3]

---

[3] The NDG Motion's argument, (*see* NDG Br. at 21-22), that § 5481(25)(C)(i) requires directors or officers to have "managerial responsibility" over a covered person in order to qualify as related persons is a clear misreading of the statute, which only requires managerial responsibility for *employees*, not officers or directors.

§ 5481(25)(C)(i). Thus, all are treated for purposes of federal consumer financial law as covered persons themselves. § 5481(25)(B).

The CFPB has properly alleged that the CFPA's UDAAP provision covers all of the Named Defendants in this case.

## B. Specificity of CFPA Claims

Next, the Ash and NDG Motions argue that the FAC fails to sufficiently plead the elements necessary to demonstrate that any Defendant engaged in unfair, deceptive, or abusive acts or practices in violation of the CFPA. Specifically, Defendants claim that the FAC fails to identify any particular loans made to consumers, any particular consumers injured by those loans, or any particular material statements that were deceptive. These failures, Defendants argue, make the FAC too conclusory to pass muster under the *Iqbal/Twombly* standard.

### 1. Unfair Acts or Practices

The FAC includes two counts of engaging in "unfair" acts or practices under the CFPA: Count II alleges that misrepresenting to consumers that they owed money on loans that they legally did not owe constitutes an "unfair" act or practice, and Count VIII alleges that conditioning certain loans on illegal wage assignment clauses is an "unfair" act or practice. Defendants argue these allegations are conclusory, and that by failing to identify specific loans or consumers affected, the FAC fails to give fair notice of the conduct alleged.

In order to declare an act or practice is "unfair" under the CFPA's rulemaking authority, the CFPB must have "a reasonable basis" to conclude that "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers," and that "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). This standard for the meaning of unfair acts or practices is borrowed from the Federal Trade Commission Act ("FTCA"). *ITT Educ. Servs.*, 2015 WL

25

1013508, at *25. Under the FTCA, a "substantial injury" is generally a financial one, although other types of injuries are cognizable as well. *Id.*

The CFPB has plausibly pleaded that Northway, Northway Broker, and E-Care violated the CFPA's prohibition on engaging in unfair acts or practices. First, falsely representing to consumers that they owe money that they, in fact, do not owe is likely to cause consumers pecuniary injury in the form of repayments that they otherwise would not make. Although Defendants argue that the loss to consumers may have been outweighed by "countervailing benefits to consumers or competition," that argument is entirely unsupported. Losing money they are otherwise entitled to keep provides consumers no conceivable benefit, and Defendants do not even bother proffering one.

Second, incorporating irrevocable wage assignment clauses into Northway and Northway Broker's loan agreements is also an unfair practice under the CFPA. Again, such assignments, if utilized, would deprive consumers of money they were not legally obligated to repay, a clear financial harm without a possible countervailing benefit. Indeed, the FAC lays out a litany of potential harms that can result from the use of these clauses. (Am. Compl. ¶¶ 328-29.) And the FAC alleges that these clauses were not only incorporated into loan agreements but actually enforced on some occasions. (*Id.* ¶¶ 156-57.) If proved, these allegations would show that consumers were deprived of money via contractual provisions that were automatic (and thus, by definition, could not be avoided) and that have no countervailing benefits.

Third, Defendants are incorrect that *Iqbal* and *Twombly* require the CFPB to identify specific consumers targeted by the payday lending scheme in order to survive a motion to dismiss. The CFPA does not require the CFPB to identify individual consumers in its complaint, and Fed. R. Civ. P. 8 does not require any plaintiff to identify the proof that undergirds a

complaint's allegations. *See, e.g., FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 473 (S.D.N.Y. 2014) (finding, for state-law UDAP claim, agency was "not required to name the consumers affected by the allegedly fraudulent conduct" in complaint).

The FAC thus plausibly alleges that Northway and Northway Broker, as parties to the loan agreements with the wage-assignment clauses, (Am. Compl. ¶¶ 31-32, 155), and E-Care, as the collection agency, (*Id.* ¶ 160), engaged in unfair consumer lending practices.

### 2.  Deceptive Acts or Practices

The FAC includes three counts of engaging in "deceptive" acts or practices under the CFPA: Counts I, IV, and VI. Counts I and IV are asserted against all Named Defendants, Count VI is asserted only against the European Group, the Canadian Group and DeThomas. While the term "deceptive" is not defined in the CFPA, all parties accept for purposes of this case that the term bears the same meaning as under the FTCA. *See* 15 U.S.C. § 45(a)(1).

To prove the existence of a deceptive act or practice under the FTCA, a plaintiff must show three elements: "(1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3), [that] the representation, omission, or practice is material." *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008) (alteration in original) (quoting *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006)).

Count I alleges that Named Defendants deceived consumers regarding Defendants' right to collect on loans that were actually void under state usury law. Count IV alleges that Named Defendants misled consumers regarding the applicability of state and federal law. Count VI accuses the European Group, the Canadian Group and DeThomas of deception regarding the consequences of non-payment. Defendants do not contest that, for each of these counts, the FAC plausibly alleges that certain Defendants made misleading representations to consumers;

27

Defendants only argue that the CFPB has not pleaded that those misrepresentations were *material*. (*See* NDG Br. at 25-26.)

It is well-established that falsely representing to a consumer that he or she owes money constitutes making a "material" misrepresentation. *See Verity Int'l*, 335 F. Supp. 2d at 496-97. Misrepresentations regarding the legal or practical consequences of failing to pay back such a debt – for example, that it would result in "lawsuits, arrest, imprisonment, or wage garnishment" (Am. Compl. ¶ 311) – are also material, as they are likely to affect the consumer's conduct regarding the alleged debt. *See FTC v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001). Similarly, misrepresenting the applicability of state or federal law to the loans – laws that would, if applicable, make the loans void – is just as likely to affect consumer decisionmaking and is therefore a material misrepresentation.

Defendants' argument – that withholding information from (or worse, actually affirmatively lying to) consumers regarding their legal obligations to repay loans are actions that are unlikely to affect consumer decisionmaking – is, frankly, bizarre. It is also completely unsupported by caselaw, and therefore Counts I, IV, and VI will not be dismissed on these grounds.

The FAC plausibly alleges that Northway, Northway Broker, and E-Care, through their various roles in the enterprise, violated the CFPA's prohibition on deceptive practices.

### 3. Abusive Acts or Practices

Counts III and V allege that Named Defendants, by misrepresenting to consumers that they owed money on the void loans and by misrepresenting the applicability of state and federal law to the loans, engaged in "abusive" practices. Defendants argue that, by failing to identify specific loans or consumers affected, the CFPB cannot allege the elements of an abusiveness claim.

28

The CFPA provides that the CFPB cannot declare an act or practice abusive unless the act or practice "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or "takes unreasonable advantage" of "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service," "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service," or "the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d).

Again, the CFPB has pleaded sufficient facts to survive a motion dismiss on these claims. Falsely representing to consumers that the loans they sought (1) are valid and must be repaid and (2) are not covered by state or federal law "materially interferes" with consumers' ability to understand the terms and conditions of their loans. It should be patently obvious to any lender that most consumers will be completely unaware of the details of their state's usury laws, such that misrepresenting the nature of those laws will interfere with the consumer's ability to understand the loan agreement's terms and to make an informed choice about the loan. In the only other case the Court is aware of interpreting the CFPA's prohibition on abusive practices, another court found that allegations of similar misrepresentations by a student loan provider were sufficient to survive a motion to dismiss. *See Illinois v. Alta Colleges, Inc.*, No. 14 Civ. 3786, 2014 WL 4377579, at *2 (N.D. Ill. Sept. 4, 2014).

Again, the misrepresentations at issue were allegedly made by Northway, Northway Broker, and E-Care, and thus the FAC has plausibly alleged violations of the abusive prong of the CFPA's UDAAP provision by these three entities.

## C.    Common Enterprise Liability

The Ash and NDG Motions next argue that, even if the FAC plausibly alleges UDAAP violations by Northway, Northway Broker, and E-Care, that the CFPA claims should be

29

dismissed as to the remaining Named Defendants, because extension of liability to them relies on a "common enterprise" theory. Defendants argue that common enterprise liability does not exist under the CFPA, and that even if it does, it was not properly pleaded here. The CFPB argues that all Named Defendants are liable under common enterprise, alter-ego, and agency theories of liability.

### 1.  Existence of Common Enterprise Liability Under the CFPA

Ordinarily, pleadings against multiple defendants must specify "the claims with which each individual defendant is charged." 5 Fed. Prac. & Proc. Civ. § 1248 (3d ed. 2016). The common enterprise doctrine, in the FTCA context, operates to "prevent individuals and companies from using corporate structures to circumvent the FTCA." *FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 808-09 (D.S.D. 2013). The CFPB argues that the doctrine should also apply to the CFPA because the two statutes serve the same public purpose, and because the statutes use similar language.

The CFPB makes a compelling argument that the language of the CFPA's provisions was designed to parallel those of the FTCA. The FTCA prohibits "unfair or deceptive acts or practices," in or affecting commerce, 15 U.S.C. § 45(a)(1), while the CFPA prohibits "covered person[s] or service provider[s]" from engaging in "any unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a)(1). The FTCA's language has long been interpreted to include common enterprise liability. *See Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964). And the Supreme Court has stated that "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States*, 342 U.S. 246, 263 (1952).

Indeed, as discussed above, courts have adopted the established meaning of other words in § 5536 from the FTCA, in acknowledgment of the two provisions' similarity. *See, e.g.*, *CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016) (adopting definition of "deceptive" from FTCA); *ITT Educ. Servs.*, 2015 WL 1013508, at *25 (adopting definition of "unfair" from FTCA). Defendants provide no rationale why these parallel provisions of law should not be interpreted in the same way, and even advocate in a footnote that the term "deceptive" as used in the CFPA should be interpreted to have the same meaning as under the FTCA. (*See* NDG Br. at 25 n.6).

Defendants highlight two structural differences between the FTCA and CFPA that they argue warrant treating the two statutes differently. (*See* Ash Reply Br. at 16, n.10, Dkt. No. 93.) Defendants point to the CFPA's inclusion of a "related person" definition, 12 U.S.C. § 5481(25), and the statute's prohibition on "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider" in violation of a CFPB-promulgated rule, 12 U.S.C. § 5536(a)(3), to argue that the CFPA provides for specific types of derivative liability to the exclusion of common-law forms of liability like the common enterprise theory. However, neither of these statutory provisions provides for derivative liability for violations of the UDAAP provision. The "related person" definition merely expands the universe of actors who may be responsible for their own violations of the UDAAP provision, and the "substantial assistance" provision only applies to violations of agency-promulgated rules, not the statute's UDAAP provision. These provisions do not alter the conclusion that the similarities in language and structure between the CFPA and FTCA support the extension of the FTCA's long-established theory of common enterprise liability to the CFPA.

The FTCA and CFPA were also enacted for similar purposes. Both statutes are designed to protect the public from practices that unfairly exploit the imbalance of power between the

31

individual consumer and the corporation. They empower watchdog agencies – like the CFPB and

FTC – to enforce their standards through investigation and litigation. And the FTCA's public-

interest purpose is precisely why the common enterprise doctrine was established under the

FTCA in the first place. As the Sixth Circuit stated nearly half a century ago: "[W]here the

public interest is involved, as it is in the enforcement of Section 5 of the Federal Trade

Commission Act, a strict adherence to common law principles is not required in the

determination of whether a parent should be held [liable] for the acts of its subsidiary, where

strict adherence would enable the corporate device to be used to circumvent the policy of the

statute." *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 267 (6th Cir. 1970). The same logic has

led to courts in this Circuit to apply common enterprise liability to other financial protection

statutes, like the Commodity Exchange Act. *See CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F.

Supp. 2d 482, 508 (S.D.N.Y. 2004).

Due to the CFPA's recent vintage, only one other court has considered the question of

whether common enterprise liability should apply under it. *See Pennsylvania v. Think Fin., Inc.*,

No. 14 Civ. 7139, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016). The *Think Finance* court

concluded that the doctrine should not apply under the CFPA, because (1) the CFPA may be

enforced by multiple state and federal government agencies (while the FTCA may only be

enforced by the FTC), and (2) the CFPA allows suit against "abusive" practices, in addition to

"unfair" and "deceptive" ones, unlike the FTCA.

It is unclear why either of those is a relevant consideration when determining whether

common enterprise liability exists under the CFPA, and the *Think Finance* court did not attempt

to explain its reasoning. The doctrine is judicially established, and designed to deal with "a case

in which the same individuals were transacting an integrated business through a maze of

interrelated companies." *Delaware Watch*, 332 F.2d at 746. The fact that multiple government agencies could theoretically enforce the statute, or that the statute covers a wider array of unlawful practices, does not appear pertinent to the calculus. What appears relevant are the two statutes' public-interest purposes and Congress's use of parallel language and structure. I conclude that common enterprise liability does apply under the CFPA and reject the holding of *Think Finance*.

### 2. Application of Common Enterprise Liability

Under a common enterprise theory, "each entity within a set of interrelated companies may be held jointly and severally liable for the actions of other entities that are part of the group." *Tax Club*, 994 F. Supp. 2d at 469. Courts consider five non-dispositive factors in evaluating whether a common enterprise exists between two defendants: "whether they (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Id.* (quoting *FTC v. Consumer Health Benefits Ass'n*, No. 10 Civ. 3551, 2012 WL 1890242, at *5 (E.D.N.Y. May 23, 2012)).

First, the remaining Canadian Group entities (Blizzard, NDG, and the Funding Entities) all share most of these factors with E-Care. They all share officers and employees. (Am. Compl. ¶¶ 72-79, 81-85, 86-88.) They are all operated under common control. (*Id.* ¶ 11.) NDG, Blizzard, and E-Care all share office space. (*Id.* ¶¶ 17-20, 37-39, 42-43.) All are alleged to have comingled funds. (*Id.* ¶¶ 147, 226.)

Second, Sagewood shared some of these factors with Northway, Northway Broker, and E-Care, at least until its controlling stake in these companies was transferred to Emerald Willow in September 2013. (*Id.* ¶ 13.) Sagewood is not alleged to have had any employees, and had no officers other than Peter Ash, who was an officer and director of nearly all the other corporate

Named Defendants until 2009 and continued to exert control over the enterprise until long after that. (*Id.* ¶¶ 67, 233.) Sagewood was the indirect controlling shareholder of all of the Canadian Group and European Group Defendants until 2013, satisfying the common control factor. (*Id.* ¶¶ 61-62.) Although Sagewood's address was not shared with any other entities, Peter Ash did use as his business address the same location that was used by Defendants E-Care, Emerald Willow, NDG, NWL, PLFL, and NWRRSP. (*Id.* ¶¶ 17, 18, 38, 50, 52, 54, 58, 60.) Funds allegedly travelled between accounts controlled by Sagewood and the other Defendants and were allegedly used by Peter Ash for personal purposes unrelated to the enterprise. (*Id.* ¶¶ 225, 228-29, 242-52.)

I am satisfied that, at least at the pleading stage, the CFPB has alleged common enterprise liability for the CFPA counts against Sagewood and all of the European Group and Canadian Group Defendants. However, common enterprise liability only applies to corporations, not to individuals, *see Tax Club*, 994 F. Supp. 2d at 469, so it cannot be used to extend liability to the Officers/Directors Group or to Peter Ash personally.

### D.    Individual Liability

The CFPB argues that the four individual Named Defendants are all liable for the CFPA violations committed by the corporate Named Defendants under the standard for individual liability borrowed from the FTCA. Defendants do not appear to contest that the FTCA's standard applies here.

Under that standard, an individual will be liable for corporate unfair, deceptive, or abusive acts or practices if (1) he or she "participated directly in the wrongful acts or practices" or had the authority to control the corporate defendant who did, and (2) "had some knowledge of the acts or practices." *Tax Club*, 994 F. Supp. 2d at 471 (quoting *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 535 (S.D.N.Y. 2000)); *accord Consumer Health Benefits Ass'n*, 2012 WL

34

1890242, at \*5. Authority to control a company "can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Med. Billers Network*, 543 F. Supp. 2d at 320 (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)). The knowledge requirement "may be fulfilled by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* (quoting *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985)).

The FAC alleges that each of the Officers/Directors Defendants was actively involved in the business affairs of Northway, Northway Broker, and E-Care during the period in question, with the three individuals taking over day-to-day management of the companies beginning in 2009. (Am. Compl. ¶¶ 230-41.) Each served as an officer or director (or both) of either Northway, Northway Broker, or E-Care. (*Id.* ¶¶ 72-88.) And each had (or should have had, based on the allegations) knowledge of the misrepresentations made by the corporations they controlled. The Officers/Directors should have known that state and federal laws applied to the loans their companies issued because they signed an offering memorandum in September 2013 admitting that fact. (*Id.* ¶¶ 205, 209.) They should have known that their loans were void in many states because various state financial regulators (including New York's) sent them cease-and-desist letters between 2011 and 2014, some of which triggered responses signed by the Officers/Directors themselves. (*Id.* ¶¶ 167-76, 201-204.)

Peter Ash also meets the standard for individual liability based on the FAC's allegations. Until 2013, he was the sole controlling shareholder of all of the entities that originated the loans and made the representations at issue. He established the corporations, set up their bank

accounts, and personally hired their first employees, including some of the Officers/Directors. (*Id.* ¶¶ 118, 210, 213-15, 218-23.) He, along with Paul Ash and Paul Grehan, continued to provide strategic direction as owners to the companies after they handed over day-to-day control. (*Id.* ¶ 239.) He was a personal signatory to multiple offering memoranda that described Northway's lending practices, including how the loans were secured by potentially unenforceable wage assignment clauses and were potentially void due to their violation of state usury laws. (*Id.* ¶ 186-89.) The FAC therefore plausibly alleges personal liability of Peter Ash and the Officers/Directors Group.

###### E.     State Usury Law

The Ash and NDG Motions make another argument as to why the CFPA claims should be dismissed for failure to state a claim: that the claims are an improper attempt by the CFPB to enforce state usury laws. Defendants are correct that the CFPB is not empowered by Congress to enforce state law, and is not permitted to establish a federal usury limit by regulation. 12 U.S.C. § 5517(o). However, none of the FAC's claims is seeking relief for a violation of a usury limit. Instead, Counts I, II, and III seek relief for *misrepresentations* to consumers about their legal obligation to repay loans that were, in fact, invalid due to state usury laws. Just as lying about committing a prior crime can constitute a separate offense of perjury, misrepresenting to consumers the legal status of an invalid loan agreement can constitute a separate violation of consumer protection law. Defendants offer no legal support for their theory that the CFPB's claims in this case are an improper "end run" around the prohibition on establishment of a federal usury limit and the Court is not aware of any.

### III.    Failure to State Credit Practices Rule Claim

The Ash Motion argues that Counts VII and VIII should be dismissed because Paul Ash, Peter Ash, Sagewood, and Knightsbridge are not covered by the Credit Practices Rule. The NDG

Motion argues that Count VII should be dismissed as insufficiently specific to properly allege a violation of the Credit Practices Rule.

First, Count VIII is not a Credit Practices Rule claim, but rather a CFPA claim, so it will not be dismissed. Second, Paul Ash and Knightsbridge are not Named Defendants and are therefore not covered by either Count VII or Count VIII. Third, for the same reasons that the CFPA claims will not be dismissed for failure to identify particular consumers and particular loans, Count VII will not be dismissed, as the CFPB is not required to identify its proof at the pleadings stage.

The Credit Practices Rule is a regulation promulgated by the FTC under 15 U.S.C. § 57a, which the CFPA gives the CFPB the authority to enforce "to the extent that such rule applies to a covered person or service provider with respect to the offering or provision of a consumer financial product or service." 12 U.S.C. § 5581(b)(5)(B)(ii). Among other things, the Credit Practices Rule prohibits a "lender" from "tak[ing] or receiv[ing] from a consumer an obligation that . . . contains an assignment of wages or other earnings" unless assignment is "revocable at the will of the debtor," is a qualifying "payroll deduction plan or preauthorized payment plan," or "applies only to wages or other earnings already earned at the time of the assignment." 16 C.F.R. § 444.2(a)(3). A "lender" is elsewhere defined as any person "who engages in the business of lending money to consumers" within the FTC's jurisdiction. § 444.1(a).

As already discussed, all Named Defendants constitute covered persons or are treated as covered persons under federal consumer financial protection law. All corporate Named Defendants are jointly and severally liable for their participation in the "common enterprise" – which all agree certainly applies to rules promulgated under the FTCA – and the individual Named Defendants are liable by virtue of their knowledge and direct participation or control over

37

the corporate entities. Per the FAC's allegations, Northway and Northway Broker constitute lenders because they lent money to consumers. The FAC also alleges that, in their capacity as lenders, Northway and Northway Broker incorporated irrevocable wage assignment clauses into some of their loan agreements, and E-Care received automatic payments from consumers under those clauses. (Am. Compl. ¶¶ 155-57, 324.) Therefore, the CFPB has properly alleged a Credit Practices Rule violation against all Named Defendants.

## IV.    Time Bar / Retroactivity

The Ash and Grehan Motions argue that the FAC should be dismissed as to their Defendants as time-barred or precluded by retroactivity, because the conduct alleged falls outside the relevant statute of limitations period or else occurred prior to the date upon which the CFPA became effective. To clarify, although the Ash and Grehan Motions appear to seek dismissal of the entire FAC, Peter Ash and Sagewood are the only Owners Group Defendants covered by most of the FAC's claims. The other Owners Group Defendants are only Relief Defendants, and are thus implicated only by Count IX, which the Grehan Motion argues is bound by the CFPA's statute of limitations for UDAAP claims since it seeks disgorgement of funds received in violation of the CFPA's UDAAP provision. Furthermore, Count VII is not a CFPA-based claim and is therefore not covered by the law's statute of limitations, and Peter Ash and Sagewood do not specifically argue in the Ash Motion for its dismissal on timeliness grounds.

A statute of limitations defense is ordinarily an affirmative defense that must be raised in an answer; however, it may be decided on a Rule 12(b)(6) motion if the defense "is clear from the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). The CFPA provides that, for UDAAP claims, "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12

38

U.S.C. § 5564(g)(1). The date of discovery is the date when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992).

The CFPB's original complaint was filed under seal on July 6, 2015, and was unsealed on July 31, 2016. (*See* Dkt Nos. 2, 5, 6.) That complaint did not name any individual Defendants nor any Relief Defendants; the only Owners Group Defendant named was Sagewood. (Dkt. No. 6.) The FAC (which added Peter Ash as a Named Defendant and all of the Owners Group as Relief Defendants) was filed on December 11, 2015. (Dkt. No. 47.) The Ash Motion therefore argues that the alleged offending conduct occurred prior to July 2012 and that the CFPB knew of, or should have discovered, the facts underlying the UDAAP claims prior to that date. The Grehan Motion argues that disgorgement of any funds received prior to December 2012 would be improper for the same reason.

While the CFPB does allege that some of Defendants' actions occurred prior to July 2012, it also alleges that the payday lending scheme continued to operate into 2013 and 2014. The FAC includes a table of usurious rates that Northway and Northway Broker allegedly charged U.S. consumers that was taken from one of the DBA websites in May 2013. (Am. Compl. ¶ 158.) Blizzard is accused of working with a lead generator to target New York and New Jersey consumers in 2013 and of directing those leads to the DBA websites operated by Northway. (*Id.* ¶¶ 130-32, 241.) State regulators have allegedly sent multiple cease-and-desist letters to Northway from 2008 through 2014 (including one in August 2013 from the New York Department of Financial Services), suggesting that Northway's lending activities continued throughout this period across the United States. (*Id.* ¶¶ 172-73.) The Funding Entities continued

39

to issue biannual offering memoranda into at least September 2013 in order to raise money for

the enterprise, and NWRRSP and PLFL remained operational until November 2013 and July

2014, respectively. (*Id.* ¶¶ 53, 55, 187, 209.) The enterprise continued to provide information to

credit reporting agencies about its consumers until 2014. (*Id.* ¶ 166.) Profits from the payday

lending scheme appear to have continued to flow between the various Defendants into at least

2013. (*Id.* ¶¶ 184, 242-52.)

      Because the CFPB's UDAAP claims are based on Defendants' alleged

misrepresentations to consumers regarding their loans, each representation would constitute a

new and separate cause of action under the CFPA. The FAC plausibly alleges that the Canadian

Group and European Group Defendants engaged in a continuing course of conduct that extended

well past July 2012. The Owners Group continued to own (and provide some direction to) all of

the other corporate Defendants until at least September 2013, and the Officers/Directors Group

continued to operate the entities until 2014. (*Id.* ¶¶ 110-11, 230-40.) Profits from the enterprise

continued to flow to Relief Defendants at least into 2013. (*Id.* ¶¶ 184, 242-52.) Although

Defendants are correct that the statute of limitations timelines are different depending on whether

the Defendant was named in the original complaint (in which case activity prior to July 2012 is

outside the statute of limitations period) or only in the FAC (in which case activity prior to

December 2012 is outside the limitations period), the FAC's UDAAP counts and the

disgorgement count plausibly allege that all the relevant Defendants acted or received funds

within their respective statute of limitations period, which is enough at this stage to allow

discovery to proceed.

      As for retroactivity, the CFPA provides that its provisions, including the UDAAP

provisions the CFPB asserts were violated here, became effective on the "designated transfer

date," which the Secretary of the Treasury established by regulation as July 21, 2011. *See* 12

U.S.C. §§ 5481(9), 5581, 5582; Designated Transfer Date, 75 Fed. Reg. 57,252, 52,253 (Sept.

20, 2010). While retroactivity of legislation is not per se unlawful, there is a presumption against

retroactivity – the legal effect of conduct is generally governed only by the law that existed when

the conduct took place. *Gordon*, 819 F.3d at 1196-97 (vacating and remanding for further

consideration of whether it is appropriate to calculate monetary judgment based on activity that

pre-dated the CFPA's effectiveness).

Whether the CFPA's UDAAP provisions apply retroactively is a question that the Court

need not answer today, as the CFPB has made clear that it seeks relief in Counts I-VI and VIII

only for activity that occurred after July 2011 – as, indeed, it must, since the statute of limitations

period for all Named Defendants does not extend earlier than 2012. (*See* Pl.'s Br. at 44-45.) The

FAC includes allegations about pre-July 2011 activity, but those allegations are only used

establish the factual background of Defendants' activities, and are not the conduct that forms the

basis of the FAC's UDAAP counts. As just discussed, the FAC includes sufficient allegations of

activity occurring in 2013 and 2014 to maintain this suit at this stage, so there is no concern

about retroactivity. Lastly, Count VII seeks relief for violations of the Credit Practices Rule,

which went into effect in 1985, long before the enterprise was even established, and therefore it

(and any related disgorgement relief sought in Count IX) are not being applied retroactively.

## V.    Unjust Enrichment

The Ash and NDG Motions additionally argue that Count IX, which seeks disgorgement

of funds held be Relief Defendants, should be dismissed because such relief does not exist under

the CFPA and the FAC fails to identify which funds are allegedly improperly held.

41

A relief defendant is a person who "holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010) (quoting *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998)). Courts have the power to order disgorgement from a relief defendant where the relief defendant "(1) is in possession of ill-gotten funds and (2) lacks a legitimate claim to those funds." *Id.* Such disgorgement is proper even where the relief defendant is not accused of any wrongdoing. *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998).

The federal courts have broad equitable powers which can be employed to recover ill-gotten gains for the benefit of victims, which is why courts frequently allowed agencies like the CFTC, FTC, and SEC to seek disgorgement from relief defendants. *See CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 n.4 (4th Cir. 2002). The CFPA specifically provides for remedies including refunding of money, restitution, and disgorgement for unjust enrichment, among others. *See* 12 U.S.C. § 5565(a)(2). Although often asserted in the fraud context, relief defendants are sometimes named in consumer protection cases brought by the FTC. *See, e.g.*, *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 177 (2d Cir. 2016); *FTC v. Johnson*, No. 2:10 Civ. 02203, 2013 WL 2460359, at *7 (D. Nev. June 6, 2013).

The FAC sufficiently alleges that Relief Defendants are in possession of funds which were obtained through unlawful practices and to which they are not legitimately entitled. It alleges that, as a result of the CFPA and Credit Practices Rule violations discussed above, the enterprise generated profits in the tens of millions of dollars annually. (Am. Compl. ¶¶ 118, 151, 184, 236.) These profits were distributed to the Owners Group Defendants in the form of regular dividends. (*Id.* ¶ 236.) And, reading the FAC in the light most favorable to the CFPB, it suggests that the Officers/Directors are now the owners of the enterprise and are the ultimate recipients of

the dividends that have been distributed since 2013. (*Id.* ¶ 211.) The FAC does not, as

Defendants note, identify every specific distribution that the CFPB will presumably seek to

prove at trial. It does, however, describe the type and frequency of the payments at issue, which

is sufficient at the pleadings stage. These funds, if obtained as profits from activity that violated

federal law, are proper subjects of a potential future disgorgement order.

## VI.    Constitutionality

Lastly, Defendants argue the CFPB is unconstitutional in structure, and that therefore the

entire FAC should be dismissed. Their argument, in essence, is that the CFPB's simultaneous

independence from the Legislative Branch (because it may seek funding from outside the

ordinary appropriations process under 12 U.S.C. § 5497(a)) and the Executive Branch (because it

is headed by a Director who may only be removed for cause under 12 U.S.C. § 5491(c)(3)) is a

separation-of-powers violation. As a result, Defendants argue, the CFPB lacks the authority to

bring this suit at all, and therefore the entire FAC must be dismissed.

The D.C. Circuit recently opined at length on the merits of the second half of Defendants'

argument and concluded that the CFPB's structure violated Article II of the Constitution by

insulating the Director from all but for-cause removal by the President. *See PHH Corp. v. CFPB*,

839 F.3d 1, 12 (D.C. Cir. 2016). Whatever the merits of that decision, I need not address its

substance here, because although the D.C. Circuit found that the CFPB's structure was

unconstitutional, it did not declare the agency incapable of enforcing the laws Congress charged

it with executing. Instead, it merely excised the Director's for-cause removal protection from the

statute and permitted the suit before it to continue unaffected. *Id.* at 39. Therefore, even if

Defendants are correct that the CFPB's structure is unconstitutional, the only appropriate remedy

would not prevent or delay this suit; the necessary correction (assuming that correction *was*

43

necessary) has already been implemented by the D.C. Circuit in *PHH*. Defendants' motions to dismiss on constitutional grounds are, therefore, denied.

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss under Rule 12(b)(2) and (6) are DENIED.

The Clerk of the Court is directed to remove Dkt. Nos. 64, 67, and 81 from the Court's list of pending motions.

Dated: December 2, 2016

_____

U.S.D.J.

BY ECF TO ALL COUNSEL

45